**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
----------------------------------------------------------------  x
                                                                  :
In re                                                             :    Chapter 11
                                                                  :
USA SYNTHETIC FUEL CORPORATION, et al.,¹                          :    Case No. 15-_____ (___)
                                                                  :
                              Debtors.                            :    (Joint Administration Pending)
                                                                  :
----------------------------------------------------------------  x
```

## DECLARATION OF DR. STEVEN C. VICK IN SUPPORT OF FIRST DAY RELIEF

1.      I am the chief executive officer and president of USA Synthetic Fuel Corporation ("USASF"), one of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors").  USASF is a corporation organized under the laws of the state of Delaware.  To minimize any disruption to the Debtors' business, preserve their enterprise value, and ensure a smooth transition into chapter 11, the Debtors intend to request various types of relief in "first day" applications and motions (collectively, the "First Day Motions") in connection with the Debtors' chapter 11 cases (the "Chapter 11 Cases").  I submit this declaration in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code") and (b) the First Day Motions.  I am over the age of eighteen, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtors.

2.      I began my employment with USASF in June 2010.  As a result of my time with the Debtors, my review of relevant documents, and my discussions with other

---

¹       The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  USA Synthetic Fuel Corporation (5258); Lima Energy Company (5661); and Cleantech Corporation (6023).  The Debtors' address is 312 Walnut Street, Suite 1600, Cincinnati, Ohio 45202.

members of the Debtors' management team and board of directors, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein and all facts set forth in the Declaration are based on my personal knowledge, my discussions with other members of the Debtors' management and board of directors, my review of relevant documents, or my opinion based on my experience and knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing the Declaration.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

## INTRODUCTION[2]

3.     The Debtors are an environmentally focused, development stage energy company pursuing low-cost, clean energy solutions through the deployment of proven Ultra Clean Btu Converter technology.  Ultra Clean Btu Converter technology is a commercially proven process that cost-effectively converts lower-value solid hydrocarbons, such as coal, into higher-value energy products, such as Ultra Clean Synthetic Crude, which can be refined into a variety of fuels, such as diesel, jet, and gasoline.

4.     The Debtors obtained approximately $36,604,863 in aggregate principal amount of secured debt financing (along with accrued interest, redemption fees, and other similar

---

[2]     Capitalized terms used but not defined in this Introduction shall have the meanings ascribed to them elsewhere in this Declaration.  The summary of any document or agreement in this Declaration is solely for the benefit of the Court and parties-in-interest, and all such summaries are qualified entirely by the terms of the actual documents and agreements.  In the event of a conflict between this Declaration and any document or agreement described herein, the terms of such document or agreement shall control in all respects.

costs associated therewith, the "TEC Prepetition Indebtedness") from Third Eye Capital Corporation ("TEC") and Strative Capital Ltd. ("Strative") in 2012.  The Debtors used the proceeds of this financing to, among other things, purchase a sixty-three acre plot of land in Lima, Ohio, and prepare that site for construction of their Ultra Clean Btu Converter.  The Debtors' plan to build an Ultra Clean Btu Converter on the Lima, Ohio site is known as the Lima Energy Project.

5.     The Debtors have taken numerous steps to turn the Lima Energy Project into a reality.  The Debtors negotiated engineering, procurement, construction, and related contracts to build the Ultra Clean Btu Converter facility and have obtained all the permits necessary to commence construction of the Ultra Clean Btu Converter.  Furthermore, the Debtors negotiated various contracts for their future production of Ultra Clean Synthetic Crude, including a contract with a major energy company for the purchase of 100% of the Debtors' future output of Ultra Clean Synthetic Crude from the first phase of the Lima Energy Project with an option to purchase up to 100% of the second phase.  In addition, the City of Lima obtained approximately $70 million in civic infrastructure investment that benefited the Debtors' Lima site.  With these funds the City of Lima constructed a railroad grade separation to facilitate cross-city traffic during railroad deliveries of the Debtors' feedstock and built a reservoir with sufficient capacity to meet the expected water needs of the Lima Energy Project.

6.     In 2014, the Debtors were preparing to launch a $700+ million bond and equity offering to, among other things, cover the substantial costs of constructing the Debtors' first Ultra Clean Btu Converter on the Lima site and refinance the TEC Prepetition Indebtedness.  However, and as discussed further below, the Debtors suspended the bond and equity offering following (i) the Debtors' failure to make certain payments under the TEC Prepetition

Indebtedness as a result of the Debtors' liquidity issues, (ii) mounting liabilities to employees, tax authorities, professional advisors, and various vendors, (iii) TEC's appraisal of the Debtors' Coal Asset, and (iv) the initiation of an investigation by the U.S. Securities and Exchange Commission into the Debtors' accounting practices and internal controls between 2011 and 2013 (the "SEC Investigation").

7.     The Debtors have at all times been mindful of their commitments to stakeholders and their obligation to preserve and maximize value.  To this end, the Debtors explored numerous avenues to obtain financing to address the defaults under the TEC Prepetition Indebtedness and restart the Lima Energy Project.  Starting in July 2014, the Debtors contacted over fifty well-capitalized project financing sources and coordinated further due diligence with those entities that expressed an interest in providing the Debtors with financing.  Additionally, the Debtors explored the possibility of implementing a sale process for substantially all of their assets in connection with a chapter 11 filing.  Specifically, in August 2014, the Debtors received a term sheet from TEC that proposed a transaction under which TEC would purchase substantially all of the Debtors' assets under section 363 of the Bankruptcy Code.  The term sheet also proposed that TEC would provide the Debtors with a debtor in possession financing facility to fund the chapter 11 cases and the sale process.  In the following months, the Debtors diligently explored TEC's proposal, as well as continued their efforts to obtain alternative financing to address the defaults on the TEC Prepetition Indebtedness and restart the Lima Energy Project.

8.     By March 2015, however, the Debtors were unable to identify viable alternatives to the proposal offered by TEC.  Considering this fact and all the other circumstances facing the Debtors, the Debtors determined that the post-petition financing

proposal made by TEC – including the requirement in TEC's proposal that the Debtors conduct a 363 sale of substantially all their assets – was the best and only viable option available under the circumstances.  Specifically, the Debtors received TEC's agreement both to fund a sale of the Debtors' assets conducted under section 363 of the Bankruptcy Code and serve as the stalking horse bidder in that sale process.  As discussed in greater detail below, TEC and the Debtors entered into a purchase agreement (the "Asset Purchase Agreement") pursuant to which TEC would acquire substantially all of the Debtors' assets.  To ensure that the Asset Purchase Agreement represents the highest and best offer for the Debtors' assets, the Debtors have retained an investment banker, Asgaard Capital LLC, to market the Debtors' assets for sale pursuant to the Debtors' proposed sale process.[3]  The Debtors believe these Chapter 11 Cases will preserve and maximize the value of the Debtors' estates.

9.      To familiarize the Court with the Debtors and the relief sought at the outset of these Chapter 11 Cases, this Declaration is organized in two parts.  Part I provides an overview of the Debtors' history, business plans, capital structure, and the events leading up to the commencement of these Chapter 11 Cases.  Part II sets forth the relevant facts supporting the relief requested by the First Day Motions.

---

[3]      *See Debtors' Motion For An Order (I) Approving Procedures In Connection With The Sale Of Certain Of The Debtors' Assets Free And Clear Of Liens, Claims, Encumbrances, And Interests, (II) Authorizing The Debtors To Enter Into A Stalking Horse Agreement In Connection Therewith, (III) Authorizing The Payment Of Stalking Horse Protections, (IV) Setting Bid Deadline, Auction (If Needed) And Sale Approval Hearing Dates; (V) Establishing Notice Procedures And Approving Forms Of Notice, And (VI) Approving Procedures Related To Assumption And Assignment Of Executory Contracts And Unexpired Leases.*

## PART I
## BACKGROUND

### *The Debtors' Formation and Corporate Structure*

10.     USASF was incorporated in 2009 by Global Energy, Inc. ("GEI"). USASF's stock was publically traded on the OTCQB, and is currently traded on PINX or "Pink Sheets."    Debtors Lima Energy Company ("Lima Energy") and Cleantech Corporation ("Cleantech") are wholly owned subsidiaries of USASF.[4]

11.     Harry H. Graves ("Mr. Graves"), USASF's former chief financial officer and chairman of the board, founded GEI and currently serves as its president and chief executive officer.  Lima Energy was a subsidiary of GEI until it was acquired by USASF from GEI in June 2010.  Lima Energy is the project company for the Lima Energy Project.  Cleantech has no operations and was used as part of the reverse merger that created USASF.

### *Gasification Technology and Its Benefits*

12.     World hydrocarbon energy resources are approximately 70% solid, 15% gaseous, and 15% liquid.  The world's largest national liquid hydrocarbon resource, Saudi Arabian oil, represents approximately 4% of the world's total hydrocarbon energy resources.  In contrast, the United States has approximately 27% of the world's solid hydrocarbon resources in coal reserves, or about 19% of the world's total hydrocarbon energy resources, giving the United States the world's largest hydrocarbon resource.

13.     In the United States, coal fired power plants have provided the majority of electricity generation for a considerable time, but the direct burning of coal has serious environmental impacts in terms of emissions of pollutants and also significant quantities of

---

[4]     Non-debtors Cleantech Energy Company ("CEC") and USASF S.a.r.l. also are wholly owned subsidiaries of USASF.  Neither entity has any operations or assets.

carbon dioxide.   In 2010, coal contributed about 81% of carbon dioxide emissions from electricity generation and produced about 45% of the electricity generated in the United States. Technology does exist to reduce the emissions of coal fired power stations, but this post-combustion technology is generally not considered to be cost-effective currently.

14.     To take advantage of the United States' ample solid hydrocarbon resources to produce higher-value energy products while significantly reducing releases of greenhouse gases and other pollutants, over the last twenty years several billion dollars of government and private money has been invested in integrated gasification, synthesis processes, and gas-to-liquid techniques.[5]   Gasification has been in commercial use around the world for more than fifty years.  The process consists of heating solid hydrocarbon feedstock (e.g., coal) to very high temperatures and then introducing steam and oxygen, which causes several chemical reactions producing synthetic gas that is composed primarily of hydrogen and carbon monoxide. Thereafter, the synthetic gas may be used as a fuel to power a gas turbine to generate electric power or manufactured into other energy products such as synthetic natural gas, hydrogen, or liquid energy products such as Ultra Clean Synthetic Crude, gasoline, jet fuel, or diesel.  The Debtors planned to use Ultra Clean Btu Converter technology to convert synthetic gas into Ultra Clean Synthetic Crude.

15.     The Debtors believe that products produced using Ultra Clean Btu Converter technology, such as Ultra Clean Synthetic Crude, represent an attractive economic

---

[5]     For example, the U.S. Department of Energy provided significant funding for the Wabash River Gasification Facility (located in West Terre Haute, Indiana).  The Wabash River Facility was erected at the existing site of a coal fired power plant, which was re-powered with a combined cycle gas turbine power plant fueled by the gasification plant's synthetic gas output.  In 2004, this project was referred to by the U.S. Department of Energy as a "Clean Coal Demonstration" due to the significant reduction in carbon dioxide and other pollutant emissions and increase in efficiency.  During my employment with GEI, I served as the General Manager of the Wabash River Facility from September 2003 through February 2006.

alternative to the historically high and volatile costs of liquid and gas-based fuel sources, particularly natural gas and petroleum crude. Indeed, notwithstanding the recent drop in petroleum crude prices, the Debtors believe that the Lima Energy Project exhibits an attractive internal rate of return.

      16.    The following graphic depicts the typical components and steps involved in the gasification process:



***The Debtors' Efforts to Develop the Lima Energy Project***

17.    As stated above, the Debtors plan to develop the Lima Energy Project on a sixty-three acre brownfield site located in Lima, Ohio.   In particular, the Debtors expect to develop the Lima Energy Project in two phases, which the Debtors refer to as Lima Energy 1 and Lima Energy 2.  Lima Energy 1 will be designed to convert approximately 860,000 tons per year of petroleum coke feedstock into approximately 2.86 million barrels per year of Ultra Clean Synthetic Crude.   Lima Energy 2 is planned for the same site as Lima Energy 1, and it is expected to produce approximately 5.5 million barrels per year of Ultra Clean Synthetic Crude. Accordingly, the Debtors project that the total expected production at the Lima Energy Project will be over 8.1 million barrels per year of Ultra Clean Synthetic Crude, with a total nominal production capacity of over 10 million barrels per year.   The Debtors anticipate that construction of Lima Energy 1 will take 30–36 months with a total capitalized cost of approximately $490 million.[6]  The Debtors anticipate that construction of Lima Energy 2 will also take approximately 30–36 months and cost approximately $1.2 billion.   At the present time, construction of Lima Energy 1 has been suspended, and the Debtors have yet to commence construction of Lima Energy 2.

18.    Since the purchase of the sixty-three acre site from the City of Lima in 2012, the Debtors have invested over $2.5 million to prepare the site for construction.   The Debtors also negotiated contracts to build Lima Energy 1.   In particular, Lima Energy had previously negotiated, but did not execute, a $371.8 million engineering, procurement, and

---

[6]    Note that total capitalized costs include engineering, procurement, and construction ("EPC") and other owner costs incurred up to commencement of operations (such as interest during construction and development fees), but do not include annual fixed or variable facility operations and maintenance costs, including the cost of purchasing solid hydrocarbon.

construction agreement (the "EPC Agreement") with Gasification Engineering Corporation ("GEC"), an entity wholly owned by Mr. Graves.  In turn, GEC entered into an agreement with Kokosing Construction Company, Inc. ("Kokosing"), through which GEC will be responsible for providing overall technical direction and project management and Kokosing will provide design and build services to GEC for the Lima Energy Project on a guaranteed completion date basis with a fixed price of $338 million.  The Debtors have also obtained all the permits necessary to commence construction of Lima Energy 1.[7]

19.    In addition to the Debtors' efforts, the City of Lima invested, with the assistance of city, state, and federal funding support, $70 million to, among other things, improve the site's existing railroad infrastructure and construct a water reservoir with sufficient capacity to meet the substantial water requirements of the Lima Energy Project.

20.    The Debtors also negotiated certain contracts for the production and sale of Ultra Clean Synthetic Crude.  The Debtors intend to use the gasification technology known as E-Gas™ for the Lima Energy Project.  In April 2003, Lima Energy was issued a license for the E-Gas™ gasification technology from GEC.  This license was subsequently amended in July 2003 to, among other things, add ConocoPhillips Company as a party following its acquisition of the E-Gas™ technology.

21.    The Debtors also negotiated a purchase and sale agreement (the "Off-Take Agreement") with an affiliate of Husky Energy Inc., ("Husky"), pursuant to which Lima Energy agreed to sell 100% of the Ultra Clean Synthetic Crude produced by Lima Energy 1 up to a maximum of 8,500 barrels per day during a ten-year term, with the option to extend for another

---

[7]    In April 2014, the Debtors obtained a renewal of their Air Permit to Install from the Ohio Environmental Protection Agency, but the Sierra Club has appealed the issuance of that permit.  A hearing on the appeal currently is set for October 2015.  The Debtors believe that the Sierra Club appeal will be rejected.

ten years.[8]  Husky operates a substantial refinery complex in Lima, Ohio, that is located directly adjacent to the Lima Energy Project.  While this proximity makes Husky the natural customer for the Debtors' projected output of Ultra Clean Synthetic Crude, just like traditional crude oil, Ultra Clean Synthetic Crude can be delivered anywhere in the world, subject to additional transportation expenses.  The Off-Take Agreement terminated according to its terms in September 2014.

22.    The Debtors planned to use petroleum coke purchased from Husky's Lima refinery as their feedstock.  Given the proximity between Husky's refinery and the Lima Energy Project, petroleum coke can be conveniently delivered to Lima Energy 1 via a conveyor, saving significant transportation expenses.  To this end, the Debtors discussed a petroleum coke supply arrangement with Husky.

23.    One of the by-products of the Debtors' Ultra Clean Btu Converter technology is liquid carbon dioxide.[9]  There is a potentially large market for liquid carbon dioxide in Ohio, as it is used by the oil drilling industry to extend oil field life and to recover additional oil around the world.  The Debtors have an agreement in place with Cambridge Resources LLC, under which Cambridge Resources LLC will buy 100% of the expected output of carbon dioxide (approximately 1.6 million tons) produced by Lima Energy 1 for $20 per ton.

24.    The Debtors have designed Lima Energy 1 to produce up to approximately 409,000 MWh/yr of electric power for export to the grid.  The Debtors intend to capture heat released during the manufacture of the Ultra Clean Synthetic Crude and produce high

---

[8]    Additionally, Husky had an option to purchase a portion or all of the volume of Ultra Clean Synthetic Crude produced by Lima Energy 2.

[9]    Sulfur and vitrified frit are additional by-products of the Ultra Clean Btu conversion process.  Vitrified frit is a material that resembles glass or sand and it can be sold to manufacturers of concrete blocks or road building supplies.  Sulfur can be sold for use in many industrial applications, as well as for fertilizer.

pressure/high temperature steam, which will be used by a steam turbine to produce the electric power.  It is the Debtors' intention to sell this electricity to the wholesale electric markets, but the Debtors have not initiated discussions with possible purchasers to date.  To export the electric power, the Debtors plan to initiate an interconnection service agreement with PJM Interconnection, the regional transmission organization that coordinates the movement of wholesale electricity in all or parts of Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia and the District of Columbia.

25.    The following is an aerial photograph of the Lima Energy Project with the Husky refinery shown in the top portion and the Lima Energy Project site outlined in red:



*Overview of the Debtors' Capital Structure*

26.    As of the Petition Date, the Debtors' secured debt obligations, excluding accrued interest, redemption fees, and other similar costs, are summarized as follows:

| | |
|---|---|
| Note Purchase Agreement | $  31,604,863 |
| Unit Purchase Agreement | $    5,000,000 |
| Royalty Agreement | $  50,000,000 |
| **Total:** | **$  86,604,863** |

i.    Note Purchase Agreement

27.    On September 24, 2012, USASF entered into a Note Purchase Agreement by and among USASF, Lima Energy, TEC, as administrative agent for the holders, and each of the holders of notes from time to time party thereto (as amended, the "Note Purchase Agreement").[10]  Pursuant to the Note Purchase Agreement, Lima Energy issued a 10% senior secured note in the aggregate principal amount of $30 million to TEC, as administrative agent for the holders (the "NPA Note").  The principal amount of the NPA Note was originally due August 31, 2015, and bears interest at the rate of 10% per annum, payable monthly.  Lima Energy used a portion of the proceeds from the NPA Note to (a) purchase the Lima, Ohio project site, (b) purchase an energy asset in Indiana containing an estimated 50 million tons of Illinois Basin coal deposits (the "Coal Asset") to be used as potential feedstock for Lima Energy 1, and (c) to repay the outstanding principal and interest on the GEI Notes (as defined below) pursuant to the GEI Purchase and Sale Agreement (as defined below).  As of the Petition Date, the Debtors estimate that they had approximately $31,604,863 in principal outstanding under the Note Purchase Agreement.  TEC agreed to amend the Note Purchase Agreement on several

---

[10]    Unless otherwise stated herein, all agreements related to the Note Purchase Agreement, the Unit Purchase Agreement (as defined below), and the Royalty Agreement (as defined below) were originally entered into on September 24, 2012.

occasions in order to provide the Debtors with additional liquidity and relief from covenant breaches so that it could continue to pursue its combined equity and bond offering: (i) on December 31, 2013, in order to provide the Debtors with additional liquidity; (ii) on March 31, 2014, in order to provide the Debtors with additional liquidity and permit the payment of interest by way of the issuance of additional notes; and (iii) on January 14, 2015, in order to provide the Debtors with prepetition financing of up to $404,863.  In addition, on October 31, 2013, TEC issued a standby commitment of $60 million to assist the Debtors' purchase of a gasification plant from Wabash Valley Power Association, for which the Debtors issued a 4% secured convertible note in the amount of $1,200,000 to TEC on November 18, 2013, in support of a commitment fee payable.

28.    In connection with the Note Purchase Agreement, certain of the Debtors and TEC entered into additional agreements.  In particular, Lima Energy and TEC, as administrative agent, entered into a First Lien Amended and Restated Mortgage, Assignment of Production, Security Agreement, Fixture Filing and Financing Statement pursuant to which Lima Energy granted TEC a mortgage on Lima Energy's rights and interests in substantially all of its assets to secure its obligations under the Note Purchase Agreement.

29.    In addition, USASF entered into a First Lien Parent Guaranty with TEC, as administrative agent for the holders under the Note Purchase Agreement, pursuant to which USASF guaranteed Lima Energy's obligations under the Note Purchase Agreement.  Similarly, Cleantech and CEC entered into a First Lien Subsidiary Guaranty with TEC, as administrative agent for the holders under the Note Purchase Agreement, pursuant to which each of CEC and

Cleantech, jointly and severally, guaranteed Lima Energy's obligations under the Note Purchase Agreement.[11]

30.     Furthermore, USASF, Lima Energy, CEC, Cleantech, and TEC, as administrative agent to the holders under the Note Purchase Agreement, also entered into a First Lien Security Agreement, pursuant to which the obligations of USASF and Lima Energy under the Note Purchase Agreement were secured by a lien on substantially all of the tangible and intangible assets of USASF, Lima Energy, CEC, and Cleantech.[12]

ii.     Unit Purchase Agreement

31.     On September 24, 2012, USASF entered into a Unit Purchase Agreement by and among USASF, Lima Energy, TEC, as agent for the unit purchasers, and each of the unit purchasers from time to time party thereto (the "Unit Purchase Agreement"). Pursuant to the Unit Purchase Agreement, Lima Energy received $2 million in exchange for the issuance by Lima Energy and USASF of a unit comprised of (i) a $5,000,000 principal amount 4% subordinated secured convertible note due August 31, 2017 (the "Convertible Note"),[13] issued by

---

[11]     On September 24, 2012, GEI entered into the First Lien GEI Pledge Agreement with TEC, as administrative agent for the holders under the Note Purchase Agreement, pursuant to which GEI pledged and granted a security interest to TEC in the stock of USASF held by GEI to secure Lima Energy's obligations under the Note Purchase Agreement.

[12]     In connection with the Note Purchase Agreement, USASF loaned $11 million to Lima Energy (the "Lima Loan") in return for an unsecured promissory note from Lima Energy in the aggregate principal amount of $11 million. The note accrues interest at a rate of 0.24% per annum and all interest and principal outstanding are payable on demand.

[13]     Pursuant to the terms of the Convertible Note, at any time prior to the business day preceding the day fixed for the redemption of the Convertible Note, if applicable, the holder of the Convertible Note may, at its option, convert all or a portion of the Convertible Note into USASF's common stock at the conversion price applicable on the date of the conversion. The initial conversion price was $0.48 per share, subject to adjustment in certain events. The Convertible Note automatically will be converted into shares of USASF's common stock upon the sale of all of such common stock for an aggregate value of more than $500,000,000 or the valuation of the common stock for ten consecutive trading days of more than $500,000,000, valued by reference to a closing price per share on a national stock exchange or other automated quotation system.

Lima Energy to Strative and (ii) a warrant (the "Warrant")[14] issued by USASF to Strative granting the right to purchase an aggregate of 10,312,500 shares of USASF's common stock. The parties amended the Unit Purchase Agreement on December 31, 2013, and March 31, 2014.

32.    In connection with the Unit Purchase Agreement, certain of the Debtors and TEC entered into additional agreements.    In particular, Lima Energy and TEC, as administrative agent, entered into a Second Lien Amended and Restated Mortgage, Assignment of Production, Security Agreement, Fixture Filing and Financing Statement pursuant to which Lima Energy granted TEC certain security interests.

33.    In addition, USASF entered into a Second Lien Parent Guaranty with TEC, as administrative agent for the investors under the Unit Purchase Agreement, pursuant to which USASF guaranteed Lima Energy's obligations under the Unit Purchase Agreement. Similarly, CEC and Cleantech entered into a Second Lien Subsidiary Guaranty with TEC, as administrative agent for the investors under the Unit Purchase Agreement, pursuant to which each of CEC and Cleantech, jointly and severally, guaranteed Lima Energy's obligations under the Unit Purchase Agreement.[15]

34.    In connection with the Unit Purchase Agreement, USASF, Lima Energy, CEC, Cleantech, and TEC, as administrative agent to the investors under the Unit Purchase Agreement, also entered into a Second Lien Security Agreement pursuant to which the

---

[14]    The Warrant has a term of 10 years.  The Warrant may be exercised in whole or in part and entitles the holder thereof to purchase 10,312,500 shares of USASF's common stock at an exercise price of $0.48 per share.  The number of shares for which the Warrant may be exercised and the exercise price are subject to adjustment in certain events.

[15]    On September 24, 2012, GEI entered into the Second Lien GEI Pledge Agreement with TEC, as administrative agent for the investors under the Unit Purchase Agreement, pursuant to which GEI pledged and granted a security interest to TEC in the stock of USASF held by GEI to secure Lima's obligations under the Unit Purchase Agreement.

obligations of USASF and Lima Energy under the Unit Purchase Agreement were secured by a lien on substantially all of the tangible and intangible assets of USASF, Lima Energy, CEC, and Cleantech.

iii.    Royalty Agreement

35.    In connection with the Unit Purchase Agreement, Lima Energy, TEC, as administrative agent for certain royalty investors, and the royalty investors from time to time party thereto (Strative is the initial royalty investor), entered into the Royalty Agreement dated as of September 24, 2012 (the "Royalty Agreement").  Under the Royalty Agreement, Lima Energy will pay to the royalty investors 5% of the annual aggregate gross sales of gas products relating to Lima Energy 1 as additional consideration for the debt financing made available to Lima Energy under the Unit Purchase Agreement.  In connection with the Unit Purchase Agreement and the Royalty Agreement, Lima Energy and TEC, as administrative agent ("Third Lien Mortgagee"), entered into a Third Lien Amended and Restated Mortgage, Assignment of Production, Security Agreement, Fixture Filing and Financing Statement, dated as of September 24, 2012, pursuant to which Lima Energy granted Third Lien Mortgagee a mortgage to secure its obligations under the Royalty Agreement. The Royalty Agreement contained a liquidated damages provision in favor of Strative whereby Lima Energy would pay $50 million to Strative in the event of certain defaults under the Unit Purchase Agreement.

iv.    GEI Purchase and Sale Agreement

36.    On September 24, 2012, USASF, Lima Energy, and GEI entered into a Purchase and Sale Agreement, pursuant to which GEI sold the Coal Asset to Lima Energy (the "GEI Purchase and Sale Agreement").  In exchange, USASF issued 2.5 million shares of its common stock to GEI and Lima Energy assumed certain of GEI's liabilities (the "GEI Notes").

The original principal amount of the GEI Notes was $25 million. Furthermore, GEI purchased 1.1 million shares of USASF's common stock at a price of $10 per share. USASF used the $11 million proceeds from this issuance to make the Lima Loan. The GEI Notes were payable on demand and were repaid by Lima Energy on September 24, 2012.[16]

v.   <u>Bridgewater Note</u>

37.   On May 29, 2014, USASF issued a 10% convertible promissory note to Bridgewater Capital Corporation ("<u>Bridgewater</u>") in the amount of $1,000,000 (the "<u>Bridgewater Note</u>"). The Bridgewater Note accrues interest at a rate of 10% per annum. The Bridgewater Note matured on October 30, 2014. A member of USASF's board of directors, James R. Treptow, is the chief executive officer, president, and sole shareholder of Bridgewater. As part of the Bridgewater Note, USASF issued a warrant to purchase up to 2,000,000 shares of common stock for $20.00 per share until January 7, 2016. As of the Petition Date, USASF has received $499,651 in proceeds from the Bridgewater Note.

vi.   <u>Other Obligations</u>

38.   The Debtors have approximately $4.8 million outstanding in unsecured obligations. These obligations primarily relate to accrued salaries, professional and vendor fees, and related party advances.

---

[16]   An intercreditor agreement and a subordination agreement were entered into in connection with the Note Purchase Agreement, the Unit Purchase Agreement, the Royalty Agreement, and the GEI Purchase and Sale Agreement. In particular, on September 24, 2012, USASF, Lima Energy, GEI, CEC, Cleantech, Mr. Graves, and TEC, as administrative agent to the first, second and third lien secured parties, entered into an Intercreditor and Subordination Agreement (the "<u>Intercreditor Agreement</u>"). The Intercreditor Agreement establishes the relative priorities and rights of the holders under the Note Purchase Agreement, the investors under the Unit Purchase Agreement, and the royalty investors under the Royalty Agreement.

On that same day, Lima Energy, GEI, TEC, as administrative agent to the noteholders pursuant to the Note Purchase Agreement, and TEC, as administrative agent to the investors pursuant to the Unit Purchase Agreement entered into a Subordination Agreement (the "<u>Subordination Agreement</u>") pursuant to which GEI agreed that all obligations and liabilities of Lima Energy due or payable to GEI are subordinate to the obligations of Lima Energy to TEC.

*Overview of the Events Leading to the Filing of these Chapter 11 Cases*

39.     In 2011, the Debtors began to explore various means of raising the financing necessary to construct Lima Energy 1.  Considering the moribund project finance market existing in 2011, USASF decided to pursue a strategy of utilizing a combination of secured debt financing placed in Europe, followed by an equity offering in the United States.  In August 2012, USASF retained an investment banker and a bond rating agency to assist with its planned bond issuance in Europe.

40.     Subsequently, the Debtors' financing strategy evolved to focus more on the U.S. capital markets.  In particular, USASF intended to privately place approximately $600 million of secured bonds and issue up to $150 million of equity (the "Bond and Equity Offering"), the combination of which would address the Lima Energy Project's capital expenditure requirements, bond reserves, interest during construction, payment of the TEC Prepetition Indebtedness, a promissory note payment of $11 million to GEI for pre-project development expenditures, working capital, and capital for the future USASF project pipeline.  The initial loan collateral for the bonds was to be the Coal Asset, which was appraised in May 2012, for $114 million.  USASF retained an additional financial services firm, Cantor Fitzgerald, L.P. ("Cantor Fitzgerald"), as its bond placement agent in November 2013.

41.     In June 2014, after an extensive eight month due diligence review, Cantor Fitzgerald was preparing a confidential information memorandum and pre-screening investor prospects for a road show projected to begin in September 2014.  However, at this same time, the Debtors were facing a liquidity crisis because the Debtors did not have sufficient cash to pay for company operations, salaries, or debt service under the TEC Prepetition Indebtedness.  To prevent these severe liquidity issues from derailing the Bond and Equity Offering, certain of

USASF's directors, TEC, and Strative were preparing to fund a short-term bridge loan. In connection with this proposed bridge loan, TEC commissioned a preliminary appraisal of the Coal Asset, which TEC suggested indicated an asset valuation substantially below the conclusion of the Debtors' 2012 appraisal of the Coal Asset. TEC's appraisal of the Coal Asset called into question whether the Coal Asset could be used as a source of equity for the Bond and Equity Offering at all. As a further result of TEC's appraisal, certain of USASF's directors, TEC, and Strative were no longer willing to fund a short-term bridge loan. In addition, the Debtors only obtained an initial advance under the Bridgewater Note, which was insufficient to address the Debtors' severe liquidity issues.

42.     On July 2, 2014, USASF received a subpoena from the U.S. Securities and Exchange Commission's Division of Enforcement (the "SEC") seeking certain documents and information about USASF's accounting practices and internal controls between 2011 and 2013, including restatements of its financial statements for the fiscal year ended December 31, 2012, and the fiscal quarter ended March 31, 2013, the resignation of the Debtors' independent auditor, KWCO, PC in January 2011, the subsequent re-engagement of KWCO, PC in March 2011 and dismissal of KWCO, PC in June 2013, its assessments of its internal controls over financial reporting and disclosure controls and procedures, and deficiencies in USASF's internal controls.

43.     On July 15, 2014, TEC delivered a default notification letter to USASF specifying non-payment of June 2014 interest, failure to comply with other covenants, and the SEC Investigation.

44.     On July 24, 2014, the board of directors of USASF suspended the duties of Mr. Graves and his spouse, Lynne R. Graves, who was the corporate secretary of USASF, until the resolution of the SEC Investigation. On August 20, 2014, Mr. Graves, USASF's

executive chairman and chairman of the board of directors, retired from all his positions with the Debtors.  As a result of Mr. Graves' departure, USASF's independent directors (collectively, the "Independent Directors") were required to take a more active role in corporate activities, including the Debtors' efforts to address the defaults on the TEC Prepetition Indebtedness and restart the Lima Energy Project.  With the active involvement of the Independent Directors and the Debtors' remaining management, in July 2014 the Debtors ran a financing process focused on well-capitalized project financing sources.  The Debtors contacted forty-five potentially interested parties and, thereafter, signed nondisclosure agreements and provided a confidential investor presentation and data room access to thirteen parties.  In addition to these efforts, the Debtors pursued other financing options and engaged in discussions with numerous potential investors.[17]

45.    Separately, in August 2014, the Debtors received a term sheet from TEC that proposed a transaction under which TEC would purchase substantially all of the Debtors' assets under section 363 of the Bankruptcy Code.  The term sheet also proposed that TEC would provide the Debtors with a debtor in possession financing facility to fund the chapter 11 cases and the sale process.

46.    In the following months, the Debtors continued to explore alternative financing arrangements to address the defaults under the TEC Prepetition Indebtedness and restart the Lima Energy Project, while simultaneously negotiating with TEC regarding the transactions proposed in the August 2014 term sheet.

---

[17]    On September 12, 2014, Daniel W. Dixon, the chief financial officer of USASF, resigned as chief financial officer of USASF effective September 19, 2014.

47.    While the Debtors' efforts to find alternative financing to address their obligations under the TEC Prepetition Indebtedness and restart of the Lima Energy Project continued until as recently as March 2015, the Debtors were unable to identify viable alternatives to the proposal offered by TEC.  Considering this fact and all the other circumstances facing the Debtors, the Debtors have determined that the post-petition financing proposals made by TEC – including the requirement in TEC's proposal that the Debtors conduct a 363 sale of substantially all their assets – were the best and only viable options available under the circumstances.

48.    Specifically, the Debtors have negotiated a post-petition financing facility in the aggregate principal amount of up to approximately $765,970 (the "DIP Facility").  The Debtors also negotiated the Asset Purchase Agreement with TEC for the sale of substantially all of the Debtors' assets, subject to a section 363 bidding and auction process.  The Asset Purchase Agreement provides, among other things, that TEC will credit bid $15,000,000 and assume certain of the Debtors' liabilities.  The DIP Facility and the Asset Purchase Agreement are the result of the Debtors' extensive negotiations with TEC, conducted in good faith and at arm's length.

49.    The DIP Facility is essential to preserving and maximizing the value of the Debtors' estates.  The Debtors have determined that, absent the funding provided by the DIP Facility, the Debtors would not have sufficient funds to continue to maintain their current business operations.

50.    The Debtors have further determined that an orderly sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code is the most effective and efficient means to maximize the value of the Debtors' estates for the benefit of all stakeholders.  In particular, by conducting a sale pursuant to section 363 of the Bankruptcy Code, the Debtors will be able to

utilize a competitive and fair bidding process to perform a market test of their assets to ensure that value is maximized.

51.     For these reasons, the Debtors believe that the DIP Facility offered by TEC and the section 363 sale process that the Debtors intend to conduct during these Chapter 11 Cases represents the best available option for the Debtors and will maximize the value of the Debtors' estates for the benefit of all the Debtors' stakeholders.

## PART II
## FIRST DAY MOTIONS

52.     As a result of my first-hand experience, and through my review of various materials and information, discussions with the Debtors' management, and discussions with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions described below, and (b) the immediate and irreparable harm to which the Debtors and their business will be exposed unless the relief requested in the First Day Motions is granted without delay.

53.     I participated in preparing and reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, I believe the facts set forth therein are true and correct.  Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

54.     The relief sought in the First Day Motions will facilitate a smooth transition into chapter 11 and thereby minimize the adverse effects of the Chapter 11 Cases on the Debtors' business and creditors.  As described more fully below, the Debtors, in consultation

with their professionals, have carefully tailored the relief requested in the First Day Motions to ensure the Debtors' immediate needs are met, and that the Debtors suffer no immediate and irreparable harm.  I was involved in the analysis that led to the creation of each of the First Day Motions and the scope and nature of the relief requested therein.

**Debtors' Motion For Order Directing Joint Administration Of Cases Pursuant To Bankruptcy Rule 1015(B) And Local Bankruptcy Rule 1015-1**

55.     By this Motion,[18] the Debtors are seeking entry of an order directing joint administration of the Debtors' related Chapter 11 Cases and related relief.

56.     Many of the motions, applications, hearings, and orders that will arise in these Chapter 11 Cases will jointly affect each and every Debtor.  Thus, the Debtors believe the interests of the various Debtors, their estates, their creditors, and other parties in interest would be best served by the joint administration of these Chapter 11 Cases for procedural purposes.  In particular, joint administration will ease the administrative burdens of these Chapter 11 Cases on the Debtors, the Court, and all parties in interest.

57.     Further, joint administration will not adversely affect the Debtors' respective constituencies because this Motion requests only administrative, not substantive, consolidation of the Debtors' estates.  Parties in interest will not be harmed by the relief requested but, instead, will benefit from the cost reductions associated with the joint administration of the Chapter 11 Cases.

58.     For these reasons, I believe that it is in the best interests of the estates and all parties in interest for the Court to approve the joint administration of the Chapter 11 Cases for procedural purposes only.

---

[18]     Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the relevant First Day Motion.

**Debtors' Motion For Entry Of An Order Authorizing The Debtors To (A) File A Consolidated List Of Creditors; (B) File A Consolidated List Of Debtors' Top Twenty Unsecured Creditors; And (C) Complete All Mailings Of Notices, Including Notices Of The Commencement Of These Cases And Of The Meeting Of Creditors Required By Section 341 Of The Bankruptcy Code**

59.     By this Motion, the Debtors are requesting authority to (i) file a consolidated list of creditors, (ii) file a consolidated list of the Debtors' twenty largest unsecured creditors, and (iii) complete all mailings of notices, including notices of the commencement of these cases and of the meeting of creditors required by section 341 of the Bankruptcy Code.

60.     The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the notices and other documents in these cases. The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the notices and other similar documents. The Debtors also submit that a single consolidated list of their combined twenty largest unsecured creditors in these cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors. The Debtors also submit that allowing the Debtors (or their agent) to complete their own mailings will save significant time and expense.

**Debtors' Motion For An Order Under Sections 105, 345, and 363 Of The Bankruptcy Code, Bankruptcy Rules 6003 And 6004 And Local Rule 2015-2 Authorizing (I) Maintenance Of Existing Bank Account; (II) Continued Use Of Existing Cash Management System; (III) Continued Use Of Existing Business Forms And Records; And (IV) Waiving The Requirements Of Section 345(b) Of The Bankruptcy Code On An Interim Basis**

61.     By this Motion, the Debtors seek: (i) authorization to maintain their Bank Account; (ii) authorization to continue use of their Cash Management System; (iii) authorization

to continue use of their existing Business Forms and Books and Records; and (iv) waiver of the requirements of section 345(b) of the Bankruptcy Code on an interim basis.

*The Debtors' Bank Account and Existing Cash Management System*

62.    The basic structure of the cash management system (the "Cash Management System") described herein constitutes the Debtors' ordinary, usual, and essential business practices.  The Cash Management System, while simple, is important to the operation and administration of the Debtors' business and the Chapter 11 Cases.  The Cash Management System enables the Debtors to collect, transfer, and disburse funds as needed and accurately record all such transactions as they are made.  Importantly, the Debtors' Cash Management System allows for an integrated method of accounting for receipts and disbursements.  To lessen the disruption caused by these bankruptcy filings and maximize the value of their estates, it is vital for the Debtors to maintain their current system of managing cash.

63.    Prior to the commencement of these Chapter 11 Cases, USASF maintained, in the ordinary course of business, one bank account (the "Bank Account") with Huntington National Bank ("Huntington").[19]  The Bank Account plays an integral role in the Debtors' Cash Management System.  In particular, the Bank Account is used by USASF for all cash disbursements, deposit of checks received in the mail, and wire and ACH transfers.  The Debtors do not maintain any investment accounts.

64.    The Cash Management System maintained by the Debtors has been designed (i) to provide an efficient method of collecting, transferring, and disbursing funds; (ii) to establish procedures and controls necessary to account for and trace funds in an accurate

---

[19]    The last four digits of the Bank Account are as follows: 9208.  Debtor Lima Energy Company also maintains a bank account with Huntington; however, it is not part of the Debtors' cash management system and contains only de minimis funds (i.e., less than $500).

manner; and (iii) to facilitate satisfaction of the Debtors' financial obligations.  The Debtors

maintain current and accurate accounting records of cash transactions, as all funds received or

disbursed by the Debtors are properly reflected on the Debtors' books and records.  The Debtors

submit that preservation of their Cash Management System will lessen the disruption caused by

the bankruptcy filings and maximize the value of their estates.  The Debtors have established a

gap in their check numbers to distinguish between checks issued prepetition versus checks issued

post-petition and have sought to minimize the number of outstanding uncashed checks as of the

Petition Date.   The Debtors have instructed Huntington that prepetition checks should be

dishonored absent a specific order of this Court authorizing honoring of certain prepetition

checks.[20]

65.      The Debtors may have daily Bank Account balances in excess of

$250,000.  Thus, and as further discussed below, the Debtors seek a waiver on an interim basis

of the deposit guidelines set forth in section 345(b) of the Bankruptcy Code to continue their

prepetition practices, without prejudice to the Debtors' ability to seek a further interim or final

waiver.

*Cash Management Fees*

66.      In the ordinary course of business, the Debtors incur fees charged by the

Cash Management Bank for administering the Bank Account (collectively, the "Cash

Management Fees").  The administration of the Bank Account is a critical aspect of the Cash

Management System, and any cessation of these services due to the Debtors' inability to pay the

Cash Management Fees would be extremely disruptive to the Cash Management System and

---

[20]      The Debtors reserve the right to make changes to their Cash Management System during the course of
these Chapter 11 Cases.

cause unnecessary expense.  As the Cash Management Fees are automatically debited from the Bank Account by the Cash Management Bank, if there were any outstanding Cash Management Fees on the Petition Date, the amount of such outstanding fees would be *de minimis*.

*Existing Business Forms and Books and Records*

67.    In the ordinary course of the Debtors' business, the Debtors use a variety of checks, business letterhead, purchase orders, invoices, envelopes, and other business forms and correspondence (collectively, the "Business Forms").  Because the Business Forms were used prepetition, they do not reference the Debtors' current debtor in possession status.  To minimize expense to the estates, the Debtors request authority to continue to use all existing Business Forms without reference to their "debtor in possession" status.  In the absence of such relief, the Debtors will be required to bear a potentially significant administrative burden and expense, which the Debtors respectfully submit is unwarranted and likely will have little or no attendant benefit to their estates.  If new Business Forms are ordered, such Business Forms will include the legend "debtor in possession" with the corresponding bankruptcy case number.

68.    In the ordinary course of their business, the Debtors maintain certain books and records in connection with the operations of their business (collectively, the "Books and Records").  Continuing to use the Books and Records subsequent to the Petition Date rather than closing those and opening new books will enable the Debtors to avoid unnecessary cost and burden.

**Motion Of Debtors For Interim And Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant To 11 U.S.C. § 364, (II) Authorizing Use Of Cash Collateral Pursuant To 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361, 363 And 364, And (IV) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001(C)**

69.    By this Motion (the "DIP Motion"), the Debtors respectfully request that the Court grant the following relief as provided in the proposed DIP Orders:

(i) authorizing the Borrower[21] to obtain secured post-petition financing (the "DIP Financing") and for the Guarantors to guarantee certain of the Borrower's obligations in connection with the DIP Financing, consisting of a first-lien superpriority term loan multi-draw facility in an aggregate principal amount of up to $765,970 (the "DIP Facility"), with Third Eye Capital Corporation, an Ontario corporation ("TECC"), as administrative agent and collateral agent on behalf of certain lenders (the "DIP Lenders") and other holders of any DIP Obligations (in such capacities, the "DIP Agent" and collectively with the DIP Lenders and any other holder of DIP Obligations, the "Secured Parties");

(ii) granting the DIP Agent, for the benefit of the Secured Parties, pursuant to Bankruptcy Code §§ 364(c)(2), 346(c)(3) and 364(d), security interests upon all DIP Collateral;

(iii) granting the DIP Agent, pursuant to Bankruptcy Code § 364(c)(1), priority in payment with respect to the DIP Obligations over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507, 546(c), 552(b), 726, 1113, 1114, or any other provision of the Bankruptcy Code, other than in respect of the Carve-Out;

(iv) authorizing the Debtors, pursuant to Bankruptcy Code § 363(c), to use Cash Collateral and, pursuant to Bankruptcy Code §§ 361, 362(d), 363(c), 363(e) and 364(d), to provide adequate protection to the Adequate Protection Parties with respect to any diminution in the value of their interest in the DIP Collateral resulting from the priming liens and security interests to be granted herein pursuant to Bankruptcy Code § 364(d), to secure the DIP Obligations, the use of Cash Collateral, the use, sale or lease of the DIP Collateral (other than Cash Collateral) and the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a);

(v) scheduling a preliminary hearing (the "Interim Hearing") on the Motion to consider entry of the Interim Order pursuant to Bankruptcy Rule 4001; and

(vi) scheduling a final hearing (the "Final Hearing") and establishing notice procedures in respect of the Final Hearing to consider entry of a final order (the "Final Order") authorizing on a

---

[21]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Interim Order or the DIP Term Sheet, as applicable.

final basis, *inter alia*, the DIP Financing and the use of Cash Collateral.

70.     The Debtors require use of the Cash Collateral and proceeds from the DIP Financing to fund the costs of working capital obligations, operating expenses, and expenses relating to administration of the Chapter 11 Cases (including professional fees) in order to preserve and maintain the value of the Debtors' estates.   Given the encumbrances upon substantially all of the Debtors' assets and the lack of an additional borrowing base under the TEC Prepetition Agreements, the Debtors urgently need credit and additional capital to mitigate any negative effect of these Chapter 11 Cases and to maintain their operations.   Absent new credit, the value of the Debtors' business will be severely and negatively impacted.

71.     Without immediate access to the DIP Financing, the Debtors expect to suffer an acute cash shortage that would immediately and irreparably harm their estates and creditors.   Furthermore, the Debtors lack sufficient funds to meet expenses necessary for the maintenance of their business operations before the Final Hearing on this Motion can be held, and, therefore, it is essential that the Debtors obtain the proposed interim financing from the DIP Lenders.   In sum, the Debtors' ability to remain viable and preserve the value of their estates for the benefit of their creditors depends upon the interim and final relief requested in the Motion. The Debtors' forecasted liquidity needs are set forth in detail in the Budget, a copy of which is attached as Exhibit D to the DIP Motion.

72.     Other than the proposed DIP Financing, there are no viable financing alternatives available to the Debtors under the circumstances.   Indeed, the Debtors are convinced that other than the proposed DIP Financing they would be entirely unable to obtain financing to address their urgent liquidity needs given, among other things, the nature and state of the Debtors' business operations, the immediacy of the Debtors' financing needs, and the liens of the

TEC Prepetition Lenders on the TEC Prepetition Collateral. Furthermore, as virtually all of the Debtors' assets are encumbered by liens and security interests granted to the TEC Prepetition Lenders, even if alternative debtor in possession financing was available on more favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the TEC Prepetition Lenders, the results of which could not be predicted with certainty. Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, immediately jeopardizing their Chapter 11 Cases at the outset. Furthermore, the Debtors do not have the financial resources to fund such a contested and protracted priming contest with the TEC Prepetition Lenders. Based on the foregoing, the Debtors believe that they would not have been able to obtain debtor in possession financing on more favorable terms from other sources.

73.    The DIP Financing proposed by the Debtors reflects the most favorable terms on which the DIP Lenders were willing to offer financing. The Debtors believe that the proceeds from the DIP Facility will allow them to maintain their business operations in the ordinary course, fund restructuring costs, and otherwise meet their liquidity needs during the course of the Chapter 11 Cases. The Debtors believe that the terms of the DIP Financing are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. Accordingly, the Debtors should be granted authority to enter into the DIP Financing and obtain funds from the DIP Lenders on the secured, administrative "superpriority" basis described above, pursuant to sections 364(c) and (d) of the Bankruptcy Code.

74.    Pending the Final Hearing, the Debtors require $408,145 under the DIP Facility for, *inter alia*, working capital needs as set forth in the Budget. It is essential that the

Debtors immediately stabilize their operations to preserve the value of the Debtors' estates for the benefit of all of the Debtors' creditors and equity holders.

75.    The Debtors believe that the terms and conditions of the DIP Financing are fair and reasonable and are the best possible terms on which the Debtors could obtain post-petition financing.  Further, the terms and conditions of the DIP Financing were negotiated in good faith and at arm's length with all parties represented by experienced counsel.

## **CONCLUSION**

76.    For all the reasons described herein and in the First Day Motions, I respectfully request that the Court grant the relief requested in each of the First Day Motions.

Dated: March 17, 2015

_Dr. Steven C. Vick_
Dr. Steven C. Vick

8928167.2

32