## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x
                         :

In re                            :      Chapter 11
                         :

USA SYNTHETIC FUEL CORPORATION, *et al.*,[1]   :      Case No. 15-_____ (___)
                         :

           Debtors.             :      (Joint Administration Pending)
                         :

------------------------------------------------------------- x

## DEBTORS' MOTION FOR AN ORDER (I) APPROVING PROCEDURES IN CONNECTION WITH THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (II) AUTHORIZING THE DEBTORS TO ENTER INTO AN ASSET PURCHASE AGREEMENT IN CONNECTION THEREWITH, (III) AUTHORIZING THE PAYMENT OF STALKING HORSE PROTECTIONS, (IV) SETTING BID DEADLINE, AUCTION (IF NEEDED) AND SALE APPROVAL HEARING DATES, (V) ESTABLISHING NOTICE PROCEDURES AND APPROVING FORMS OF NOTICE, AND (VI) APPROVING PROCEDURES RELATED TO ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The debtors and debtors in possession in the above-captioned cases (collectively, the

"<u>Debtors</u>"), through their undersigned proposed counsel, hereby move (the "<u>Motion</u>"), pursuant

to sections 105, 362, 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§

101 *et seq.* (as amended, the "<u>Bankruptcy Code</u>") and Rules 2002, 6004, 6006, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 6004-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "<u>Local Rules</u>") for the entry of an order (the "<u>Bidding Procedures</u>

<u>Order</u>"), substantially in the form attached hereto as **Exhibit A**:

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: USA Synthetic Fuel Corporation (5258); Lima Energy Company (5661); and Cleantech Corporation (6023). The corporate headquarters and the mailing address for each entity listed above is 312 Walnut Street, Suite 1600, Cincinnati, OH 45202.

      i.      approving the proposed procedures (the "<u>Bidding Procedures</u>") to be used in connection with the sale of substantially all of the Debtors' assets (the "<u>Bid Assets</u>");

      ii.     approving and authorizing the stalking horse asset purchase agreement dated March 17, 2015 (the "<u>Asset Purchase Agreement</u>"), entered into by Debtors USASF and Lima Energy as sellers and Third Eye Capital Corporation as buyer (the "<u>Stalking Horse Bidder</u>"), subject only to higher and better offers submitted in accordance with the Bidding Procedures;

      iii.    authorizing the Debtors to pay the customary break-up fee and expense reimbursement set forth in and pursuant to the terms of the Asset Purchase Agreement (together, the "<u>Stalking Horse Protections</u>");

      iv.    setting the dates for the Bid Deadline (as defined below), the auction of the Bid Assets (the "<u>Auction</u>"), the sale hearing (the "<u>Sale Hearing</u>") and approval of notices related thereto; and

      v.     authorizing certain procedures related to the assumption and assignment of executory contracts and unexpired leases (the "<u>Assignment Procedures</u>").

The Debtors also move the Court, pursuant to Bankruptcy Code sections 105, 363, and 365, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002-1 and 6004-1, for the entry of an order (the "<u>Sale Order</u>"), substantially in the form attached hereto as **<u>Exhibit B</u>**:

      i.      authorizing the sale of the Bid Assets (the "<u>Sale</u>") free and clear of all liens, claims, interests, and encumbrances;

      ii.     authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; and

      iii.    granting related relief.[2]

In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Dr. Steven C. Vick in Support of First Day Relief* (the "<u>Vick Declaration</u>")[3], filed with the Court concurrently herewith. In further support of the Motion, the Debtors, by and through their proposed undersigned counsel, respectfully represent:

---

[2]     This Motion contains the Debtors' request for entry of the Bidding Procedures Order and approval of the Sale Order. The Debtors are seeking approval of the Bidding Procedures Order at the initial hearing to be conducted on this Motion. The Sale Order is requested to be considered at the Sale Hearing.

[3]     Capitalized terms used but not defined herein have the meanings ascribed to them in the Vick Declaration, the Bidding Procedures, and the Asset Purchase Agreement, as applicable.

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006, and 9014 and Local Rule 6004-1.

3.      The Debtors consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

4.      On the date hereof (the "Petition Date"), each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  No trustee, examiner, or official committee has been appointed in these cases.  The Debtors are operating their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

5.      The Debtors are an environmentally focused, alternative energy company pursuing clean energy solutions based on gasification and other proven Btu conversion technologies.

6.      A full description of the Debtors' business operations, corporate structure, capital structure, and reasons for commencing these cases is set forth in the Vick Declaration, incorporated herein by reference.

A.      **The Marketing Process**

7.      With the active involvement of the Independent Directors and the Debtors' remaining management, in July 2014 the Debtors ran a financing process focused on well-capitalized project financing sources.  The Debtors contacted forty-five potentially interested parties and, thereafter, signed nondisclosure agreements and provided a confidential investor presentation and data room access to thirteen of the parties.  In addition to these efforts, the Debtors pursued other financing options and engaged in discussions with numerous potential investors.

8.      Separately, in August 2014, the Debtors received a term sheet from TEC that proposed a transaction under which TEC would purchase substantially all of the Debtors' assets under section 363 of the Bankruptcy Code.  The term sheet also proposed that TEC would provide the Debtors with a debtor in possession financing facility to fund the chapter 11 cases and sale process.

9.      In the following months, the Debtors continued to explore alternative financing arrangements to address the defaults under the TEC Prepetition Indebtedness and restart the Lima Energy Project, while simultaneously negotiating with TEC regarding the transactions proposed in the August 2014 term sheet.

10.      While the Debtors' efforts to find alternative financing to address their obligations under the TEC Prepetition Indebtedness and restart the Lima Energy Project continued until as recently as March 2015, the Debtors were ultimately unable to identify viable alternatives to the proposal offered by TEC.  Considering this fact and all the other circumstances facing the

Debtors, the Debtors have determined that the post-petition financing proposals made by TEC – including the requirement in TEC's proposal that the Debtors conduct a 363 sale of substantially all their assets – were the best and only viable options available under the circumstances.

**B.      The Need for a Timely Sale Process**

11.      The Debtors believe that the auction process and time periods set forth in the Bidding Procedures are reasonable and will provide parties with sufficient time and the information necessary to formulate a bid to purchase the Bid Assets.  In formulating the procedures and time periods, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and potential purchasers with the need to quickly and efficiently sell their assets while they still have realizable value.

12.      Completion of the sale process in a timely manner will also maximize the value of the Bid Assets.  The time periods set forth in the Bidding Procedures were negotiated by the Stalking Horse Bidder and the Debtors, and failure to adhere to such time periods could jeopardize the closing of the Sale, which the Debtors believe is the best means of maximizing the value of their assets.  In addition, to ensure that the Asset Purchase Agreement represents the highest and best offer for the Debtors' assets, the Debtors have retained an investment banker, Asgaard Capital LLC, to market the Debtors' assets for sale pursuant to the Debtors' proposed sale process.

13.      Thus, the Debtors have determined that pursuing the Sale in the manner and with the procedures proposed is in the best interest of the Debtors' estates and will provide all interested parties with sufficient opportunity to participate.

C.    **The Asset Purchase Agreement and Sale Order**[4]

14.    A summary of the terms of the Asset Purchase Agreement, a complete copy of which is attached hereto as **Exhibit C** and incorporated herein by reference, and certain relief sought in the Sale Order, including the terms to be highlighted pursuant to Local Bankruptcy Rule 6004-1, is as follows:[5]

| **Purchase Price**<br>*See* Asset Purchase Agreement, § 2.1. | The aggregate consideration for the sale and transfer of the Acquired Assets (the "Purchase Price") shall be: (a) Fifteen Million Dollars ($15,000,000.00) less any amounts required to be withheld under applicable Law (including Section 897 or 1445 of the Internal Revenue Code of 1986), plus (b) the assumption of Assumed Liabilities, including payment of all Cure Amounts in accordance with the terms of the Sale Order. |
|---|---|
| | Buyer, at the direction of Third Eye Capital Corporation, in its capacity as administrative agent under the Note Purchase Agreement and Unit Purchase Agreement, shall surrender and release a portion of the DIP Loan, a portion of the Note Obligations, a portion of the Break Up Fee and a portion of the Expense Reimbursement and credit the Sellers with the satisfaction of the same, in the amount of Fifteen Million Dollars ($15,000,000.00) (such amount as may be increased pursuant to Section 2.1(b) of the Asset Purchase Agreement, the "Credit Bid Amount") in order to satisfy payment of the Purchase Price to be paid at Closing. |
| **Acquired Assets**<br>*See* Asset Purchase Agreement, § 1.1. | Substantially all property, assets and rights owned, leased or held for use by Sellers used or useful in or held for use in the Business of every kind, character and description including, all direct or indirect, right, title, and interests of Sellers in, to and under all the tangible and intangible, real and personal, assets, properties, rents, Claims and contracts of Sellers wheresoever located whether carried on the books of Sellers or not carried on the books of Sellers, due to expense, full depreciation or otherwise, used or useful in or held for use in the Business, including, without limitation, the following; provided, however, that the Acquired Assets shall not include any Excluded Assets: |
| |     (a)    all of Sellers' right, title, and interests in, to, and under all real property owned in fee by Sellers, including, but not limited to, all real property located in Lima, Ohio (the "Owned Real Property"); |
| |     (b)    all of Sellers' rights and interests under the leases, licenses, or other agreements (written or oral) pursuant to which Sellers convey or grant to any Person a leasehold interest in, or the right to use or occupy, any Owned Real Property or portion thereof other than the leases, licenses, and other agreements set forth on Schedule 1.1(b) to the Asset Purchase Agreement (all of such assumed leases, licenses, and other agreements, the "Owned Real Estate Leases"), including the right to all |

---

[4]    This summary is qualified in its entirety by the provisions of the Asset Purchase Agreement. In the event of any inconsistency between the terms of the Asset Purchase Agreement and the terms herein, the terms of the Asset Purchase Agreement shall govern and control. Any capitalized terms used in this summary and not defined therein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

[5]    The Debtors believe these provisions are typical and customary for transactions of this kind and are the result of arms-length and good faith negotiations between the Debtors and the Stalking Horse Bidder.

security deposits and other amounts and instruments deposited by or on behalf of any tenant or occupier thereunder;

(c)     all of Sellers' rights, titles, interests and estates under leases of real property leased by Sellers with respect to the Coal Assets as defined and set forth on Schedule 1.1(c) to the Asset Purchase Agreement (all of such assumed leases, the "Leased Real Estate Leases," and, together with the Owned Real Estate Leases, the "Real Estate Leases"), including rights to security deposits related thereto (the real property leased by Sellers pursuant to the Leased Real Estate Leases, the "Leased Real Property");

(d)     all of: (i) Sellers' rights and interests to the buildings, improvements and FF&E now or hereafter located on the Owned Real Property or the Leased Real Property, subject to limitations set forth in the Real Estate Leases (collectively, the "Improvements"); (ii) Sellers' equipment, security devices, furniture, fixtures, tools and other personal property now or hereafter owned, leased or held by Sellers, but excluding any of the foregoing items under capitalized leases and similar instruments not constituting Assigned Contracts (collectively, the "Equipment") a schedule of which Equipment, the historical cost of which exceeds $20,000 individually, is set forth on Schedule 1.1(d) to the Asset Purchase Agreement; and (iii) any rights of Sellers to the warranties and licenses received from manufacturers and Sellers of the Equipment, Improvements or any component thereof;

(e)     all of Sellers' rights, titles, interests and estates under: (i) any Coal Assets as defined and set forth on Schedule 1.1(c) to the Asset Purchase Agreement; (ii) subject to Section 1.2(c) of the Asset Purchase Agreement, the sales orders, customer Contracts, master service agreements, work orders, study agreements, contractor agreements, memorandums of agreement, statements of work, or other similar Contracts entered into by Sellers with its customers, including those listed on Schedule 1.1(e) to the Asset Purchase Agreement ("Customer Contracts"); (iii) the open purchase orders for which the goods or services have not been received by Sellers as of the Closing Date (the "Purchase Orders"); (iv) other Contracts entered into by Sellers with any supplier or vendor and listed on Schedule 1.1(e) ("Supplier Contracts"); (v) all rights under any existing confidentiality or non-disclosure agreements; and (vi) all other Contracts listed on Schedule 1.1(e) (the "Other Contracts" and, together with the Real Estate Leases, the Employment Contracts, the Customer Contracts, the Purchase Orders and the Supplier Contracts that Buyer is assuming, the "Assigned Contracts");

(f)     all of Sellers' Intellectual Property Rights owned, licensed or used by Sellers, including those related to the names "USA Synthetic Fuel Corporation" or "Lima Energy Company" (the "Acquired Intellectual Property") provided that, to the extent such Acquired Intellectual Property cannot be transferred to Buyer, Sellers shall be deemed to have granted to Buyer an exclusive, royalty-free right and license to use such

Intellectual Property Rights from and after the Closing Date, to the fullest extent permitted by applicable Law;

(g)    any computer software or systems owned by Sellers and licenses held by Sellers (to the extent transferable);

(h)    subject to Sections 1.6 and 12.2 of the Asset Purchase Agreement, all rights and interests of Sellers under any Permits (including environmental, health and safety Permits) and all pending applications therefore which have been issued to, or are held or used by, the Sellers, including, but not limited to Permits associated with mineral claims and similar interests in Vigo County, Indiana, or the real property owned or leased by Sellers in Lima, Ohio, in each case, to the extent transferable;

(i)    all of Sellers' instruments, trade accounts, accounts receivable or notes receivable (whether current or noncurrent), rebates, refunds, unbilled costs and fees attributable to the Business or the Acquired Assets and all causes of action specifically pertaining to the collection of the foregoing, and any other receivables of Sellers, in each case arising prior to or on the Closing Date;

(j)    subject to applicable privacy laws and Section 3.4 of the Asset Purchase Agreement, copies of all Business Records;

(k)    all current and prior insurance policies of Sellers and all rights of any nature with respect thereto, including all insurance recoveries, prepaid premiums, and unearned premiums thereunder and rights to assert claims with respect to any such insurance recoveries; provided, however, insurance policies of any of the Sellers and/or the Subsidiaries for directors', managers', and officers' liability and all rights of any nature with respect thereto, including all insurance recoveries, prepaid premiums, and unearned premiums thereunder and rights to assert claims with respect to any such insurance recoveries shall be Excluded Assets;

(l)    all rights to Tax refunds and, to the extent permitted by applicable law, loss carryforwards, claims, defenses, credits or similar benefits attributable to either Seller, and all related records and documentation;

(m)    all security and utility deposits, other deposits, credits, allowance, prepaid assets, or charges, rebates, setoffs, prepaid expenses, and other prepaid items related to the Acquired Assets (except for security deposits relating to Sellers' (i) Real Estate Leases which are not Assigned Contracts, (ii) Contracts that are not Assigned Contracts, and (iii) Excluded Assets) and any restricted Cash that Sellers are required to maintain in connection with Sellers' insurance programs or policies that represent prepayments and similar items arising out of, or relating to, the Acquired Assets or the Business;

(n)    all promotional allowances and vendor rebates and similar items;

<table>
<tr><td></td><td>

(o)    all office supplies, stationery, forms, labels, shipping materials, brochures, art work, photographs, production supplies, other miscellaneous supplies, and other tangible property of any kind wherever located, including all property of any kind located in any building, office or other space leased, owned, or occupied by Sellers or in any warehouse where any of Sellers' properties and assets may be situated;

(p)    all rights, claims or causes of action of Sellers against third parties arising out of events occurring prior to the Closing Date, including, for the avoidance of doubt, arising out of events occurring prior to the Petition Date, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers, and contractors relating to products sold, or services provided, to Sellers, excluding only the rights, claims and causes of action that are identified as Excluded Assets in Section 1.2 of the Asset Purchase Agreement;

(q)    the right to receive and retain mail and other communications; and

(r)    subject to applicable privacy Laws, all goodwill and other intangible assets including correspondence with present or prospective customers and suppliers, advertising materials, software programs, telephone exchange numbers, and other similar intangible assets associated with the Business and the Acquired Assets (to the extent transferable), including customer and supplier lists <u>provided</u> that, to the extent such intangible assets cannot be transferred to Buyer, Sellers shall be deemed to have granted to Buyer an exclusive, royalty-free right and license to use such intangible assets from and after the Closing Date, to the fullest extent permitted by applicable Law.

</td></tr>
<tr><td>

**Assumed Liabilities**
*See* Asset Purchase Agreement, § 1.3.

</td><td>

Subject to the terms and conditions set forth in the Asset Purchase Agreement, at the Closing, in consideration for the sale, assignment, conveyance, transfer and delivery of the Acquired Assets to Buyer, Buyer will assume and pay, perform and discharge when due and otherwise in accordance with the terms of the Asset Purchase Agreement, only the following Liabilities (collectively, the "<u>Assumed Liabilities</u>"):

(a)    Sellers' Liabilities under the DIP Loan and Sellers' Liabilities under the Note Purchase Agreement and Unit Purchase Agreement to the extent such amounts are not included in the Credit Bid Amount;

(b)    all Liabilities and executory obligations of Sellers under the Assigned Contracts (specifically excluding the Excluded Assets);

(c)    all Liabilities arising in connection with the use and operation of the Leased Real Property or the Owned Real Property from and after the Closing Date;

(d)    all Liabilities with respect to Cure Amounts;

</td></tr>
</table>

9

<table>
<tr>
<td></td>
<td>

(e)     all Liabilities and obligations relating to or arising from the Acquired Assets or the operation of the Business relating to or arising from the period commencing on or after the Closing Date, but, to the fullest extent permitted by Law, excluding any Liabilities under the Real Estate Acquisition and Development Agreement by and between the City of Lima, Ohio, and Lima Energy Company, dated October 26, 2012, and any other agreements related thereto;

(f)     all Taxes related to the operation of the Business by Buyer attributable to periods, or portions thereof, beginning on or after the Closing Date, including Liabilities for Taxes attributable to the ownership of the Acquired Assets from and after the Closing Date (but excluding income Taxes attributable to the gain or loss derived by Sellers in connection with the transfer of the Acquired Assets on the Closing Date); and

(g)     Sellers' Liabilities under the Royalty Agreement.

Notwithstanding anything in the Asset Purchase Agreement to the contrary, Sellers acknowledge and agree that Buyer is not assuming from Sellers, or is in any way responsible for, the Excluded Liabilities.  The transactions contemplated by the Asset Purchase Agreement shall in no way expand the rights or remedies of any third party against Buyer or Sellers as compared to the rights and remedies that such third party would have had against Sellers absent the Bankruptcy Cases had Buyer not assumed such Assumed Liabilities.  Other than the Assumed Liabilities, Buyer is not assuming and shall not be liable for any liabilities or obligations of Sellers.

</td>
</tr>
<tr>
<td>

**Excluded Assets**
*See*   Asset   Purchase Agreement, § 1.2.

</td>
<td>

Notwithstanding anything to the contrary in the Asset Purchase Agreement, the Acquired Assets are the only properties, rights and assets transferred to, or otherwise acquired by, Buyer under the Asset Purchase Agreement.  Without limiting the generality of the foregoing, the Acquired Assets do not include (i) any right, title, or interest of any Person other than Sellers in any property or asset and (ii) the properties and assets of Sellers listed or described below (all properties and assets not being acquired by Buyer are herein collectively referred to as the "Excluded Assets"):

(a)     the Purchase Price and all Cash held by or on behalf of Sellers (other than the deposits and restricted Cash referenced in Section 1.1(m) of the Asset Purchase Agreement or prepaid premiums referenced in Section 1.1(k) of the Asset Purchase Agreement);

(b)     all of Sellers' rights under Contracts that are not Assigned Contracts, including any Contracts set forth on Schedule 1.2(b) to the Asset Purchase Agreement;

(c)     all of Sellers' rights under Employee Benefit Plans;

(d)     all of Sellers' rights and interests under any Permits that are not Acquired Assets;

(e)     any assets and associated claims or rights arising out of the Excluded Liabilities, including rights relating to prepaid expenses, refunds or adjustments;

(f)     all rights of Sellers arising under the Asset Purchase

</td>
</tr>
</table>

Agreement, the Ancillary Agreements, and under any other agreement between Sellers and Buyer entered into in connection with the Asset Purchase Agreement;

(g)    all company seals, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence, or capitalization of Sellers, as well as any other records or materials relating to Sellers generally and not involving or related to the Acquired Assets or the operations of the Business (the "Corporate Records"); provided that Sellers shall provide Buyer with reasonable access to, and copies of, any Corporate Records;

(h)    all rights, claims or causes of action of Sellers that are related to the Excluded Assets or the Excluded Liabilities and all Avoidance Actions; provided that Sellers may not bring any Avoidance Actions or other causes of Action against any customers of the Business; provided, further, the Debtors may bring any Avoidance Actions against the persons and entities listed in Section 1.2(n) of the Asset Purchase Agreement.

(i)    all good faith or other bid deposits submitted by any third party under the terms of the Bid Procedures Order, including the sales procedures;

(j)    any and all privileges of Sellers with any of their professionals including attorneys, accountants, and other advisors, whether related to attorney-client privilege, attorney work product, or otherwise;

(k)    the stock and any other equity interests or securities, including promissory notes, issued by each Subsidiary;

(l)    all bank accounts and lockboxes;

(m)    all of Sellers' rights and interests in and to the assets listed on Schedule 1.2 to the Asset Purchase Agreement;

(n)    all causes of action, including, but not limited to, Avoidance Actions, against or with respect to any employees, current and former shareholders of Sellers or any of their Affiliates and current and former officers or directors of Sellers or any of their Affiliates; and

(o)    all insurance policies of any of the Sellers and/or the Subsidiaries for directors', managers', and officers' liability and all rights of any nature with respect thereto, including all insurance recoveries, prepaid premiums, and unearned premiums thereunder and rights to assert claims with respect to any such insurance recoveries.

| | |
|---|---|
| **Termination Provisions** <br> *See* Asset Purchase Agreement, § 11. | <u>Right of Termination</u> <br><br> Notwithstanding anything to the contrary, the Asset Purchase Agreement may be terminated only as provided in Article 11 thereunder. In the case of any such termination that is not automatic pursuant to Section 11.2(b) of the Asset Purchase Agreement, the terminating Party shall give proper written notice to the other Party specifying the provision pursuant to which the Asset Purchase Agreement is being |

terminated.

<u>Termination Rights</u>

The Asset Purchase Agreement may be terminated at any time before Closing:

     (a)    by mutual written consent of Sellers and Buyer;

     (b)    automatically and without any action or notice by either Sellers to Buyer, or Buyer to Sellers, immediately upon the occurrence of any of the following events:

         (i)    the issuance of a final and non-appealable Order by a Government authority to restrain, enjoin, or otherwise prohibit the transfer of the Acquired Assets contemplated by the Asset Purchase Agreement;

         (ii)    either Seller's Bankruptcy Case being converted into a case under Chapter 7 of the Bankruptcy Code or dismissed; or

         (iii)    Buyer is not declared the winning bidder upon completion of the Auction; provided that in such event, the Asset Purchase Agreement shall terminate five (5) days following entry of a sale order with respect to a transaction with a third party; <u>provided</u>, <u>further</u>, this subsection shall have no force or effect if the Buyer is declared the Back-Up Bidder pursuant to the Bid Procedures Order.

     (c)    by either Buyer or Sellers;

         (i)    in the event that an Alternative Transaction has been consummated following approval by the Bankruptcy Court;

         (ii)    at any time after fifteen (15) days following the entry of the Sale Order by the Bankruptcy Court (as may be extended by written agreement of the Parties, the "<u>Termination Date</u>"), if the Closing shall not have occurred and such failure to close is not caused by or the result of Buyer's material breach of the Asset Purchase Agreement; or

     (d)    by the Buyer:

         (i)    if the Buyer is not in material breach of the Asset Purchase Agreement and there has been a material breach by Sellers of any representation, warranty, or covenant contained therein that (A) has not been waived by the Buyer, and (B) Sellers have failed to cure such violation or breach within ten (10) calendar days following receipt of notification thereof by the Buyer;

         (ii)    if the Bankruptcy Cases are not filed by Sellers on or before March 17, 2015;

(iii)     if the Bid Procedures, the Bid Procedures Order, the Break Up Fee and the Expense Reimbursement are not approved by the Bankruptcy Court on or before the thirtieth (30th) day immediately following the Petition Date;

(iv)     if the Sale Order with respect to the transactions contemplated in the Asset Purchase Agreement has not been entered on or before the later of (A) the sixtieth (60th) day immediately following the Petition Date and (B) in the event the Buyer is declared the Back-Up Bidder pursuant to the Bid Procedures Order, the eightieth (80th) day immediately following the Petition Date;

(v)     if the Sale Order has not become a Final Order on or before fourteen (14) days after the entry thereof; and

(vi)     if the Sale Order with respect to the transactions contemplated in the Asset Purchase Agreement has been entered and (a) the Buyer has provided the Sellers with written notice that it is prepared to consummate the transactions and (b) the Closing Date does not occur within two (2) Business Days of the Buyer providing the Sellers with such notice.

(e)     by the Sellers:

(i)     if Sellers are not in material breach of the Asset Purchase Agreement and there has been a material violation or breach by Buyer of any representation, warranty, or covenant contained therein that (A) has rendered the satisfaction of any condition to the obligations of Sellers set forth in Section 10.1 of the Asset Purchase Agreement impossible, (B) has not been waived by Sellers, and (C) Buyer has failed to cure such violation or breach within ten (10) calendar days following receipt of notification thereof by Sellers; or

(ii)     at any time after the Termination Date, if the Closing shall not have occurred and such failure to close is not caused by or the result of Sellers' material breach of the Asset Purchase Agreement.

<u>Effect of Termination</u>

If the Asset Purchase Agreement is validly terminated pursuant to Section 11.2 thereunder, the Asset Purchase Agreement shall become null and void and have no effect (other than Article 11 and Article 12 of the Asset Purchase Agreement, which shall survive termination) and none of Sellers, Buyer, or any of their respective Related Persons shall have any liability or obligation arising under or in connection with the Asset Purchase Agreement except for any willful or intentional breach occurring prior to the termination; provided, however, that the payment of the Break Up Fee and Expense Reimbursement to the extent required pursuant to Section 8.3, Article 11, and Article 12 of the Asset

|  | Purchase Agreement shall survive any such termination and shall be enforceable under the Asset Purchase Agreement.  For the avoidance of doubt, if the Asset Purchase Agreement is terminated pursuant to Section 11.2(c) thereunder, Buyer shall be entitled to and Sellers shall immediately pay or cause to be paid to Buyer the Break Up Fee and Expense Reimbursement.<br><br>Specific Performance<br><br>Each of Sellers and Buyer acknowledge and agree that the other Party would be damaged irreparably in the event any of the provisions of the Asset Purchase Agreement is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, in addition to any other remedy to which they may be entitled pursuant thereto, Buyer and Sellers each agree that the non-breaching Party shall be entitled to specific performance, and injunctive and other equitable relief, to prevent or restrain a breach of the terms of the Asset Purchase Agreement by the other Party. |
|---|---|
| **Expense Reimbursement and Break-Up Fee**<br>*See* Asset Purchase Agreement, § 8.3. | Subject to approval of the Bankruptcy Court, in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of the assets of Sellers and to compensate Buyer as a stalking-horse bidder, in the event that an Alternative Transaction has been consummated following approval by the Bankruptcy Court, then upon consummation of such Alternative Transaction, Sellers shall pay or cause to be paid and Buyer shall receive, (a) a breakup fee equal to Four Hundred Fifty Thousand Dollars $450,000 (the "Break Up Fee") and (b) an amount equal to the reasonable and documented third party costs, fees and expenses incurred by Buyer and its Affiliates (including fees and expenses of legal, accounting and financial advisors), subject to a cap of One Million Dollars ($1,000,000), in connection with this Agreement and the transactions contemplated hereby (the "Expense Reimbursement").  Subject to approval of the Bankruptcy Court, the Break Up Fee and the Expense Reimbursement shall have superpriority administrative claim status in the Bankruptcy Cases pursuant to section 507(b) of the Bankruptcy Code, senior to all administrative expense priority claims including debtor in possession financing and the Break Up Fee and Expense Reimbursement shall be paid to Buyer in full upon consummation of an Alternative Transaction (as defined herein).  Sellers acknowledge and agree that (i) the approval of the Break Up Fee and Expense Reimbursement is an integral part of the transactions contemplated by this Agreement, (ii) in the absence of Sellers' obligation to pay the Break Up Fee and Expense Reimbursement, Buyer would not have entered into this Agreement, (iii) the entry of Buyer into this Agreement is necessary for the preservation of Sellers' estate and is beneficial to Sellers because, in Sellers' business judgment, it will enhance each Seller's ability to maximize the value of its assets for the benefit of its creditors, (iv) the Break Up Fee and Expense Reimbursement are reasonable in relation to Buyer's efforts and to the magnitude of the transactions contemplated in this Agreement and Buyer's lost opportunities resulting from the time spent pursuing such transactions, and (v) time is of the essence with respect to entry of the Bid Procedures Order. |
| **Record Retention**<br>*See* Asset Purchase Agreement, § 9.4. | After the Closing Date and for a period of six (6) years from the Closing Date, Buyer shall retain possession of all accounting, business, financial, and Tax records and information that (a) relate to the Acquired Assets and are in existence on the Closing Date and (b) come into existence after the Closing Date but relate to the Acquired Assets before the Closing Date, and Buyer shall give Sellers notice and a reasonable opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them during such period.  After the Closing Date and for a period of six (6) years from the Closing Date (or, if earlier, the date the Bankruptcy Court enters an order closing the Bankruptcy Cases), Sellers shall retain possession of all accounting, |

| | |
|---|---|
| | business, financial, and Tax records and information that relate to the Excluded Liabilities.  In addition, from and after the Closing Date, Buyer shall provide to Sellers and its Affiliates (after reasonable notice and during normal business hours and without charge to Sellers) access to the books, records, documents, and other information relating to the Acquired Assets as Sellers may reasonably deem necessary to properly prepare for, file, prove, answer, prosecute, and defend any Tax Return, claim, filing, Tax audit, Tax protest, suit, proceeding, or answer.  Such access shall include access to any computerized information systems that contain data regarding the Acquired Assets.  The provisions contained in this section are intended to, and shall, supplement and not limit the generality of the provisions contained in Section 7.3 of the Asset Purchase Agreement. |
| **Releases**<br>*See* Asset Purchase Agreement, § 12.25 and Sale Order, ¶ 42. | Section 12.25 of the Asset Purchase Agreement provides as follows:<br><br>Effective upon the Closing Date, each Seller, on behalf of itself, and any Person claiming by, through, under, derivatively for, as agent for or on behalf of such Seller and (collectively, the "Sellers Group"), acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against (1) any of the Buyer and its directors, officers, control persons (as defined in Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934, as amended), members, employees, agents, attorneys, financial advisors, legal representatives, shareholders, partners, successors and assigns solely in their capacity as such, and (2) any of their respective directors, officers, control persons, members or employees in their capacity as a member on, or arising from their involvement with the activities of, the board of directors of any entity included in the Sellers Group (including pursuant to board observer rights), (the Buyer and all Persons referenced in clauses (1) and (2) are collectively referred to as the "Buyer Group"), that directly or indirectly arise out of, are based upon, or in any manner connected with any Prior Event (collectively, "Released Claims"); and, should any Released Claims nonetheless exist, each Seller on behalf of itself and all the other members of the Sellers Group (i) releases and discharges each member of the Buyer Group from any liability whatsoever on such Released Claims that directly or indirectly arise out of, are based upon, or in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Released Claims against any member of the Buyer Group.  As used herein, the term "Prior Event" means any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including without limitation any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken, permitted or begun prior to the consummation of the transactions contemplated under the Asset Purchase Agreement.  For the avoidance of doubt, "Prior Event" shall include but not be limited to any transaction, event, circumstances, action, failure to act or occurrence of any sort or type which occurred, existed, was taken, permitted or begun in accordance with, pursuant to or by virtue of: (i) any terms of the Asset Purchase Agreement, (ii) the transactions referred to therein, or (iii) any oral or written agreement relating to the foregoing (i) and (ii) of this sentence.  Notwithstanding anything set forth in the Asset Purchase Agreement to the contrary, the releases set forth herein do not extend to (a) any obligations that are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the willful misconduct or gross negligence of such person, (b) the obligations of the lenders or agent under the DIP Facility or (c) any obligations of the Parties under the Asset Purchase Agreement.<br><br>Without limiting in any way the scope of the release contained in the paragraph immediately above and effective upon the Closing Date, each Seller, to the fullest extent allowed under applicable law, waives and relinquishes for itself and the other members of the Sellers Group, all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any law which provides that a release may not apply to material unknown claims.  Each Seller affirms its intent |

<table>
<tr><td></td><td>

to waive and relinquish such unknown Claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto.

Paragraph 42 of the Sale Order provides as follows:

Other than the Assumed Liabilities, the Purchaser and its affiliates and their respective successors, assigns, members, partners, principals and shareholders (or equivalent) shall have no obligations with respect to any liabilities of the Debtors, including, without limitation, the Excluded Liabilities, and the Debtors and their estates are deemed to release and forever discharge the Purchaser and its affiliates and their respective successors, assigns, members, partners, principals and shareholders (or equivalent) from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the Transactions, the sale and assignment of the Acquired Assets and the Assumed Contracts, except for liabilities and obligations expressly assumed under the Asset Purchase Agreement.  Notwithstanding anything to the contrary herein, the Debtors' releases do not extend to (a) any DIP Lender's obligation to make any DIP Loan subject to the terms and conditions of the DIP Orders and of the DIP Term Sheet, (b) the DIP Agent's or any DIP Lender's obligations to comply in all respects with the terms and conditions of the DIP Orders and the DIP Term Sheet that are required to be performed by such party (subject to any applicable limitations on such compliance set forth in herein or therein) or (c) compliance in all respects by the Purchaser with the Asset Purchase Agreement and this Order.[6]

</td></tr>
<tr><td>

**Closing Conditions**
*See* Asset Purchase Agreement, § 10.

</td><td>

Conditions Precedent to Performance by Sellers

The obligations of Sellers to consummate the transactions contemplated by the Asset Purchase Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which (other than Section 10.1(e) of the Asset Purchase Agreement) may be waived by Sellers in their sole discretion:

(a)   Representations and Warranties of Buyer.  The representations and warranties of Buyer made in the Asset Purchase Agreement that are qualified by materiality or Material Adverse Effect shall be true and correct as of the date thereof and on and as of the Closing Date, as though made on and as of the Closing Date, and the representations and warranties of Buyer that are not so qualified shall be true and correct in all material respects as of the date of the Asset Purchase Agreement and on and as of the Closing Date, as though made on and as of the Closing Date, except for representations and warranties that speak as of a specific date or time (which need only be true and correct as of such date or time).

(b)   Performance of the Obligations of Buyer.  Buyer shall have in all material respects performed or tendered performance of or complied with each and every covenant, obligation and condition on Buyer's part to be performed which, by its terms, is required by the Asset Purchase Agreement or any Ancillary Agreement to be performed or complied with at or before the

</td></tr>
</table>

---

[6]   Unless defined elsewhere herein, capitalized terms used in this sentence shall have the meanings ascribed to them in the *Final Order (I) Authorizing Debtors To Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 362, 363, And 364, (II) Granting Liens And Superpriority Claims To Postpetition Lenders Pursuant To 11 U.S.C. §§ 364 And 507, (III) Authorizing Use Of Cash Collateral Pursuant To 11 U.S.C. § 363, And (IV) Providing Adequate Protection To Prepetition Secured Lenders Pursuant To 11 U.S.C. §§ 361, 362, 363, 364, And 507* [Docket No. [●]].

Closing.

(c) <u>Buyer's Deliveries</u>.  Buyer shall have delivered, and Sellers shall have received, all of the items set forth in Section 3.3 of the Asset Purchase Agreement.

(d) <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other Order that declares the Asset Purchase Agreement or any Ancillary Agreements invalid or unenforceable in any respect or that prevents the consummation of the transactions contemplated by the Asset Purchase Agreement or any Ancillary Agreements shall be in effect.

(e) <u>Entry of Sale Order</u>.  The Sale Order shall have been entered by the Bankruptcy Court and shall be a Final Order.

If the Closing occurs, all conditions set forth in the section immediately above ("Conditions Precedent to Performance by Sellers") that have not been fully satisfied as of the Closing shall be deemed to have been fully waived by Sellers.

<u>Conditions Precedent to Performance by Buyer</u>

The obligations of Buyer to consummate the transactions contemplated by the Asset Purchase Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Buyer in its sole discretion:

(a) <u>Representations and Warranties of Sellers.</u>  The representations and warranties of Sellers made in the Asset Purchase Agreement that are qualified by materiality or Material Adverse Effect, shall be true and correct as of the date thereof and on and as of the Closing Date, as though made on and as of the Closing Date, and the representations and warranties of Sellers that are not so qualified shall be true and correct in all material respects as of the date of the Asset Purchase Agreement and on and as of the Closing Date, as though made on and as of the Closing Date, except for representations and warranties that speak as of a specific date or time (which need only be true and correct as of such date or time).

(b) <u>Performance of the Obligations of Sellers.</u>  Sellers shall have in all material respects performed or tendered performance of or complied with, each and every covenant, obligation and condition on Sellers' part to be performed which, by its terms, is required by the Asset Purchase Agreement or any Ancillary Agreement to be performed or complied with at or before the Closing.

(c) <u>Sellers' Deliveries.</u>  Sellers shall have delivered, and Buyer shall have received, all of the items set forth in Section 3.2 of the Asset Purchase Agreement.

(d) <u>Consents.</u>  Any Consents set forth on Schedule 4.4 to the Asset Purchase Agreement shall have been obtained.

| | |
|---|---|
| | (e) <u>No Violation of Orders.</u>  No preliminary or permanent injunction or other Order that declares the Asset Purchase Agreement or any Ancillary Agreements invalid or unenforceable in any respect or that prevents the consummation of the transactions contemplated by the Asset Purchase Agreement or any Ancillary Agreements shall be in effect. |
| | (f) <u>Entry of Bid Procedures Order.</u>  The Bid Procedures Order shall have been entered by the Bankruptcy Court and shall be a Final Order. |
| | (g) <u>Entry of Sale Order.</u>  The Sale Order shall have been entered by the Bankruptcy Court no later than sixty (60) days after the Petition Date and shall be a Final Order. |
| | If the Closing occurs, all conditions set forth in the section immediately above ("Conditions Precedent to Performance by Buyer") that have not been fully satisfied as of the Closing shall be deemed to have been fully waived by Buyer. |
| **Successor Liability**<br>*See* Sale Order, ¶¶ 24–25. | The Purchaser and its affiliates and their respective successors, assigns, members, partners, principals and shareholders (or equivalent) are not and shall not be (a) deemed a "successor" in any respect to the Debtors or their estates as a result of the consummation of the Transactions contemplated by the Asset Purchase Agreement or any other event occurring in the chapter 11 cases under any theory of law or equity, (b) deemed to have, de facto or otherwise, merged or consolidated with or into the Debtors or their estates, (c) deemed to have a common identity with the Debtors, (d) deemed to have a continuity of enterprise with the Debtors, or (e) deemed to be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors. The Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor liability, liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or similar liability except as otherwise expressly provided in the Asset Purchase Agreement, and the Sale Motion contains sufficient notice of such limitation in accordance with Local Rule 6004-1. Except for the Assumed Liabilities, the transfer of the Acquired Assets and the Assumed Contracts to the Purchaser or its designee under the Asset Purchase Agreement shall not result in (i) the Purchaser and its affiliates and their respective successors, assigns, members, partners, principals and shareholders (or equivalent), or the Acquired Assets, having any liability or responsibility for any claim against the Debtors or against an insider of the Debtors, (ii) the Purchaser and its affiliates and their respective successors, assigns, members, partners, principals and shareholders (or equivalent), or the Acquired Assets, having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Liens or Excluded Liability, or (iii) the Purchaser and its affiliates and their respective successors, assigns, members, partners, principals and shareholders (or equivalent), or the Acquired Assets, having any liability or responsibility to the Debtors except as is expressly set forth in the Asset Purchase Agreement.  In the event that Purchaser elects to be treated as a successor employer under section 3121(a)(1) of the Internal Revenue Code, or makes an election to assume, on an employee by employee basis, immigration-related liabilities with respect to former employees of the Debtors hired by the Purchaser, the Purchaser shall not by reason of any such election be deemed to have assumed any other liabilities or to be a successor for any other purpose.<br><br>Without limiting the effect or scope of the foregoing, as of the Closing Date, the Purchaser and its affiliates and their respective successors, assigns, members, partners, |

| | |
|---|---|
| | principals and shareholders (or equivalent) shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to, the Acquired Assets or the Assumed Contracts prior to the Closing. |
| **Relief from Bankruptcy Rule 6004(h)** *See* Sale Order, ¶ 46. | Notwithstanding Bankruptcy Rules 6004 and 6006, the Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. Time is of the essence in closing the Transactions referenced in the Sale Order, and the Debtors and the Purchaser intend to close the Transactions as soon as practicable. Any party objecting to the Sale Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot. |
| **Successors and Assigns** *See* Asset Purchase Agreement, § 12.3. | Except as otherwise provided in the Asset Purchase Agreement, no Party to the Asset Purchase Agreement shall assign the Asset Purchase Agreement or any rights or obligations thereunder without the prior written consent of the other parties thereto, and any such attempted assignment without such prior written consent shall be void and of no force and effect. The Asset Purchase Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties thereto. Notwithstanding anything to the contrary in the Asset Purchase Agreement, without obtaining the consent of any Party thereto, Buyer may assign all or part of its rights under the Asset Purchase Agreement to, and all or part of its obligations under the Asset Purchase Agreement may be assumed by, any of its Affiliates or to its lenders as collateral security, or to a third party, provided that if such assignment and/or assumption takes place, Buyer shall continue to be liable jointly and severally with such assignee for all of its obligations thereunder. Any assignment and/or assumption pursuant to the foregoing sentence shall not by itself cause Sellers to become obligated to pay or cause to be paid the Break Up Fee and/or Expense Reimbursement. |

## D.   **The Bidding Procedures**

15.   The Bidding Procedures are designed to maximize value for the Debtors' estates and will enable the Debtors to review, analyze, and compare all bids received to determine which bid(s) is in the best interests of the Debtors' estates and creditors. The Bidding Procedures describe, among other things, the procedures for parties to access due diligence materials, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidder(s), and the deadlines with respect to the foregoing Bidding Procedures. The Debtors submit that the Bidding Procedures afford the Debtors a sufficient opportunity to pursue a sale process that will maximize the value of their estates.

19

16.     Certain of the key terms of the Bidding Procedures are highlighted as follows pursuant to Local Rule 6004-1(c):[7]

| | |
|---|---|
| **Assets for Sale**<br>*See* Bidding Procedures, p. 1. | The Debtors are soliciting superior offers for the Bid Assets. |
| **Participation Requirements**<br>*See* Bidding Procedures, pp. 1–3. | In order to participate in the bidding process, a person interested in acquiring the Bid Assets (a "Potential Bidder") must first deliver to (i) Asgaard Capital LLC, 1934 Old Gallows Rd., Suite 350, Vienna, VA 22182 (Attn: Charles C. Reardon and Jeffrey D. Henderson); and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, Wilmington, DE 19899-1347 (Attn: Robert J. Dehney and Andrew R. Remming) (together, the "Notice Parties"):<br><br>(a)    Confidentiality Agreement.   An executed confidentiality agreement in form and substance acceptable to Seller and its counsel; and<br><br>(b)    Identification of Potential Bidder.  Identification of the Potential Bidder and any Principals (as defined below), and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the auction and the contemplated transaction.<br><br>Upon the receipt from a Potential Bidder of the documents and information required under subparagraphs (a)–(b) above, a Potential Bidder may receive due diligence information from the Seller, access to the Seller's confidential electronic data room concerning the Bid Assets (the "Data Room") and an electronic copy of the Asset Purchase Agreement and proposed Sale Order.<br><br>Designation as Qualified Bidder<br><br>A "Qualified Bidder" is a Potential Bidder that:<br><br>(a)    delivers the documents described in subparagraphs (a) and (b) above;<br><br>(b)    delivers written evidence satisfactory to Seller that demonstrates the Potential Bidder has the necessary financial ability to close the contemplated transaction without delay, including:<br><br>    (i)    current financial statements (audited if they exist);<br><br>    (ii)    contact names and numbers for verification of financing sources; and<br><br>    (iii)    evidence of internal resources and proof of any underwritten debt or equity funding commitments that are needed to close the contemplated transaction; and |

---

[7]     This summary is qualified in its entirety by the provisions of the Bidding Procedures.  In the event of any inconsistency between the terms of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

|  | |
|---|---|
|  | (c)  Seller determines is reasonably likely to submit a *bona fide* offer that (standing on its own or in combination with one or more other offers) would result in greater total consideration being received for the benefit of Seller's creditors than under the Asset Purchase Agreement and be able promptly to consummate a sale if selected as a Successful Bidder (as defined below).<br><br>Upon the receipt from a Potential Bidder of the information required under subparagraphs (a)–(c) above, Seller, as soon as is practicable, shall determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.<br><br>Third Eye Capital, the Stalking Horse Bidder and any other assignee of Third Eye Capital's credit bid rights are each a Qualified Bidder.<br><br><u>Access to Due Diligence Materials</u><br><br>If Seller determines that a Potential Bidder that has satisfied the participation requirements does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due diligence information (including access to the Data Room) or additional non-public information shall terminate.  Seller shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined below).<br><br><u>Due Diligence From Bidders</u><br><br>Each Potential Bidder and Qualified Bidder (each, a "<u>Bidder</u>") shall comply with all reasonable requests for additional information and due diligence access by Seller or its advisors regarding such Bidder and its contemplated transaction.  Failure by a Potential Bidder to comply with the requests for additional information and due diligence access will be a basis for Seller to determine that the Potential Bidder is not a Qualified Bidder.  Failure by a Qualified Bidder to comply with requests for additional information and due diligence access will be a basis for Seller to determine that a bid made by a Qualified Bidder is not a Qualified Bid. |
| **Bidding Process**<br>*See* Bidding Procedures, p. 3. | Seller and its advisors shall: (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions above; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Bid Assets (collectively, the "<u>Bidding Process</u>").  Subject to approval by the Stalking Horse Bidder, in its sole discretion, the Debtors shall have the right to adopt such other rules for the Bidding Process (including rules that may depart from those set forth in the Bidding Procedures) that will better promote the goals of the Bidding Process and that are not inconsistent with any of the other provisions of the Bidding Procedures or of any Bankruptcy Court order. |
| **Bid Deadline**<br>*See* Bidding Procedures, p. 3. | The deadline for submitting bids by a Qualified Bidder shall be 55 days after the Petition Date, at 5:00 p.m. (Eastern Time) (the "<u>Bid Deadline</u>").<br><br>Prior to the Bid Deadline, a Qualified Bidder that desires to make an offer, solicitation or proposal (a "<u>Bid</u>") shall deliver written copies of its bid to the Notice Parties, so that the bid is actually received by the Bid Deadline.<br><br>A Bid received after the Bid Deadline shall not constitute a Qualified Bid. |
| **Bid Requirements**<br>*See* Bidding Procedures, pp. 3–6. | To be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be determined by Seller to satisfy each of the following conditions: |

(a)  Good Faith Deposit: Each Bid must be accompanied by a deposit (the "Good Faith Deposit") by wire transfer to an escrow agent selected by the Debtors in an amount of not less than ten percent (10%) of the amount of the Bid. No Good Faith Deposit shall be made by or is otherwise required of the Stalking Horse Bidder.

(b)  Minimum Overbid:  A Bid must provide for aggregate consideration that is equal to or greater than $500,000 more than the Purchase Price under the Asset Purchase Agreement with the Stalking Horse Bidder. The Debtors may consider other Bids in evaluating compliance with this Bid Requirement.

(c)  Irrevocable:  A Bid must be irrevocable until two (2) business days after the Bid Assets have been sold pursuant to the Closing of the sale approved by the Bankruptcy Court (the "Termination Date") and must be in the form of an asset purchase agreement signed by the Qualified Bidder.

(d)  The Same or Better Terms:  The Bid shall propose a contemplated transaction involving substantially all the Bid Assets and Assumed Liabilities under the Asset Purchase Agreement, and shall contain substantially all of the material terms and conditions contained in the Asset Purchase Agreement, provided, however, that any variations from one or more material terms (including, but not limited to, an offer to purchase less than substantially all the Bid Assets) must, in the aggregate constitute an improvement, as determined by Seller, upon such term or terms as set forth in the Asset Purchase Agreement. The Bid must be on terms that, in Seller's business judgment, are better than the terms of the Asset Purchase Agreement, taking into account the quality and type of consideration being offered and the certainty of performing and closing in a timely manner. A Bid must include executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "Contemplated Transaction Documents"). A Bid shall include copies of the Asset Purchase Agreement and the proposed Sale Order marked to show all changes requested by the Bidder (including those related to Purchase Price) and a list of all contracts and leases proposed to be assumed and assigned. The Contemplated Transaction Documents must include a written commitment satisfactory to Seller of the Bidder's financial ability and intention to promptly complete the transaction without delay and contain a representation that the Qualified Bidder shall make all necessary regulatory filings, if any, and pay all costs and expenses of such filings (including Seller's costs and expenses).

(e)  A Bid may not be conditioned on obtaining financing or any corporate, regulatory, stockholder or internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in all material respects at the closing of specified conditions,

none of which shall be more burdensome than those set forth in the Asset Purchase Agreement.

(f) <u>Corporate Authority</u>:  A Bid must include written evidence of the Qualified Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction; provided, however, that if the Qualified Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction, then the Qualified Bidder must furnish written evidence reasonably acceptable to Seller of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder (the "<u>Principals</u>").

(g) <u>Financing Sources</u>.  A Bid must contain written evidence satisfactory to Seller that demonstrates the Qualified Bidder has the necessary financial ability to close the contemplated transaction without delay and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction.  Such information should include, *inter alia*, the following:

(i) the Qualified Bidder's current financial statements (audited if they exist);

(ii) contact names and numbers for verification of financing sources;

(iii) evidence of the Qualified Bidder's internal resources and proof of any underwritten debt or equity funding commitments that are needed to close the contemplated transaction; and

(iv) any such other form of financial disclosure or credit quality support information or enhancement reasonably acceptable to or requested by Seller demonstrating that such Qualified Bidder has the ability to close the contemplated transaction without delay; provided, however, that Seller shall determine, in its reasonable discretion, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Qualified Bidder's financial qualifications.

(h) <u>No Fees Payable to Qualified Bidder</u>:  A Bid may not request or entitle the Qualified Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code § 503 related in any way to the submission of its Bid or the Bidding Procedures.

(i) <u>Stalking Horse Protections</u>:  A Bid must provide for the payment of the Stalking Horse Protections by such Qualified

|                                                          | Bidder.  The Stalking Horse Bidder shall not be required to pay for or provide any Stalking Horse Protections. |
|----------------------------------------------------------|---------------------------------------------------------------|
|                                                          | A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements, and that satisfies the Bid Deadline requirement above, shall constitute a "<u>Qualified Bid</u>" if Seller believes, in its reasonable discretion, that such Bid would be consummated if selected as a Successful Bid (as defined below).  For purposes hereof, the Asset Purchase Agreement is a Qualified Bid. |
|                                                          | Each Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Bid Assets that are the subject of the Auction prior to making any such bids; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Bid Assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Bid Assets, or the completeness of any information provided in connection therewith, except as expressly stated in the Bidding Procedures or, as to the Successful Bidder(s), the asset purchase agreement(s) with such Successful Bidder(s). |
|                                                          | In the event that any Bid is determined by Seller not to be a Qualified Bid, the Qualified Bidder shall be refunded its Good Faith Deposit within three (3) business days after such determination. |
| **Auction**<br>*See* Bidding Procedures, pp. 6–9.        | Only if a Qualified Bid (other than the Stalking Horse Bidder's) is received by the Bid Deadline, shall Seller conduct an Auction to determine the highest and best bid(s) with respect to the Bid Assets under the Asset Purchase Agreement.  Seller shall provide the Stalking Horse Bidder and all Qualified Bidders with copies of all Qualified Bids at least 1 day prior to the Auction.  The Auction shall commence on the date that is 58 days after the Petition Date at 10:00 a.m. (prevailing Eastern time). |
|                                                          | No later than 4:00 p.m. (prevailing Eastern time) on the date that is 57 days after the Petition Date, Seller will notify all Qualified Bidders of (i) the highest and best Qualified Bid (or combination of Qualified Bids), as determined by Seller (the "<u>Baseline Bid</u>") and (ii) the time and place of the Auction.  If, however, no other such Qualified Bid is received by the Bid Deadline, then the Auction will not be held, the Stalking Horse Bidder will be the Successful Bidder, the Asset Purchase Agreement will be the Successful Bid, and, at the Sale Hearing, the Debtors will seek approval of and authority to consummate the Proposed Sale contemplated by the Asset Purchase Agreement. |
|                                                          | The Auction shall be conducted according to the following procedures: |
|                                                          |     (a)    Participation at the Auction |
|                                                          |     Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction.  The Auction shall be conducted openly and all creditors shall be entitled to attend.  As described below, during the Auction, bidding shall begin initially with the highest Baseline Bid and subsequently continue in minimum increments of at least $500,000 higher than the immediately preceding prevailing bid.[8]  Bidding at the Auction shall be transcribed or videotaped.  Unless otherwise set forth in the Bidding Procedures, Seller may conduct the Auction in the manner they determine will |

---

[8]    The Debtors may reduce the bid increments during the Auction; <u>provided</u>, <u>however</u>, that such bid increments shall in no event be lower than $100,000.

result in the highest and best offer(s) for the Bid Assets.

(b)      Seller Shall Conduct the Auction

Seller and its professionals shall direct and preside over the Auction.  At the start of the Auction, Seller shall describe the terms of the Baseline Bid.  The determination of which Qualified Bid(s) constitutes the Baseline Bid shall take into account any factors Seller reasonably deem relevant to the value of the Qualified Bid(s) to the estate, including, *inter alia*, the following:  (A) the amount and nature of the consideration; (B) the proposed assets to be purchased and the assumption of any liabilities; (C) the ability of the Qualified Bidder(s) to close the proposed transaction(s) without delay; (D) the proposed Closing Date and the likelihood, extent and impact of any potential delays in Closing; (E) any purchase price adjustments; (F) the impact of the contemplated transaction(s) on any actual or potential litigation; (G) the net economic effect of any changes from the Asset Purchase Agreement, if any, contemplated by the Contemplated Transaction Documents, and (H) the net after-tax consideration to be received by Seller's bankruptcy estates (collectively, the "<u>Bid Assessment Criteria</u>").  All Bids made thereafter shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders.  Seller shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid(s).

(c)      Terms of Overbids

An "Overbid" is any bid made at the Auction subsequent to Seller's announcement of the Baseline Bid.  To submit an Overbid for purposes of the Auction, a Qualified Bidder must comply with the following conditions:

(i)      Minimum Overbid Increment

Any Overbid after the Baseline Bid shall be made in increments of at least $500,000 or such lower amount as determined by the Seller during the Auction (<u>provided, however</u>, that such bid increments shall in no event be lower than $100,000) <u>plus</u> the aggregate amount of the Stalking Horse Protections.  Any subsequent bids by the Stalking Horse Bidder will be credited with the full amount of the Stalking Horse Protections.

(ii)      Remaining Terms are the Same as for Qualified Bids

Except as modified in the Bidding Procedures, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (A) Seller accepts a higher Qualified Bid as an Overbid and (B) such Overbid is not selected as the Back-Up Bid (as defined below).

To the extent not previously provided (which shall be determined by Seller), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support

information or enhancement reasonably acceptable to Seller) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid without delay.

(iii)     Announcing Overbids

Seller shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to Seller's bankruptcy estates based on, *inter alia*, the Bid Assessment Criteria.

(d)     Additional Procedures

Seller may adopt rules for the Auction, subject to the consent of the Stalking Horse Bidder in its sole discretion, at or prior to the Auction that, in its reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order. All such rules will provide that all bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (i.e., the principals submitting the Bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction. Subject to the prior consent of the Stalking Horse Bidder in its sole discretion, Seller may adjourn without further notice the Auction (and Sale Hearing) if in its reasonable discretion an adjournment will better promote the goals of the Auction and allow parties to make progress toward modifications of any Qualified Bid that could result in a higher and better Qualified Bid.

(e)     Consent to Jurisdiction as Condition to Bidding

All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable.

(f)     Closing the Auction

Upon conclusion of the bidding, the Auction shall be closed, and Seller shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, and (ii) immediately identify the highest and best offer or collection of offers for the Bid Assets (the "Successful Bid(s)") and the entity or entities submitting such Successful Bid(s) (the "Successful Bidder(s)"), which highest and best offer will provide the greatest amount of net value to Seller, and the next highest and best offer or collection of offers after the Successful Bid(s) (the "Back-up Bid(s)") and the entity or entities submitting such Back-Up Bid(s) (the "Back-up Bidder(s)"), and advise the Qualified Bidders of such determinations. If the Stalking Horse Bidder's final bid is deemed to be highest and best at the conclusion of the Auction, the Stalking Horse Bidder will be the Successful Bidder, and such bid, the Successful Bid.

| | |
|---|---|
| **Acceptance of Successful Bid(s)** | Seller shall sell the Bid Assets to the Successful Bidder(s) upon the approval of the Successful Bid(s) by the Bankruptcy Court after the Sale Hearing. Seller's presentation |

| | |
|---|---|
| *See* Bidding Procedures, p. 9. | of a particular Qualified Bid (or Qualified Bids) to the Bankruptcy Court for approval does not constitute Seller's acceptance of the bid(s). Seller shall be deemed to have accepted a Bid (or Bids) only when the Bid (or Bids) has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to Seller's selection of the Successful Bidder(s) (including the assignment of any such objector's Assigned Contract thereto, provided, however, that any objection to such assignment on the basis of the cure amount must be made and/or reserved as set forth in the order approving these Bidding Procedures). |
| **Credit Bid**<br>*See* Bidding Procedures, p. 9. | Third Eye Capital shall be entitled to credit bid all or a portion of a secured claim against Seller that Third Eye Capital has a right to. Third Eye Capital shall be entitled to assign its credit bid to any third party designated by Third Eye Capital. |
| **Stalking Horse Protections**<br>*See* Bidding Procedures, p. 9. | In the event that the Stalking Horse Bidder is entitled to payment of the Stalking Horse Protections under the terms of the Asset Purchase Agreement, the Successful Bidder(s) shall promptly pay, within ten (10) days of the closing of its purchase agreement, the Stalking Horse Protections to the Stalking Horse Bidder. In the event the Stalking Horse Protections are not timely paid by the Successful Bidder(s) when due, the Seller shall pay such Stalking Horse Protections from the proceeds received at the closing of the sale(s) as an expense of the sale(s) and the Seller shall have a claim against the Successful Bidder(s) for recovery of such amount.<br><br>The Seller's contingent obligation to pay the Stalking Horse Protections shall survive termination of the Asset Purchase Agreement, dismissal or conversion of the Chapter 11 Case, and confirmation of any plan of reorganization or liquidation, and shall constitute an administrative expense of the Seller under Sections 503(b) and 507(a) of the Bankruptcy Code. |
| **As Is, Where Is**<br>*See* Bidding Procedures, p. 10. | The sale of the Bid Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or their estates except as provided in any agreement with respect to the sale or sales approved by the Bankruptcy Court. |
| **Free of Any and All Interests**<br>*See* Bidding Procedures, p. 10. | Except as otherwise provided in the Asset Purchase Agreement or another Successful Bidder's purchase agreement, all of Seller's right, title and interest in and to the Bid Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Interests") in accordance with Bankruptcy Code § 363 with such Interests to attach to the net proceeds of the sale of the Bid Assets. |
| **Sale Hearing**<br>*See* Bidding Procedures, p. 10. | The Sale Hearing shall be conducted by the Bankruptcy Court on a day that is one (1) business day following the Auction Date or on such date as may be established by the Bankruptcy Court. Following the approval of the sale of the Bid Assets to the Successful Bidder at the Sale Hearing, if any Successful Bidder fails to consummate an approved sale within fifteen (15) days after entry of an Order approving the Sale, Seller, unless such Order approving the Sale is otherwise stayed by order of a court with competent jurisdiction, shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bid, and Seller shall be authorized, but not required, promptly to consummate the sale with the Qualified Bidder submitting such Bid without further order of the Bankruptcy Court. If such failure to consummate the purchase is the result of a breach by the Successful Bidder(s), the Debtors reserve the right to seek all available remedies from the defaulting Successful Bidder(s), subject to the terms of the applicable purchase agreement. |
| **Return of Good Faith Deposit**<br>*See* Bidding Procedures, p. 10. | The Good Faith Deposit of the Successful Bidder(s) shall be applied to the purchase price of such transaction at Closing. The Good Faith Deposit of the Bidder that submitted the Back-up Bid (the "Back-up Bidder") shall be held in an interest-bearing account until five (5) days after the Closing of the transaction contemplated by the Successful Bid, and thereafter returned to the Back-up Bidder. Good Faith Deposits of |

|  | all other Qualified Bidders shall be held in an interest-bearing escrow account until no later than two (2) business days after the Sale Hearing, and thereafter returned to the respective bidders. If a Successful Bidder or the Back-up Bidder, as appropriate, fails to consummate an approved sale because of a breach or failure to perform on the part of such Bidder, Seller shall be entitled to retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by such Bidder. The Stalking Horse Bidder shall not be required to provide a deposit. |
|---|---|
| **Modifications**<br>*See* Bidding Procedures, pp. 10–11. | Seller may (a) determine which Qualified Bid(s), if any, represent the highest and best offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid(s), any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of Seller, its bankruptcy estate and creditors. Seller shall not make material modifications to these Bidding Procedures without Bankruptcy Court approval, provided however, that, to the extent not contrary to the order approving the Bidding Procedures and, subject to approval by the Stalking Horse Bidder in its sole discretion, Seller may make other non-material modifications to such procedures if, in its reasonable judgment, such modifications would be in the best interests of Seller's estates and promote an open and fair sale process. |

17.     The Debtors believe that the Bidding Procedures are fair and reasonable, designed to maximize the proceeds of the Sale, and are not likely to dissuade any serious potential purchaser from bidding for the Bid Assets.

**E.     Assignment Procedures**

18.     The Debtors propose the following procedures (collectively, the "Assignment Procedures") for notifying counterparties to executory contracts and unexpired leases of potential cure amounts in the event the Debtors decide to assume such contracts or leases and assign them to the eventual purchaser:

> **Notice of Assignment and Cure**: As soon as practicable after the date the Bidding Procedures Order is entered, the Debtors will file with the Court, a schedule (the "Assignment Schedule"), in form and substance reasonably acceptable to the Stalking Horse Bidder, listing each contract and lease proposed to be assumed and assigned (each an "Assumed Contract and Lease" and, collectively, the "Assumed Contracts and Leases") pursuant to the Asset Purchase Agreement on the date the Sale Order is entered (the "Closing Date Contracts"). The Debtors will serve each of the non-Debtor counterparties to the Assumed Contracts and Leases with a notice, which shall be in form and substance acceptable to the Stalking Horse Bidder (a "Notice of Assignment and Cure") (in substantially the form of the proposed notice attached hereto as

**Exhibit D**), by first class mail, that will include (i) the title of the Assumed Contract and Lease to be assumed, (ii) the name of the counterparty to the Assumed Contract and Lease, (iii) any applicable cure amounts, (iv) that the assignee is the Stalking Horse Bidder or its designee, or any other Successful Bidder(s), (v) adequate assurance materials demonstrating the ability of the Stalking Horse Bidder to perform under the Assumed Contracts and Leases, and (vi) the deadline by which any such Assumed Contract and Lease counterparty must object.

**Assignment and Cure Objection Deadline**:  Any objections to the assumption and/or assignment of any Assumed Contract and Lease identified on a Notice of Assignment and Cure, including the cure amount set forth on such notice, must be in writing, filed with the Court, and actually be received by the Service Parties no later than fourteen days after such Notice of Assignment and Cure is mailed to the affected party, as indicated by the date noted on such Notice of Assignment and Cure (the "Assignment and Cure Objection Deadline"), and must set forth a specific default under the Assumed Contract and Lease and claim a specific monetary cure amount that differs from the amount, if any, specified by the Debtors in such Notice of Assignment of Cure.

**Resolution of Objections to Assumption and/or Assignment of Assumed Contracts and Leases**:  If no objection is received by the Assignment and Cure Objection Deadline, then the assumption and assignment of the applicable Assumed Contract and Lease is authorized pursuant to section 365 of the Bankruptcy Code and the cure amounts, if any, set forth on the Notice of Assignment and Cure shall be binding upon the non-Debtor party to the Assumed Contract and Lease for all purposes and will constitute a final determination of total cure amounts required to be paid to the Assumed Contract and Lease counterparty in connection with any potential assignment of such Assumed Contract and Lease to the Successful Bidder(s).  In addition, each non-Debtor party to such Assumed Contract and Lease shall be forever barred from objecting to the assumption and assignment of such contract or lease or the cure information set forth in the Notice of Assignment and Cure, including, without limitation, the right to assert any additional cure or other amounts with respect to the Assumed Contract and Lease arising or relating to any period prior to such assumption or assignment.  Furthermore, if no timely objection is received by the Assignment and Cure Objection Deadline, the Stalking Horse Bidder (or Successful Bidder(s), if applicable) shall enjoy all of the rights and benefits under all Assumed Contracts and Leases acquired under the Asset Purchase Agreement (or such other purchase agreement of an alternative Successful Bidder(s), if applicable), without the necessity of obtaining any party's written

consent to the Debtors' assumption and assignment of such rights and benefits, and each such party shall be deemed to have waived any right to object to, contest, condition or otherwise restrict any such assumption and assignment.

## F.    <u>Notice and Sale Hearing</u>

19.    Within three days after entry of the Bidding Procedures Order (the "<u>Mailing Deadline</u>"), the Debtors (or their agents) shall:

   i.    provide notice of the Sale, the Bidding Procedures, the Asset Purchase Agreement, the Bidding Procedures Order, the Motion, the Auction, the Objection Deadline (defined below), and the Sale Hearing (the "<u>Sale Notice</u>") (in substantially the form of the proposed notice attached hereto as **<u>Exhibit E</u>**) by first-class mail upon: (i) the Office of the United States Trustee for the District of Delaware; (ii) applicable state and local taxing authorities; (iii) the Internal Revenue Service; (iv) the Securities & Exchange Commission; (v) the United States Attorney General; (vi) each of the non-Debtor counterparties to the Assumed Contracts and Leases; (vii) counsel to the Stalking Horse Bidder; (viii) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Bid Assets; (ix) those parties who have filed the appropriate notice requesting notice of all pleadings filed in these cases; and (x) all other known creditors of the Debtors (collectively, the "<u>Sale Notice Parties</u>").

20.    Within five days after the entry of the Bidding Procedures Order or as soon thereafter as practicable, the Debtors will publish the Sale Notice once in the national edition of the Wall Street Journal.

21.    Within one business day after the conclusion of the Auction, the Debtors will file a notice (i) identifying the Successful Bidder(s) and (ii) providing adequate assurance materials demonstrating the ability of the Successful Bidder(s) to perform under the Assumed Contracts and Leases (the "<u>Notice of Successful Bidder</u>").[9]  In the event that the Stalking Horse Bidder is not the Successful Bidder, non-Debtor counterparties to the Assumed Contracts and Leases shall have until the commencement of the Sale Hearing to file any objections to the assumption,

---

[9]    The Debtors will provide adequate assurance materials regarding the Stalking Horse Bidder as part of the Notice of Assignment and Cure.

assignment, and/or transfer of an Assumed Contract and Lease to the Successful Bidder (not the Stalking Horse Bidder)[10] solely on the basis of whether the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code (an "Adequate Assurance Objection").  Any such Adequate Assurance Objection must be filed with the Bankruptcy Court and served upon the Debtors and the Successful Bidder prior to the commencement of the Sale Hearing.

22.     The Debtors submit that the proposed Sale Notice and Notice of Successful Bidder, and providing notice of this Motion, the Asset Purchase Agreement, the Bidding Procedures, the Bidding Procedures Order, the Auction, and the Sale Hearing as described herein, comply fully with Bankruptcy Rule 2002 and Local Rule 2002-1 and constitute good and adequate notice of the Sale and the proceedings with respect thereto.  Therefore, the Debtors respectfully request that this Court approve the form of the Sale Notice and the notice procedures proposed above.

23.     In addition, and subject to the Court's availability, the Debtors request that the Sale Hearing be scheduled for a date that is approximately 60 days from the date hereof.

24.     By this Motion, the Debtors also request that the objection deadline (the "Objection Deadline") with respect to the Sale of the Bid Assets or related relief requested in the Sale Order[11] be 12:00 p.m. (ET) on a date that is at least 7 days prior to the Sale Hearing, or such later date as the Debtors may agree, and that such objections: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the Bankruptcy Court by

---

[10]     Any objections to the ability of the Stalking Horse Bidder to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code must be filed by the Assignment/Cure Objection Deadline as set forth above.

[11]     Objections to the assumption, assignment, and/or transfer of Assumed Contracts and Leases are addressed above.

the Objection Deadline; and (d) be served upon the Service Parties, so as to be received no later than the Objection Deadline.

## AUTHORITY FOR REQUESTED RELIEF

A.    **The Bidding Procedures Are Fair, Appropriate, and Designed to Maximize the Value Received for the Bid Assets.**

25.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Debtors submit that the Bidding Procedures are appropriate, are consistent with procedures routinely approved by courts in this district, will ensure that the bidding process is fair and reasonable, and will yield the maximum value for Debtors' estates and creditors. The Bidding Procedures proposed herein are designed to maximize the value received for the Bid Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire the information necessary to submit a timely and informed bid. Thus, the Debtors and all parties in interest can be assured that the consideration for the Bid Assets will be fair and reasonable. At the same time, the Bidding Procedures provide the Debtors with an adequate opportunity to consider all competing offers and to select, in their reasonable business judgment, the highest and best offer for the Bid Assets. Accordingly, the Debtors submit that the Court should approve the Bidding Procedures.

B.    **The Sale of the Bid Assets is Within the Sound Business Judgment of the Debtors and Should Be Approved**

26.    As stated above, section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 does

not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 145–47 (3d Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999).

27.    The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely:  (a) a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) adequate and reasonable notice has been provided to interested persons, (c) the debtors have obtained a fair and reasonable price, and (d) the sale was negotiated in good faith. *Abbotts Dairies*, 788 F.2d at 145–47; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).  In this case, as set forth more fully herein, the Debtors submit that the decision to proceed with Sale of the Bid Assets and the Bidding Procedures is based upon sound business judgment and should therefore be approved.  A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155.

28.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a bankruptcy case.  Specifically, section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets.  *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that a bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

29.     The Debtors submit that more than ample business justification exists to sell the Bid Assets to the Successful Bidder(s) pursuant to the Bidding Procedures.  The prompt Sale of the Bid Assets presents the best opportunity to maximize their value for the estates.  The Debtors believe the sale of their business and assets must occur quickly in order to maximize the value of their estates, and that significant time spent in chapter 11 will only decrease the value of the Debtors' estates.  *In re Lehman Brothers Holdings, Inc.*, 445 B.R. 143, 180 (Bankr. S.D.N.Y. 2011) ("[A] sale should be approved when the court is faced with the situation of a so-called "melting ice cube," a sale that would prevent further, unnecessary losses, the failure of other

potential buyers to appear despite well-publicized efforts, and where the only alternative is an immediate liquidation that would yield far less for the estate and creditors.") (internal quotations and citations omitted); *In re Bos. Generating, LLC*, 440 B.R. 302, 329 (Bankr. S.D.N.Y. 2010) ("[I]f the Debtors were to abandon the Sale Transaction . . . there [would be] a material risk that, although the Debtors may not 'die,' their condition would significantly deteriorate.").

30.     Cash and liquidity for the Debtors' business are very limited.  There simply is not enough liquidity available to the Debtors for a more protracted sale process than that proposed. Accordingly, any delay in proceeding with the Sale on the proposed timeline may negatively impact the Debtors' ability to finance the sale process and, ultimately, consummate the Sale.

31.     The Debtors have very specific milestones they must meet pursuant to the proposed post-petition financing order (the "Proposed Interim DIP Order").  Given the Debtors' liquidity issues, compliance with the terms of the Proposed Interim DIP Order is absolutely critical to ensure access to the financing necessary to manage these chapter 11 cases in an orderly and expeditious manner.

32.     The Debtors further believe that a targeted sale process, which the Bidding Procedures establish, is most likely to achieve the highest and best price for their assets and will do so in an efficient and timely manner.  The Debtors respectfully submit that the relief sought by this Motion not only is reasonable, but necessary, to maximize the value of these estates for the benefit of the Debtors and their stakeholders, and that a sound business justification exists to pursue the proposed Sale utilizing the expedited process available to the Debtors under section 363 of the Bankruptcy Code.

33.     In addition, the notice described herein and in the Bidding Procedures Order is designed to provide adequate notice to all potentially interested parties, including both creditors of the Debtors' estates and also those parties who have previously expressed an interest in

purchasing the Bid Assets in the past nine months.  Accordingly, the proposed sale satisfies the second prong of the *Abbotts Dairies* standard.

34.    As discussed above, the Bidding Procedures are also designed to maximize the value received for the Bid Assets, therefore satisfying the requirement that the Debtors are adhering to the fiduciary duties owed to all creditors and interest holders.  The process proposed by the Debtors allows for a timely auction process while providing bidders ample time and information to submit a timely bid.  The Bidding Procedures are designed to ensure that the Bid Assets will be sold for the highest and best possible purchase price.  The Debtors are subjecting the value of their assets to market testing and permitting prospective purchasers to bid on the assets in a competitive environment, thereby subjecting the proposed Sale to a market check through the solicitation of competing bids in a court-supervised auction process.  Accordingly, the Debtors and all parties in interest can be assured that the consideration received for their assets will be fair and reasonable, and therefore the third prong of the *Abbotts Dairies* standard is satisfied.  As discussed below, the "good faith" prong of *Abbotts Dairies* is also satisfied here.

**C.    The Proposed Sale is Proposed in "Good Faith"
        Under Section 363(m) of the Bankruptcy Code**

35.    The Debtors request that the Court find that any Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Bid Assets.

36.    Section 363(m) provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

37.     Section 363(m) thus protects the purchaser of assets sold pursuant to section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.

38.     As required by section 363(m), the Bidding Procedures have been proposed in good faith and provide for both the Debtors and potential purchasers to act in good faith in negotiating the Sale of the Bid Assets and the assignment of the Assumed Contracts and Leases related thereto.[12]   Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m), has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'"  *Abbotts Dairies*, 788 F.2d at 147.   To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders."  *Id.* (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).   *See also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995).   Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings."  *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1998).

---

[12]     By its terms, section 363(m) applies to the sale of interests in tangible assets.   Additionally, the United States Court of Appeals for the Third Circuit has indicated that section 363(m) also protects the assignee of a debtor's interest in executory contracts under section 365 of the Bankruptcy Code.   *See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 497–98 (3d Cir. 1998).   In *Krebs*, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)."  *Id.* at 497.   Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in *Krebs* concluded that section 363(m) protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale.   Like the franchise agreements protected in *Krebs*, the Assumed Contracts and Leases are contracts that may be assumed, assigned, and/or transferred pursuant to section 365.   Therefore, the Debtors respectfully submit that section 363(m) applies to protect any Successful Bidder with respect to the purchase of the Bid Assets and the assumption of Assumed Contracts and Leases.

39.     Here, the Sale of the Bid Assets and the assignment and/or transfer of the Assumed Contracts and Leases, which will be designated by any Successful Bidder, will be in good faith.     As discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, any sale agreement will be the culmination of an extensive, arm's length solicitation and negotiation process in which all parties will be represented by counsel.   All negotiations have been and will continue to be conducted on an arm's length, good faith basis. Moreover, there is no evidence of fraud or collusion in terms of the proposed Sale.  With respect to the potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.   Lastly, the Bidding Procedures Order requires any Qualified Bidder to confirm that it has not engaged in any collusion with respect to the bidding on the Bid Assets.  Under the circumstances, any Successful Bidder for the Bid Assets should be afforded the protections that section 363(m) provides to a good faith purchaser.

40.     All parties in interest as described herein will receive notice of the Sale proposed herein and will be provided with an opportunity to be heard.  Additionally, all counterparties to Assumed Contracts and Leases will be provided notice of assumption, assignment, and/or transfer and an opportunity to be heard.  The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

**D.**     **The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code**

41.     The Debtors request approval to sell the Bid Assets free and clear of any and all liens, claims, interests, and encumbrances (except for Assumed Liabilities) in accordance with section 363(f) of the Bankruptcy Code.  Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

a.  applicable nonbankruptcy law permits sale of such property free and clear of such interest;

b.  such entity consents;

c.  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.  such interest is in bona fide dispute; or

e.  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met).

42.     Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

43.     The Debtors submit that the Sale will satisfy the requirements of section 363(f). To the extent a party objects to the Sale on the basis that it holds a lien or encumbrance on the Bid Assets, the Debtors believe that any such party could be compelled to accept a monetary satisfaction of such claims or that such lien is in bona fide dispute.  In addition, to the extent the Debtors discover that any party may hold a lien on all, or a portion of, the Bid Assets, the Debtors will provide such party with notice of, and an opportunity to object to, the Sale.  Absent objection, each such party will be deemed to have consented to the sale of the Bid Assets.

44.    Accordingly, the Debtors believe that the Sale will satisfy the statutory prerequisites of section 363(f) and should be approved free and clear of all liens, claims, interests, and encumbrances.

**E.    Assumption and Assignment of Assumed Contracts and Leases
Should Be Approved**

45.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g., In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim, or caprice); *see also In re Mkt. Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

46.    The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control over the administration of the estate, and threaten the court's ability to decide a case impartially.  *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1), for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any

default, including compensation for "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

47.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  *See In re Rickel Home Ctr., Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtor's assets).

48.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora Indus.*, 2002 WL 32332749, at *8 (D. Del. May 20, 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment.").  Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

49.     The Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption and assignment of the Assumed Contracts and Leases to the Stalking Horse Bidder or the Successful Bidder(s).  The Debtors further request that the Sale Order provide that the Assumed Contracts and Leases will be transferred to, and remain in full force and effect for the

benefit of, the Stalking Horse Bidder or the Successful Bidder(s) notwithstanding any provisions in the Assumed Contracts and Leases, including those described in Bankruptcy Code sections 365(b)(2), (f)(1), and (f)(3), that prohibit such assignment.

50.     To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the Stalking Horse Bidder or the Successful Bidder(s) to perform under the Assumed Contracts and Leases.  The Sale Hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the Stalking Horse Bidder or the Successful Bidder(s) to provide adequate assurance of future performance under the Assumed Contracts and Leases, as required under section 365(b)(1)(C).  Further, as set forth above, the Debtors will give notice to all parties to the Assumed Contracts and Leases.  This notice will include the amounts the Debtors believe are necessary to cure any defaults in accordance with section 365(b).  Accordingly, the Debtors submit that implementation of the proposed Assignment Procedures is appropriate in these cases.

**F.      The Bid Assets and Assumed Contracts and Leases Should
        Be Sold Free and Clear of Any Successor Liability**

51.     Under the terms of any agreement, the Stalking Horse Bidder and/or Successful Bidder(s) likely will not be liable for any of the Seller's liabilities as a successor to the Seller's business or otherwise, under any theory of law or equity, unless such liability is expressly assumed.  Significant precedent exists demonstrating that claims against a winning bidder are directed to the proceeds of a free and clear sale and may not subsequently be asserted against a successful bidder.

52.     Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," but the term "any interest" is not defined in the Bankruptcy Code.  *In re Downtown Athletic Club of N.Y.C., Inc.*, 2000 WL 744126, at *4 (S.D.N.Y. June 9, 2000) (approving sale free and clear of leasehold interests); *see also Folger Adam Sec., Inc. v.*

*DeMatteis/MacGregor, JV*, 209 F.3d 252, 257 (3d Cir. 2000) ("The term 'any interest,' as used in section 363(f), is not defined anywhere in the Bankruptcy Code.").  Courts construe the term "interest" in line with its plain meaning to include interests other than mere liens, and they generally give a "broad interpretation of 'any interest' as utilized under § 363(f)."  *In re Downtown Athletic Club*, 2000 WL 744126, at *4 (citing *In re Lady H Coal Co.*, 193 B.R. 233, 246 (Bankr. S.D. W. Va. 1996)); *see also In re Trans World Airlines, Inc.*, 322 F.3d 283, 289–90 (3d Cir. 2003) (finding that any interests that "arise from the property being sold" may qualify as "interests" under section 363(f)).  As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581–82 (4th Cir. 1996), the scope of section 363(f) is not limited to *in rem* interests.  Thus, *Leckie* held that debtors could sell their assets under § 363(f) free and clear of successor liability that could have otherwise arisen under a federal statute.  *Id.*; *see also In re Trans World Airlines*, 322 F.3d at 290 ("Indeed, to equate interests in property with only *in rem* interests such as liens would be inconsistent with section 363(f)(3), which contemplates that a lien is but one type of interest.").

53.     Courts consistently hold that "stalking horse" bidders in section 363 sales take free of successor liability resulting from pre-existing claims.  *See In re Trans World Airlines*, 322 F.3d at 290 (sale order barring successor liability on account of employment and voucher claims consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); *In re Specialty Packaging Holdings, Inc.*, 2010 WL 2822104, at *4 (Bankr. D. Del. Mar. 24, 2010) (approving a sale of assets under section 363(f) "free and clear of any and all liens, claims, interests, encumbrances, and successor liabilities"); *Ninth Ave. Remedial Grp. v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash.

1982) (finding section 363 sale free and clear of Title VII employment discrimination and civil

rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876–77 (Bankr. D.R.I. 1985)

(transfer of liquor license free and clear of any interest permissible even though the estate had

unpaid taxes); *Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 190

(Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of

assets free and clear); *WBQ P'ship v. Va. Dep't of Med. Assistance Servs. (In re WBQ P'Ship)*,

189 B.R. 97, 104–05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture

depreciation is an "interest" as used in section 363(f)).[13]

54.     An order purporting to authorize the sale of the Bid Assets free and clear of any

interests would be thwarted if claimants could later use that sale to assert claims against the

Successful Bidder(s).  Under section 363(f) of the Bankruptcy Code, a Stalking Horse Bidder or

other Successful Bidder is entitled to know that the Bid Assets are not infected with latent claims

that will be asserted against the bidder after the proposed transaction is completed.

55.     Accordingly, the Sale Order should provide that any Successful Bidder is not

liable as a successor under any theory of successor liability, whether in law or in equity, for any

liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations,

liabilities, contractual commitments, or interests of any kind or nature whatsoever that encumber

or relate to the Bid Assets.

## G.      Ability to Provide the Stalking Horse Bidder with Stalking Horse Protections.

56.     The Break-Up Fee and the Expense Reimbursement were negotiated at arm's-

length and in good faith and are necessary to secure the Stalking Horse Bidder's participation in

---

[13]      Courts concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims have nonetheless found that section 105(a) of the Bankruptcy Code provides the requisite authority.  *See Volvo White Truck Corp.*, 75 B.R. at 948 (stating that the absence of specific authority to sell assets free and clear of liens does not prevent such a sale, as the court's authority to permit such a sale is implicit in the court's equitable power when necessary to carry out the provisions of title 11).

the Debtors' sale process.  The Debtors have determined that pursuing a sale transaction is in the best interests of the Debtors, their creditors, and their estates, and therefore submit that agreeing to the Break-Up Fee and the Expense Reimbursement were actual, necessary costs of preserving their estates.

57.    In the Third Circuit, bid protections, including traditional break-up fees and expense reimbursement provisions, will be approved where they are necessary for the preservation of the debtor's estate.  *See, e.g., In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (citing *Calpine Corp.* v. *O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999).  Accordingly, bid protections may be awarded where they induce the stalking horse bidder to make an initial bid or adhere to its bid after the court orders an auction and where they promote more competitive bidding.  *In re O'Brien*, 181 F.3d at 537.

58.    Here, the Break-Up Fee and the Expense Reimbursement should be approved because they provide a clear benefit to the Debtors' estates and the Stalking Horse Bidder has expressly conditioned its willingness to enter into the Asset Purchase Agreement upon the Debtors' agreement to, and Court approval of, the Break-Up Fee and the Expense Reimbursement, as set forth in the Asset Purchase Agreement. The Break-Up Fee and the Expense Reimbursement will enable the Debtors to secure an adequate floor and, thus, insist that competing bids be materially higher and better than any agreement that might be entered into with the Stalking Horse Bidder.  Accordingly, the Debtors' ability to offer the Break-Up Fee and the Expense Reimbursement enables them to ensure the sale of substantially all of the Bid Assets to a contractually-committed bidder at a price they believe to be fair while, at the same time, providing them with the potential of even greater benefit to their estates.

59.     The Debtors submit that the amount of the Break-Up Fee and the Expense Reimbursement is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Bidder, including conducting the legal and financial diligence necessary to negotiate and enter into the Asset Purchase Agreement, which will serve as the baseline for other bids for the Bid Assets.

60.     In addition, payment of the Break-Up Fee and the Expense Reimbursement will not diminish the Debtors' estates.  The Debtors do not intend to terminate the Asset Purchase Agreement if to do so would incur an obligation to pay the Break-Up Fee, unless to accept an alternative bid(s), which bid(s) must exceed the consideration offered by the Stalking Horse Bidder by an amount sufficient to pay the Break-Up Fee and the Expense Reimbursement.  With respect to the Expense Reimbursement, only reasonable out-of-pocket costs, fees, and expenses will be reimbursed by the Debtors.

61.     The Break-Up Fee, which represents 3.0% of the Purchase Price, is reasonable and consistent with the range of bid protections typically approved by bankruptcy courts in this District.  *See, e.g., In re Vertis Holdings, Inc.*, Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) (D.I. 206) (court approved break-up fee of 3.0% in connection with a $258 million sale of assets); *In re Northstar Aerospace (USA) Inc.*, Case No. 12-11817 (MFW) (Bankr. D. Del. June 27, 2012) (D.I. 119) (court approved break-up fee of 3.5% in connection with $70 million sale of assets); *In re Global Motorsport Grp., Inc.*, Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (D.I. 101) (court approved break-up fee of approximately 4% or $500,000 in connection with sale of assets); *In re Global Home Prods. LLC*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006 (court approved break-up fee of approximately 3.1% or $650,000 in connection with sale of assets).

62.     Accordingly, the Debtors submit that the Break-Up Fee and Expense Reimbursement reflect a sound business purpose, are fair and appropriate under the circumstances and, because the standard used by courts in this district in approving similar protections has been satisfied here, the Debtors respectfully submit that the Break-Up Fee and Expense Reimbursement should be approved.

H.      **Relief from the Fourteen-Day Waiting Periods Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate**

63.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Bidding Procedures Order and the Sale Order be effective immediately by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

64.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

65.     Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

66.     Notice of this Motion will be given to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims; (c) counsel to the Stalking Horse Bidder; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) all entities (or counsel therefor) known or reasonably believed to have asserted any lien, claim, encumbrance, right of first refusal, or other interest in or upon any portion of the Bid Assets; and (g) all parties that have requested, prior to the date hereof, or that are required to receive notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court:  (a) enter the Bidding Procedures Order in substantially the form attached hereto as **Exhibit A**; (b) enter a Sale Order in a form attached hereto as **Exhibit B**, authorizing the sale of the Bid Assets to the Stalking Horse Bidder or another Successful Bidder(s) at the Auction; and (c) grant such other and further relief to the Debtors as the Court may deem proper.

Dated:    March 17, 2015                          Respectfully submitted,
          Wilmington, Delaware

                                                  MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                                                  */s/ Andrew R. Remming*
                                                  Robert J. Dehney (No. 3578)
                                                  Andrew R. Remming (No. 5120)
                                                  Matthew R. Koch (No. 6048)
                                                  1201 N. Market St., 16th Flr.
                                                  PO Box 1347
                                                  Wilmington, DE  19899-1347
                                                  Telephone:    302-658-9200
                                                  Facsimile:    302-658-3989
                                                  rdehney@mnat.com
                                                  aremming@mnat.com
                                                  mkoch@mnat.com

                                                  *Proposed Counsel for Debtors*
                                                  *and Debtors in Possession*

8950219