### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
                 :
In re                            :    Chapter 11
                 :
USA SYNTHETIC FUEL CORPORATION, *et al.*,[1]   :    Case No. 15-_____ (___)
                 :
          Debtors.              :    (Joint Administration Pending)
                 :
---------------------------------------------------------------- x

### MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS
### (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO
### 11 U.S.C. § 364, (II) AUTHORIZING USE OF CASH COLLATERAL
### PURSUANT TO 11 U.S.C. § 363, (III) GRANTING ADEQUATE PROTECTION
### PURSUANT TO 11 U.S.C. §§ 361, 363 AND 364, AND (IV) SCHEDULING A
### FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)

USA Synthetic Fuel Corporation and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), hereby move (the "Motion") this Court, under sections 105, 361, 362, 363(c)(2), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order substantially in the form annexed hereto as **Exhibit A**, (the "Interim Order") and, thereafter, a final order substantially in the form annexed hereto as **Exhibit B** (the "Final Order", and together with the Interim Order, the "DIP Orders") (i) authorizing the Debtors to enter into a $765,970 Secured Superpriority Priming Debtor-in-Possession Term Loan

---

[1]      The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): USA Synthetic Fuel Corporation (5258); Lima Energy Company (5661); and Cleantech Corporation (6023). The Debtors' address is 312 Walnut Street, Suite 1600, Cincinnati, Ohio 45202.

Facility, substantially in the form annexed hereto as **Exhibit C** (the "DIP Term Sheet"), to obtain post-petition financing on a secured superpriority basis, (ii) scheduling a final hearing (the "Final Hearing") pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (iii) granting related relief.  In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Dr. Steven C. Vick in Support of First Day Relief* (the "Vick Declaration"),[2] filed with the Court concurrently herewith.   In further support of the Motion, the Debtors, by and through their proposed undersigned counsel, respectfully represent:

## JURISDICTION

1.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).   Venue of these proceedings in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief sought herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002 and 4001 and Local Rule 4001-2.

3.      The Debtors consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

[2]      Capitalized terms used but not defined herein have the meanings ascribed to them in the Vick Declaration, the Interim Order, or the DIP Term Sheet, as applicable.

## BACKGROUND

4.      On the date hereof (the "Petition Date"), each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  No trustee, examiner, or official committee has been appointed in these cases.  The Debtors are operating their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases (the "Chapter 11 Cases") pursuant to Bankruptcy Rule 1015(b).

5.      The Debtors are an environmentally focused, alternative energy company pursuing clean energy solutions based on gasification and other proven Btu conversion technologies.

6.      A full description of the Debtors' business operations, corporate structure, capital structure, and reasons for commencing these Chapter 11 Cases is set forth in the Vick Declaration.

## SUMMARY OF THE DEBTORS' PREPETITION SECURED INDEBTEDNESS

*Loan and Security Agreement*[3]

7.      As described in the Vick Declaration, prior to the Petition Date, the Debtors, other than Cleantech Corporation ("Cleantech Corp"), entered into (i) that certain Note Purchase Agreement (the "Note Purchase Agreement"), dated as of September 24, 2012, among Lima Energy Company ("LEC"), as borrower, USA Synthetic Fuel Corporation ("USFC"), as guarantor, TECC (as defined below), as administrative agent (in such capacity, "NPA Agent"), Sprott PC Trust, as noteholder, and Third Eye Capital Credit Opportunities Fund – Insight Fund,

---

[3]      All descriptions are qualified in their entirety by the actual definitive documents.

as noteholder (together with Sprott PC Trust, the "Prepetition Noteholders"); and (ii) that certain Unit Purchase Agreement (the "Unit Purchase Agreement"), dated as of September 24, 2012, among LEC, as borrower, USFC, as guarantor, TECC, as administrative agent (in such capacity, "UPA Agent"), and Strative Capital Ltd. (the "Prepetition Investor", and together with the Prepetition Noteholders, the NPA Agent, the UPA Agent, and the Royalty Agent (defined below), collectively, the "TEC Prepetition Lenders"), and (iii) that certain Royalty Agreement (the "Royalty Agreement"; and together with the Note Purchase Agreement and the Unit Purchase Agreement, collectively, the "TEC Prepetition Agreements"), among LEC, as payor, TECC, as administrative agent (in such capacity, the "Royalty Agent"), and the Prepetition Investor, as royalty investor.

8.      Pursuant to the TEC Prepetition Agreements, the Debtors were, as of the Petition Date, indebted to (i) the Prepetition Noteholders under the Note Purchase Agreement in the aggregate principal amount of approximately $31,604,863 plus accrued interest, redemption fees, and other similar costs and (ii) the Prepetition Investor under the Unit Purchase Agreement in the aggregate principal amount of approximately $5,000,000 plus accrued interest, redemption fees, and other similar costs.

9.      To secure the TEC Prepetition Indebtedness under the TEC Prepetition Agreements, the Debtors entered into the following prepetition collateral documents (the "TEC Collateral Documents", and together with the TEC Prepetition Agreements, the "TEC Prepetition Debt Documents") and thereby granted security interests in, and liens upon, substantially all of their assets:

    A. that certain First Lien Security Agreement (the "First Lien Security Agreement"), dated September 24, 2012, by and among USFC, LEC, Cleantech Energy Company ("Cleantech Energy"), Cleantech Corp, and TECC, as administrative agent under the Note Purchase Agreement;

B.  that certain First Lien Parent Guaranty, dated as of September 24, 2012, by and between USFC and TECC, as administrative agent under the Note Purchase Agreement;

C.  that certain First Lien Subsidiary Guaranty, dated as of September 24, 2012, by and between Cleantech Energy, Cleantech Corp, and TECC, as administrative agent under the Note Purchase Agreement;

D.  that certain First Lien Amended and Restated Mortgage, Assignment of Production, Security Agreement, Fixture Filing and Financing Statement (the "First Lien Mortgage"), dated as of September 24, 2012, by LEC in favor of TECC, as administrative agent under the Note Purchase Agreement;

E.  that certain Second Lien Security Agreement (the "Second Lien Security Agreement", and together with the First Lien Security Agreement, the "TEC Security Agreements"), dated September 24, 2012, by and among USFC, LEC, Cleantech Energy, Cleantech Corp, and TECC, as administrative agent under the Unit Purchase Agreement;

F.  that certain Second Lien Parent Guaranty, dated as of September 24, 2012, by and between USFC and TECC, as administrative agent under the Unit Purchase Agreement;

G.  that certain Second Lien Subsidiary Guaranty, dated as of September 24, 2012, by and between Cleantech Energy, Cleantech Corp, and TECC, as administrative agent under the Unit Purchase Agreement;

H.  that certain Second Lien Amended and Restated Mortgage, Assignment of Production, Security Agreement, Fixture Filing and Financing Statement (the "Second Lien Mortgage"), dated as of September 24, 2012, by LEC in favor of TECC, as administrative agent under the Unit Purchase Agreement; and

I.  that certain Third Lien Amended and Restated Mortgage, Assignment of Production, Security Agreement, Fixture Filing and Financing Statement (the "Third Lien Mortgage"), dated as of September 24, 2012, by LEC in favor of TECC, as administrative agent under the Royalty Agreement.

## RELIEF REQUESTED

10.  By this Motion, the Debtors respectfully request that the Court grant the following relief as provided in the proposed DIP Orders:

> (i) authorizing the Borrower to obtain secured post-petition financing (the "DIP Financing") and for the Guarantors to guarantee certain of the Borrower's obligations in connection with the DIP Financing, consisting of a first lien superpriority term loan multi-draw facility in an aggregate principal amount of up to $765,970 (the "DIP Facility"), with Third Eye Capital Corporation, an Ontario corporation ("TECC"), as administrative agent and collateral agent on behalf of certain lenders (the "DIP Lenders")

and other holders of any DIP Obligations (in such capacities, the "DIP Agent" and collectively with the DIP Lenders and any other holder of DIP Obligations, the "Secured Parties");

(ii) granting the DIP Agent, for the benefit of the Secured Parties, pursuant to Bankruptcy Code §§ 364(c)(2), 346(c)(3), and 364(d), security interests upon all DIP Collateral;

(iii) granting the DIP Agent, pursuant to Bankruptcy Code § 364(c)(1), priority in payment with respect to the DIP Obligations over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507, 546(c), 552(b), 726, 1113, 1114, or any other provision of the Bankruptcy Code, other than in respect of the Carve-Out;

(iv) authorizing the Debtors, pursuant to Bankruptcy Code § 363(c), to use Cash Collateral and, pursuant to Bankruptcy Code §§ 361, 362(d), 363(c), 363(e), and 364(d), to provide adequate protection to the Adequate Protection Parties with respect to any diminution in the value of their interest in the DIP Collateral resulting from the priming liens and security interests to be granted herein pursuant to Bankruptcy Code § 364(d), to secure the DIP Obligations, the use of Cash Collateral, the use, sale, or lease of the DIP Collateral (other than Cash Collateral) and the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a);

(v) scheduling a preliminary hearing (the "Interim Hearing") on the Motion to consider entry of the Interim Order pursuant to Bankruptcy Rule 4001; and

(vi) scheduling a final hearing (the "Final Hearing") and establishing notice procedures in respect of the Final Hearing to consider entry of a final order (the "Final Order") authorizing on a final basis, *inter alia*, the DIP Financing and the use of Cash Collateral.

## COMPLIANCE WITH LOCAL RULE 4001-2

11.    Local Rule 4001-2(a) requires that all cash collateral and financing requests under sections 363 and 364 of the Bankruptcy Code highlight certain provisions contained in the financing documents and the proposed form of order, and that the movant provide justification for the inclusion of such provisions.  The Debtors believe that certain provisions of the DIP Term

Sheet, Interim Order, and Final Order implicate Local Rule 4001-2, and that such provisions are justified and necessary in the context and circumstances of these cases.  In particular, Local Rule 4001-2(a)(i) states in pertinent part:

> (i) All Financing Motions must (a) recite whether the proposed form of order and/or underlying cash collateral stipulation or loan agreement contains any provision of the type indicated below, (b) identify the location of any such provision in the proposed form of order, cash collateral stipulation and/or loan agreement and (c) justify the inclusion of such provision:
>
>> (A) Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by post-petition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law);
>>
>> (B) Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters;
>>
>> (C) Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c);
>>
>> (D) Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549;
>>
>> (E) Provisions that deem prepetition secured debt to be post-petition debt or that use post-petition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);
>>
>> (F) Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those

professionals retained by the debtor with respect to a professional fee carve-out;

(G) Provisions that prime any secured lien without the consent of that lienor; and

(H) Provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).

Del. Bankr. L.R. 4001-2(a)(i).

12.     The Debtors identify here the provisions of the DIP Term Sheet, Interim Order, and Final Order that may fall within the ambit of Local Rule 4001-2.

13.     Pursuant to Local Rule 4001-2(a)(i)(B), paragraph 23 of the Interim Order reads[4]:

The stipulations and admissions contained in this Interim Order with respect to the validity, perfection or amount of any secured creditor's prepetition lien or the waiver of claims against any secured creditor became binding on the Debtors and the Debtors' estates upon entry of this Interim Order and shall be binding on all other parties in interest, including, without limitation, any Committee, unless any Committee or another party in interest (other than any of the Debtors or other Debtors), in each case with standing and requisite authority, has timely commenced a contested matter or adversary proceeding, challenging the amount, validity or enforceability of the TEC Prepetition Indebtedness or the perfection or priority of the TEC Prepetition Liens, or otherwise asserting any objections, claims, or causes of action on behalf of the Debtors' estates against the TEC Prepetition Lenders relating to the TEC Prepetition Indebtedness or the TEC Prepetition Liens (such adversary proceeding or contested matter, a "Challenge") (provided, however, that not more than $20,000 in the aggregate may be used to pay any allowed fees of a Committee and professionals retained by such Committee incurred in connection with pursuing a Challenge), on or before (a) as to the Committee, the sixtieth (60th) calendar day after the date of appointment of such Committee by the U.S. Trustee, or (b) as to any party in interest other than the Committee, the seventy-fifth (75th) calendar day after the date of entry of this Interim Order ((a) and (b) together, the "Challenge Period").  If no such Challenge is timely commenced as of such date then, without further order of

---

[4]     *See also* Final Order, ¶ 23.

the Court, (x) the claims, Liens, and security interests of the TEC Prepetition Lenders shall, without further order of the Court, be deemed to be finally allowed for all purposes in the Cases and any Successor Case and shall not be subject to challenge or objection by any party in interest as to validity, priority, amount, or otherwise, and (y) without further order of the Court, the Debtors and their estates shall be deemed to have relinquished, released, and waived any and all claims or causes of action against the TEC Prepetition Lenders with respect to the TEC Prepetition Debt Documents or any related transactions.  Notwithstanding anything to the contrary herein, if no Challenge is timely commenced, the stipulations contained in paragraph 6 of this Interim Order with respect to the validity, perfection or amount of the TEC Prepetition Liens or the waiver of claims against the TEC Prepetition Lenders shall be binding on the Debtors' estates, any Committee, and all parties in interest.  If a Challenge is timely commenced, the stipulations contained in paragraph 6 of this Interim Order shall be binding on the Debtors' estates and all parties in interest except to the extent such stipulations are specifically challenged in such Challenge, as and when originally filed (ignoring any relation back principles); provided, that if and to the extent a Challenge is withdrawn, denied, or overruled, the stipulations specifically challenged in such Challenge also shall be binding on the Debtors' estates and all parties in interest; provided further, that if the Cases are converted to cases under chapter 7 of the Bankruptcy Code prior to the expiration of the Challenge Period, a chapter 7 trustee may move for an extension of the Challenge Period, but TEC and all other parties in interest reserve the right to object.

14.     Pursuant to Local Rule 4001-2(a)(i)(F), paragraph 15 of the Interim Order reads[5]:

Notwithstanding anything in this Interim Order, the DIP Term Sheet, the TEC Prepetition Debt Documents, the Existing Agreements, the DIP Documents, or any other order of this Court to the contrary (but subject to paragraph 17 of this Interim Order), the TEC Prepetition Liens and all claims and Liens granted under this Interim Order, the DIP Term Sheet, the TEC Prepetition Debt Documents, the Existing Agreements and the DIP Documents to or for the benefit of the TEC Prepetition Lenders, the Prepetition Secured Parties, the DIP Agent, the DIP Lenders, Adequate Protection Parties (as defined below) and the other Secured Parties, including, but not limited to, the DIP Superpriority Claims, the DIP Liens, the Adequate Protection Liens and the Adequate Protection Superpriority Claims (as defined below), shall be

---

[5]     See also DIP Term Sheet, p. 15; Final Order, ¶ 15.

subject to payment of the Carve Out.  As used in this Interim Order, the term "Carve Out" means, collectively: (i) all unpaid fees required to be paid (a) to the Clerk of the Bankruptcy Court and (b) to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code in such amounts as determined in agreement with the United States Trustee or by final order of the Court, (ii) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code not to exceed $25,000, (iii) after the occurrence and during the continuance of a Trigger Event (as defined below), all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtors in an aggregate amount not exceeding $25,000 for the payment of the Debtors' professionals, which amount may be used subject to the terms of the DIP Term Sheet and this Interim Order, and (iv) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtors at any time when no Trigger Event is continuing, that remain unpaid subsequent to a Trigger Event, in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the Budget, to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (i), (ii), (iii) and (iv), to the extent allowed by the Court at any time; provided, however, that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv) above.  For purposes of the foregoing, the term "Trigger Event" shall mean the delivery of a written notice (which may be delivered by email) by the DIP Agent to the Debtors through their counsel that an Event of Default has occurred.

15.     Pursuant to Local Rule 4001-2(a)(i)(G), paragraph 12(a) of the Interim Order reads[6]:

> As security for the full and timely payment of the DIP Obligations, effective upon the entry of this Interim Order, the DIP Agent, for the benefit of the Secured Parties, hereby is granted, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable, and fully perfected security interests in and liens and mortgages (collectively, the "DIP Liens") upon all DIP Collateral (as defined below), which shall (i)

---

[6]      *See also* Final Order, ¶ 12(a).

constitute first-priority security interests in and Liens upon all DIP Collateral (as defined below) that is not otherwise subject to any valid, enforceable, and non-avoidable Liens in existence on the Petition Date that are not subject to subordination and were either properly perfected as of the Petition Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code and are senior to the TEC Prepetition Liens (collectively, the "Permitted Prepetition Liens"), (ii) be senior to and prime the TEC Prepetition Liens on the TEC Prepetition Collateral, (iii) be senior to and prime all Adequate Protection Liens, and (iv) be subordinate to the Carve Out (as defined below) and the Permitted Prepetition Liens; provided, that the Debtors expressly reserve their rights and the estates' rights to challenge, avoid or otherwise object to any Prepetition Liens (other than the TEC Prepetition Liens).

16.     Pursuant to Local Rule 4001-2(a)(i)(G), paragraph 13(a) of the Interim Order reads[7]:

> The DIP Liens and the DIP Superpriority Claims are and shall be at all times senior and prior in all respects to the Adequate Protection Liens, the TEC Prepetition Liens and any other prepetition liens that are not Permitted Prepetition Liens on the DIP Collateral.

17.     Pursuant to Local Rule 4001-2(a)(i)(H), paragraph 34 of the Interim Order reads[8]:

> No action, inaction, or acquiescence by the DIP Agent, including funding the Debtors' operations and the conduct and pursuit of a sale and liquidation process under this Interim Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Agent to a charge against the DIP Collateral pursuant to sections 506(c), 552(b), or 105(a) of the Bankruptcy Code. The DIP Agent shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral. The DIP Liens shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code and, subject to the entry of the Final Order, the "equities of the case" exception of section 552(b) of the Bankruptcy Code shall not apply to the TEC Prepetition Lenders with respect to the TEC Prepetition Debt Documents or the TEC Prepetition Collateral.

---

[7]     *See also* Final Order, ¶ 13(a).

[8]     *See also* Final Order, ¶ 34.

18.     The justification for the provisions of the DIP Financing for which disclosure is required pursuant to Local Rule 4001-2 is the immediate and critical need for this financing.  As discussed below, the Debtors were unable to secure post-petition financing on terms more favorable than those obtained from the DIP Lenders and such financing is critical to the maximization of recoveries for the Debtors' creditors.  Indeed, without this financing, it is likely that the Debtors will be forced to immediately liquidate and will be unable to conduct the sale process proposed in these Chapter 11 Cases.  Accordingly, the facts and circumstances of these cases justify the inclusion of the terms that require disclosure under Local Rule 4001-2, and such terms of the DIP Financing should therefore be approved.

## CONCISE SUMMARY OF THE DIP FINANCING TERMS[9]

19.     In accordance with Bankruptcy Rules 4001(c) and (d) and Local Rule 4001-2(a)(ii), the following summarizes the significant terms of the DIP Financing.  The Debtors have determined, in the exercise of their sound business judgment, that to meet their working capital needs they require a post-petition credit facility in substantially the form described herein.  Accordingly, subject to the Court's approval, the Debtors have determined to enter into the DIP Financing.  The terms of the DIP Financing are more specifically set forth in the proposed Interim Order, the proposed Final Order, and the DIP Term Sheet.  The Debtors believe that the

---

[9]     The summaries and descriptions of the terms and conditions of the DIP Term Sheet, the proposed Interim Order, and the proposed Final Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the Interim Order, the Final Order, and the DIP Term Sheet.  In the event there is a conflict between this Motion and the Interim Order, the Final Order, or the DIP Term Sheet, the Interim Order, the Final Order or the DIP Term Sheet, as applicable, shall control in all respects.

following provisions of the DIP Term Sheet, the Interim Order, and the Final Order are justified

and necessary in the context and circumstances of these cases[10]:

| | |
|---|---|
| **Borrower** | USA Synthetic Fuel Corporation (*See* DIP Term Sheet, p. 1; Interim Order, p. 1) |
| **Guarantors** | Lima Energy Company and Cleantech Corporation (*See* DIP Term Sheet, p. 1; Interim Order, ¶ 8) |
| **Lenders** | One or more lenders from time to time party to the DIP Term Sheet (together with such lenders' respective successors and permitted assigns, the "DIP Lenders").  As used herein, "Majority Lenders" means, at any date of determination, DIP Lenders holding more than 50% of the sum of (a) the aggregate principal amount of DIP Loans outstanding at such time and (b) the aggregate principal amount of unutilized DIP Commitments at such time.<br><br>(*See* DIP Term Sheet, p. 1; Interim Order, p. 2) |
| **DIP Agent** | Third Eye Capital Corporation (*See* DIP Term Sheet, p.1; Interim Order, p. 2) |
| **DIP Facility**<br><br>    Facility Amount:<br><br>    Budget: | <br><br>$765,970 (*See* DIP Term Sheet, pp.1–2; Interim Order, p. 2)<br><br>A copy of the Budget (as defined below) is attached hereto as **Exhibit D**. |
| **Interest Rate** | 12.00% per annum (the "Base Rate") (*See* DIP Term Sheet, p. 4; Interim Order, ¶ 8) |
| **Default Interest** | Upon the occurrence and during the continuation of any Event of Default interest on all DIP Loans shall be payable at the Base Rate, plus 5.0%.<br><br>(*See* DIP Term Sheet, p. 4; Interim Order, ¶ 8) |
| **Maturity** | The DIP Facility shall be paid in full in cash or otherwise satisfied in a manner agreed to by the DIP Agent in its sole discretion on the date (the "Maturity Date") which is the earliest of (a) 75 days from the Petition Date; (b) the effective date of a plan of reorganization or liquidation; (c) the consummation of a sale(s) of all or substantially all of the assets of the Debtors; (d) the occurrence of an Event of Default; (e) the entry of an order by the Court approving or authorizing any alternative or additional debtor-in-possession financing; and (f) such later date as the DIP Agent and the DIP Lenders in their sole discretion may agree to in writing with the Borrower.  By virtue of Clause (d) of the definition of "Maturity Date", the Maturity Date shall be the date of the occurrence of an Event of Default, subject to the Default Notice Period.<br><br>(*See* DIP Term Sheet, pp. 4–5; Interim Order, ¶ 18) |
| **Commitment and Other Fees** | None.  (*See* DIP Term Sheet, p. 15) |
| **Expenses** | Upon the consummation of the transactions contemplated by the DIP Term Sheet, the Debtors shall pay all reasonable costs and expenses of the DIP Agent and the DIP Lenders (including all reasonable fees, expenses, and disbursements of outside counsel of the DIP Agent and any DIP Lender) in connection with the DIP Facility (including the reasonable costs and expenses of any financial consultant retained by the DIP Agent) and all reasonable costs and expenses incurred by the DIP Agent and the DIP Lenders in connection with the enforcement of any of their respective rights and remedies under any of the applicable DIP Documents.  Any fees, costs and expenses payable pursuant to this |

---

[10]    Capitalized terms used but not otherwise defined in the following summaries have the meanings ascribed to them in the Interim Order or the DIP Term Sheet, as applicable.

|  | section or any other payments required under the section entitled "Expenses and Indemnification" below shall be payable from (a) the proceeds of any sale of the DIP Collateral or other exercise of remedies against any Debtor after a Termination Event and/or (b) to the extent provided for in the Budget, proceeds of any DIP Loans.<br><br>(*See* DIP Term Sheet, p. 15; Interim Order, ¶ 22) |
|---|---|
| **Priority and Liens** | The DIP Obligations, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code:<br><br>(i) shall constitute (without the need to file a proof of claim) joint and several superpriority claims against each Debtor, with priority over any and all administrative expenses of the Debtors, whether now existing or hereafter arising or incurred, of any kind whatsoever, including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (subject to entry of the Final Order), 507, 546(c), 552(b) (subject to entry of the Final Order), 726, 1113, 1114, or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, whether now in existence or hereafter incurred by the Debtors, and shall at all times be senior to the rights of any Debtor, any Debtor's estate, and any successor trustee, estate representative, or any creditor, in any of the Chapter 11 Cases or any Successor Case;<br><br>(ii) shall be secured by valid, enforceable, non-avoidable, and fully perfected first priority security interests in and liens and mortgages upon (in favor of the DIP Agent for the benefit of the Secured Parties) all DIP Collateral that is not otherwise subject to any valid, enforceable, and non-avoidable liens in existence on the Petition Date that are not subject to subordination and were either properly perfected as of the Petition Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code and are senior to the TEC Prepetition Liens (collectively, the "Permitted Prepetition Liens");<br><br>(iii) shall be secured by valid, enforceable, non-avoidable, and fully perfected security interests in and liens and mortgages upon (in favor of the DIP Agent for the benefit of the Secured Parties) all DIP Collateral, which liens shall be senior to and prime the TEC Prepetition Liens on the TEC Prepetition Collateral (in each case, as defined in the Interim Order) and any other prepetition liens that are not Permitted Prepetition Liens;<br><br>(iv) shall be secured by valid, enforceable, non-avoidable, and fully perfected security interests in and liens and mortgages upon (in favor of the DIP Agent for the benefit of the Secured Parties) all DIP Collateral, which liens shall be senior to and prime all Adequate Protection Liens; and<br><br>(v) shall be subordinate to the Carve Out and the Permitted Prepetition Liens.<br><br>(*See* DIP Term Sheet, pp. 12–13; Interim Order, ¶ 11–14, 20) |
| **Adequate Protection** | (A) Any secured creditor of the Debtors with a valid, perfected, enforceable, continuing and non-avoidable prepetition first lien (a "Prepetition First Lien") on or security interest in property of the Debtors pursuant to the First Lien Security Agreement and the First Lien Mortgage shall be granted adequate protection for, and in equal amount to, the diminution in value of their valid, perfected, enforceable, continuing and non-avoidable prepetition security interests in the form of superpriority claims and replacement liens on all assets securing the DIP Facility (the "First Lien Adequate Protection Liens"), which claims and replacement liens shall be junior in priority and subject in all respects to the DIP Liens and to the Carve Out but senior to the TEC Prepetition Liens (as defined in the Interim Order).<br><br>(B) Any secured creditor of the Debtors with a valid, perfected, enforceable, continuing and non-avoidable prepetition second lien (a "Prepetition Second Lien") on or security |

14

|  | interest in property of the Debtors pursuant to the Second Lien Security Agreement and the Second Lien Mortgage shall be granted adequate protection for, and in equal amount to, the diminution in value of their valid, perfected, enforceable, continuing and non-avoidable prepetition security interests in the form of superpriority claims and replacement liens on all assets securing the DIP Facility (the "<u>Second Lien Adequate Protection Liens</u>"), which claims and replacement liens shall be junior in priority and subject in all respects to the DIP Liens, the Carve Out, the First Lien Adequate Protection Liens and the Prepetition First Liens. |
|---|---|
|  | (C) Any secured creditor of the Debtors with a valid, perfected, enforceable, continuing and non-avoidable prepetition third lien (a "<u>Prepetition Third Lien</u>") on or security interest in property of the Debtors pursuant to the Third Lien Mortgage shall be granted adequate protection for, and in equal amount to, the diminution in value of their valid, perfected, enforceable, continuing and non-avoidable prepetition security interests in the form of superpriority claims and replacement liens on all assets securing the DIP Facility (the "<u>Third Lien Adequate Protection Liens</u>"), which claims and replacement liens shall be junior in priority and subject in all respects to the DIP Liens, the Carve Out, the First Lien Adequate Protection Liens, the Prepetition First Liens, the Second Lien Adequate Protection Liens and the Prepetition Second Liens. |
|  | (D) Any other secured creditor of the Debtors (an "<u>Other Adequate Protection Party</u>") with a valid, perfected, enforceable, continuing and non-avoidable prepetition lien on or security interest in property of the Debtors shall be granted adequate protection for, and in equal amount to, the diminution in value of their valid, perfected, enforceable, continuing and non-avoidable prepetition security interests in the form of superpriority claims and replacement liens on all assets securing the DIP Facility (the "<u>Other Adequate Protection Liens</u>"; and together with the First Lien Adequate Protection Liens, the Second Lien Adequate Protection Liens and the Third Lien Adequate Protection Liens, the "<u>Adequate Protection Liens</u>"), which claims and replacement liens shall be junior in priority and subject in all respects to the DIP Liens, the Carve Out and the Adequate Protection Liens of any Prepetition Secured Parties that hold Prepetition Liens senior to the Prepetition Liens of such Other Adequate Protection Party. |
|  | (*See* DIP Term Sheet, pp. 13–14; Interim Order, ¶ 19) |
| **Carve Out** | As more fully set forth in the Interim Order and Final Order, the liens on and security interests in the DIP Collateral and the superpriority administrative expenses claims shall be subject to the payment of the "Carve Out". For purposes hereof, the "Carve Out" means: (i) all unpaid fees required to be paid (a) to the Clerk of the Court and (b) to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code in such amounts as determined in agreement with the United States Trustee or by final order of the Court, (ii) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code not to exceed $25,000, (iii) after the occurrence and during the continuance of a Trigger Event (as defined below), all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtors in an aggregate amount not exceeding $25,000 for the payment of the Debtors' professionals, which amount may be used subject to the terms of the DIP Term Sheet and the Interim Order, and (iv) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtors at any time when no Trigger Event is continuing, that remain unpaid subsequent to a Trigger Event, in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the Budget, to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (i), (ii), (iii) and (iv), to the extent allowed by the Court at any time; <u>provided</u>, <u>however</u>, that nothing herein shall be construed to impair the ability of any party |

| | |
|---|---|
| | to object to any of the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv) above.  For purposes of the foregoing, the term "Trigger Event" shall mean the delivery of a written notice (which may be delivered by email) by the DIP Agent to the Debtors through their counsel that an Event of Default has occurred.<br><br>(*See* DIP Term Sheet, p. 13; Interim Order, ¶ 15) |
| **Security** | Each Debtor grants to the DIP Agent, for the benefit of the Secured Parties, a security interest in and continuing lien on all of such Debtor's right, title and interest in, to and under all assets of such Debtor, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located (all of which being hereafter collectively referred to as the "DIP Collateral"): all assets and property of each Debtor and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all permits, contracts, general intangibles, instruments, equipment, accounts, and documents, all goods, inventory and fixtures, all documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, tradenames and other intellectual property, all equity interests, all books and records relating to the foregoing, all other personal and real property of the Debtors, and all other collateral pledged under the DIP Documents, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of Delaware (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)).  For the avoidance of doubt, the DIP Collateral shall not include Avoidance Actions (as defined below), but shall, upon entry of a Final Order, include the proceeds of Avoidance Actions.<br><br>"Avoidance Actions" shall mean actions for preferences, fraudulent conveyances, and other avoidance power claims under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code.<br><br>(*See* DIP Term Sheet, pp. 11–12; Interim Order, ¶ 12) |
| **Use of Proceeds** | All advances under the DIP Facility shall be used by the Debtors solely to (i) fund the Debtors' (x) post-petition operating expenses and general corporate and working capital requirements, and (y) the expenses of the Chapter 11 Cases, (ii) make any prepetition payments expressly permitted by the DIP Term Sheet, (iii) pay costs, expenses, interest and other obligations owing to the DIP Agent and the DIP Lenders under the DIP Facility and (iv) conduct and pursue a sale and liquidation process to be completed pursuant to section 363 of the Bankruptcy Code (the "Sale Process"), each of the above in accordance with and to the extent provided for in the two-month budget from time to time in effect as approved by the DIP Agent (the "Budget").  With the DIP Agent's written consent and without further order of the Court, the DIP Agent and the Debtors may agree to modify or amend the Budget.  Compliance with the Budget will be measured every week (commencing on the date that is two weeks after the Petition Date) on a trailing four-week basis (or, with respect to the first test date, on a trailing two-week basis and, with respect to the second test date, on a trailing three-week basis).<br><br>For the avoidance of doubt at any given time, (A) the Borrower may amend the Budget with the written consent of the DIP Agent; provided that the total amount of funding provided pursuant to the Budget shall not exceed the total amount of the DIP Facility authorized by the Interim Order or the Final Order, as applicable; and (B) the Debtors' actual cash disbursements may, on a line item basis and a cumulative basis, vary from the Budget by no more than 10% (or $5,000 if 10% of the budgeted amount would be less than |

|  | $5,000) (the "<u>Permitted Variance</u>").  As further set forth below (commencing on the date that is two weeks after the Petition Date), the Debtors shall provide the DIP Agent and the DIP Lenders with weekly and cumulative variance reporting on a line item basis, which reporting shall (1) detail the variance, if any, of actual cash disbursements and actual cash receipts from the Budget (on a weekly and cumulative basis), (2) provide an explanation of any per line item variance greater than the Permitted Variance, and (3) include a statement from an officer of the Borrower that to such person's actual knowledge after due inquiry an Event of Default has not occurred (the "<u>Variance Report</u>").  If the aggregate amount of any proceeds of the DIP Loans or any Cash Collateral actually used by the Debtors, measured once every week, is less than the aggregate amount of proceeds of the DIP Facility and Cash Collateral available for use by the Debtors in the Budget during such period, then the Debtors may carry over any such unused amount to the future periods in the Budget.<br><br>(*See* DIP Term Sheet, pp. 3–4; Interim Order, ¶ 8, 10) |
|---|---|
| **Affirmative Covenants** | The Debtors covenant and agree with the DIP Agent and the DIP Lenders that, unless the DIP Agent otherwise consents in writing, so long as any amount payable under the DIP Term Sheet is outstanding or the DIP Facility shall remain in place, it shall only use the advances made under the DIP Facility for the purposes set out in the DIP Term Sheet and identified in the Budget and shall not use such funds to commence any action against the DIP Agent, any DIP Lender or any of their respective Related Persons.  "Related Persons" means, with respect to any person, its affiliates, lenders, noteholders, investors and its and their respective shareholders, members, managers, officers, principals, directors, employees, participants, advisors, representatives, fiduciaries and agents.<br><br>As more fully set forth in the Interim Order and Final Order, the Debtors further covenant and agree that no DIP Obligation shall be subject to setoff or recoupment or any such rights under Bankruptcy Code section 553 or otherwise with respect to any claim the Debtors may have against the DIP Agent, any DIP Lender or any of their respective affiliates arising on or before the Petition Date.<br><br>The Debtors further covenant and agree that they shall:<br><br>1.    deliver to the DIP Agent and the DIP Lenders (i) certifications upon submission of each borrowing request with respect to compliance with the Budget and any other information reasonably requested by the DIP Agent or any DIP Lender, (ii) every week (commencing on the date that is two weeks after the Petition Date) and no later than the fourth (4th) business day of each such week (the "<u>Reporting Date</u>"), the Variance Report, (iii) as soon as possible and in any event within three (3) business days after an officer or director of any Debtor obtains actual knowledge of the occurrence of any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default (a "<u>Default</u>"), a statement of an officer or director of such Debtor setting forth details of such Default and the action which such Debtor has taken and proposes to take with respect thereto, and (iv) as soon as possible and in any event within three (3) business days after an officer or director of any Debtor obtains actual knowledge of the occurrence of any material adverse development with respect to any loss, damage, investigation, claim, litigation, action, proceeding or controversy involving the Debtors, notice thereof and as soon as practicable thereafter, to the extent the DIP Agent or any DIP Lender requests, copies of all documentation relating thereto;<br><br>2.    permit the DIP Agent and the DIP Lenders and their respective representatives and designees to visit and inspect the properties, books |

|  |  |
| --- | --- |
|  | and records of the Debtors upon reasonable notice at the Debtors' expense; |
|  | 3.    to the extent provided for in the Budget, pay all taxes, assessments, contributions and other governmental charges imposed upon any Debtor or any of its properties or assets as they become due and payable, to the extent payment and/or enforcement thereof is not stayed as a result of the Chapter 11 Cases; |
|  | 4.    to the extent provided for in the Budget, maintain insurance with respect to the business and properties of the Debtors against loss of the kind and in the amounts maintained by the Debtors as of the Petition Date; |
|  | 5.    comply in all material respects with the requirements of all applicable laws; |
|  | 6.    to the extent provided for in the Budget, promptly upon request execute and deliver such documents and do such other acts as the DIP Agent or any DIP Lender may reasonably request in connection with the DIP Facility, and in accordance with the DIP Documents (including but not limited to execution of any additional security documents that may be required by the DIP Agent to secure the DIP Liens); |
|  | 7.    maintain compliance with the Budget (subject to any Permitted Variance) and all other provisions of the DIP Term Sheet; |
|  | 8.    include the DIP Agent, the DIP Lenders and the TEC Prepetition Lenders (and their respective Related Persons) as released and exculpated parties in the release and exculpation provisions of any plan pursued by the Debtors in the Chapter 11 Cases; and |
|  | 9.    to the extent provided for in the Budget, perform all obligations of the Debtors under the DIP Facility, the DIP Documents and the Interim Order and the Final Order, as applicable. |
|  | To the extent any Debtor is not required to take any action pursuant to clause (c), (d), (f) or (i) above as a result of applicable limitations pursuant to the Budget, and failure to take such action could reasonably be expected to result in a Material Adverse Change or otherwise be adverse to the interests of the DIP Agent and DIP Lenders in their capacity as such, then the Borrower shall promptly notify the DIP Agent, who may (but shall not be obligated to), in its sole discretion, advance funds to be applied by the Debtors to take such actions as are designated by the DIP Agent (and any such advances shall constitute DIP Obligations).<br><br>(*See* DIP Term Sheet, pp. 16–18) |
| **Negative Covenants** | The Debtors covenant and agree that they shall not, and shall not cause or permit their subsidiaries to:<br><br>1.    except to the extent existing as of the closing date of the DIP Facility (the "Closing Date"), incur any indebtedness (other than the borrowings under the DIP Facility and obligations permitted to be incurred under the Budget, current accounts payable incurred in the ordinary course of business and any other indebtedness permitted to be incurred by the DIP Agent and the Court); |

|  | |
|---|---|
|  | 2.   except to the extent existing as of the Closing Date and other than the Carve Out expenses as permitted by the DIP Term Sheet and the Adequate Protection Liens as set forth in the proposed forms of DIP Orders attached as <u>Exhibits B and C</u> to the DIP Term Sheet, consent to the granting of adequate protection payments or liens, superpriority administrative expense claims or liens having priority that is senior to or <u>pari passu</u> with the liens and claims granted to and/or for the benefit of the DIP Agent and the DIP Lenders or otherwise incur any liens other than liens permitted in writing by the DIP Agent;<br><br>3.   except to the extent existing as of the Closing Date, make any investments in any person or make any loan to any person (other than as permitted in writing by the DIP Agent);<br><br>4.   engage in any business other than the businesses engaged in by the Debtors on the Closing Date except with the written consent of the DIP Agent;<br><br>5.   terminate or agree to any modification to any organizational documents of any Debtor except with the written consent of the DIP Agent;<br><br>6.   make any payment of prepetition claims or payment of post-petition items except in accordance with the Budget;<br><br>7.   to the fullest extent permitted by law, wind up, liquidate or dissolve its affairs or enter into any transaction of merger, consolidation or amalgamation, or convey, sell, lease or otherwise dispose of (or agree to do any of the foregoing at any future time) all or any part of its property or assets, or enter into any sale-leaseback transactions involving any of its property or assets, or purchase or otherwise acquire (in one or a series of related transactions) all or substantially all of the property or assets of any person or a majority of the equity interests of any person, except with the written consent of the DIP Agent; <u>provided</u>, <u>however</u>, the foregoing shall not restrict the Debtors' efforts in connection with the Sale Process or the Debtors' efforts to wind up their businesses following the conclusion of the Sale Process (subject to the repayment in full of the DIP Obligations (or other satisfaction thereof agreed to by the DIP Agent in its sole discretion) and the termination of the DIP Commitments of the DIP Lenders under the DIP Facility substantially concurrently with the closing of such Sale Process);<br><br>8.   enter into any new transaction or series of related transactions with any affiliate of a Debtor, other than (i) pursuant to an order entered by the Court, and (ii) with the written consent of the DIP Agent; or<br><br>9.   agree to, cause or permit any amendment, restatement, supplement or other modification to, or waiver of, the Sale Order or the Sale Procedures Order that could reasonably be expected to be adverse to the DIP Agent or any DIP Lender without in each case obtaining the prior written consent of the DIP Agent.<br><br>(*See* DIP Term Sheet, pp. 18–20) |
| **<u>Use of Cash Collateral</u>** | Set forth in the Interim Order.  (*See* Interim Order, ¶ 16) |

| | |
|---|---|
| **Material Terms, Including Duration** | Set forth in the Interim Order.  (*See* Interim Order, ¶ 16, 18) |
| **Initial Conditions Precedent to Funding** | Availability of the DIP Facility shall be subject to the following conditions precedent, all of which shall be for the benefit of the DIP Agent and the DIP Lenders and must be satisfied prior to the first drawdown under the DIP Facility, unless waived in writing (including by e-mail) in advance by the DIP Agent and the DIP Lenders:<br><br>1.    The Court shall have issued an Interim Order, in form and substance acceptable to the DIP Agent and its counsel, on or before the date that is 5 days after the Petition Date, in substantially the form annexed to the DIP Term Sheet as <u>Exhibit B</u> or such other form as may be agreed to by the DIP Agent, in relation to the Debtors which order, <u>inter alia</u>, shall authorize the DIP Facility on an interim basis, including, without limitation, the grant of, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable, and fully perfected security interests in and liens and mortgages (collectively, the "<u>DIP Liens</u>") upon all DIP Collateral, with the priority as set forth in the section entitled "Priority and Liens", to secure the DIP Obligations of the Debtors under the DIP Facility in accordance with the terms of the DIP Term Sheet, effective immediately upon the granting of the Interim Order, without the need for any further action on the part of the DIP Agent, any DIP Lender, the Debtors or any other person (including, without limitation, the execution or delivery of any further documents or agreements or the recording, filing, indexing, entering or registering of any financing statements or other similar instruments or documents).  The Interim Order shall be in full force and effect and shall not have been reversed, stayed, modified or amended without the express written consent of the DIP Agent, and no application or motion shall have been made to the Court for any stay, modification or amendment of the Interim Order and no stay, appeal or leave to appeal with respect to same shall be pending.<br><br>2.    All "first day orders" entered by the Court at the time of the commencement of the Chapter 11 Cases shall be reasonably satisfactory in form and substance to the DIP Agent.  Contemporaneous with the Petition Date, the Debtors shall have filed with the Court an application or motion (and notices if applicable) seeking approval of the Sale Procedures Order (as defined in <u>Exhibit D</u> to the DIP Term Sheet).<br><br>3.    The DIP Agent shall have received and approved the Budget.<br><br>4.    All representations and warranties of the Debtors set forth in the DIP Term Sheet shall be accurate in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of such date as if made on and as of such date, and after giving effect to the DIP Loans to be made on such date (except to the extent that such representations and warranties specifically relate solely to an earlier date thereto, in which case such representation and warranty shall be true and correct as of such earlier date).<br><br>5.    No event has occurred and is continuing that constitutes an Event of Default or would constitute an Event of Default, but for the requirement that notice be given or time elapse or both. |

|  | 6. | The DIP Agent shall have received at least three (3) business days' (or less with the consent of the DIP Agent) prior written notice of the initial DIP Loan to be incurred under the DIP Term Sheet; provided that any such notice shall be deemed to have been given on a certain day only if given before 11:00 A.M. (New York City time) (or later with the consent of the DIP Agent). Each written notice for a DIP Loan (each a "Notice of Borrowing") shall be irrevocable and shall be given by the Borrower in a form reasonably acceptable to the DIP Agent, specifying (i) the aggregate principal amount of the DIP Loans to be incurred pursuant to such borrowing, (ii) the date of such borrowing (which shall be a business day), and (iii) to which account the proceeds of such DIP Loans are to be deposited. Without in any way limiting the obligation of the Borrower to deliver a written Notice of Borrowing in accordance with the above, the DIP Agent and the DIP Lenders may act without liability upon the basis of telephonic notice of such borrowing, believed by the DIP Agent in good faith to be from the Borrower. The DIP Agent shall promptly notify each DIP Lender of any Notice of Borrowing that it receives and its pro rata share of the DIP Loans requested thereby. |
|  | 7. | Since the Petition Date, there shall have been no Material Adverse Change (as defined below), or any event or occurrence which could reasonably be expected to result in a Material Adverse Change. |
|  |  | (*See* DIP Term Sheet, pp. 6–8; Interim Order, ¶ 9, 12) |
| **Conditions Precedent to Additional Drawdown** |  | The obligation of the DIP Lenders to make any additional DIP Loans following the first drawdown under the DIP Facility shall be subject to the following conditions precedent, all of which shall be for the benefit of the DIP Agent and the DIP Lenders and must be satisfied on occasion of each drawdown under the DIP Facility, unless waived in writing (including by e-mail) in advance by the DIP Agent and the DIP Lenders: |
|  | 1. | If such drawdown request is made following the date that is 25 days after the Petition Date, the Court shall have entered a Final Order, in form and substance acceptable to the DIP Agent and its counsel on or before the date that is 25 days after the Petition Date, in substantially the form annexed to the DIP Term Sheet as Exhibit C or such other form as may be agreed to by the DIP Agent, in relation to the Debtors (the date on which the Final Order is entered, the "Final Order Entry Date"; the Final Order together with the Interim Order, the "DIP Orders") which order, inter alia, shall authorize the DIP Facility on a final basis, including, without limitation, the grant of, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable, and fully perfected DIP Liens upon all DIP Collateral with the priority as set forth in the section entitled "Priority and Liens", to secure the DIP Obligations of the Debtors under the DIP Facility in accordance with the terms of the DIP Term Sheet, effective as of the granting of the Interim Order, without the need for any further action on the part of the DIP Agent, any DIP Lender, the Debtors or any other person (including, without limitation, the execution or delivery of any further documents or agreements or the recording, filing, indexing, entering or registering of any financing statements or other similar instruments or documents). |
|  | 2. | The Interim Order or the Final Order, as applicable, shall be in full force and effect and shall not have been reversed, stayed, modified or amended without the express written consent of the DIP Agent, and no application or motion shall have been made to the Court for any stay, modification or amendment of the Interim Order or the Final Order, as applicable, and no |

stay, appeal or leave to appeal with respect to same shall be pending.

3.      All "second day orders" entered by the Court shall be reasonably satisfactory in form and substance to the DIP Agent.

4.      The Debtors shall be in compliance with the Budget, subject to Permitted Variances, and the proceeds of all DIP Loans previously borrowed shall have been applied in full in accordance with the Budget, subject to Permitted Variances (including to pay or fund an escrow account or a restricted account maintained by counsel for the Debtors budgeted amounts for professional fees and disbursements).

5.      All representations and warranties of the Debtors set forth in the DIP Term Sheet shall be accurate in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of such date as if made on and as of such date, and after giving effect to the DIP Loans to be made on such date (except to the extent that such representations and warranties specifically relate solely to an earlier date thereto, in which case such representation and warranty shall be true and correct as of such earlier date).

6.      No event has occurred and is continuing that constitutes an Event of Default or would constitute an Event of Default, but for the requirement that notice be given or time elapse or both.

7.      The DIP Agent shall have received a Notice of Borrowing at least three (3) business days' (or less with the consent of the DIP Agent) prior to the requested funding date for each DIP Loan to be incurred under the DIP Term Sheet; provided that any Notice of Borrowing shall be deemed to have been given on a certain day only if given before 11:00 A.M. (New York City time) (or later with the consent of the DIP Agent). Each Notice of Borrowing shall be subject to the provisions set forth in item 6 of the section entitled "Initial Conditions Precedent to Funding."

8.      Since the Petition Date, there shall have been no Material Adverse Change (as defined below), or any event or occurrence which could reasonably be expected to result in a Material Adverse Change.

As used herein "Material Adverse Change" means (a) a material adverse change in (i) the business, condition (financial or otherwise), operations, performance, properties, or liabilities of the Borrower and its subsidiaries taken as a whole (other than as a result of the events leading up to and following commencement of a proceeding under chapter 11 of the Bankruptcy Code and the Chapter 11 Cases and the continuation and prosecution thereof); provided that nothing disclosed (1) in the Borrower's Annual Report on Form 10-K for the year ended December 31, 2013, (2) in the Borrower's Quarterly Report on Form 10-Q for each quarter ended since June 30, 2014, as filed prior to the Petition Date, or (3) in any filings on Form 8-K made by the Company prior to the Petition Date (but in the case of each of clauses (1), (2) and (3), without regard to "risk factor" or other forward looking disclosure), shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein), be deemed to constitute a Material Adverse Change, (b) a material adverse effect on the ability of any Debtor to perform its obligations under the DIP Documents to which it is a party or of the DIP Agent's or any DIP Lender's ability to enforce the DIP Obligations or realize upon the DIP Collateral, (c) a material adverse effect on the DIP Collateral, taken as a whole, or the liens

| | |
|---|---|
| | on the DIP Collateral securing the DIP Obligations or the priority of such liens or (d) a material adverse effect on the rights of DIP Agent or the DIP Lenders under the DIP Documents; provided, however, that any adverse effect resulting from any circumstances, state of facts, event, change or effect caused by events, changes or developments relating to any of the following shall not be a Material Adverse Change: (i) changes in conditions in the U.S. or global economy generally or the U.S. or global capital, credit, or financial markets generally, including changes in commercial bank loan interest rates or currency exchange rates; (ii) changes in, or required by, applicable Law or general legal, Tax, regulatory or political conditions; (iii) changes required by GAAP; (iv) acts of war (whether or not declared), armed hostilities, sabotage or terrorism occurring after the date of the DIP Facility or the continuation, escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of the DIP Facility; (v) earthquakes, hurricanes, floods, or other natural disasters; (vi) changes generally affecting the alternative energy, oil or natural gas industries; (vii) any affirmative action knowingly taken by the DIP Agent, any DIP Lender or any of their respective Affiliates; and (viii) the announcement of a Sale Agreement entered into by the Debtors and the DIP Agent or one of its Affiliates; provided, however, that effects set forth in clauses (i), (ii), (iii), (iv) (v), and (vi) above may be taken into account in determining whether there has been or is a Material Adverse Change if such effects have a disproportionate impact on the Debtors, taken as a whole, relative to the other development stage companies focused on the development of low cost clean energy solutions through the deployment and operation of commercial facilities designed to cost-effectively convert lower value solid hydrocarbons such as coal, renewables or petcoke into higher value, ultra clean energy products.<br><br>(*See* DIP Term Sheet, pp. 8–11; Interim Order, ¶ 9) |
| **Releases** | The DIP Orders shall contain and approve the admissions, stipulations, and agreements of each Debtor, on behalf of and for itself, with regard to, among other things, the DIP Documents, the DIP Obligations, the DIP Liens, the TEC Prepetition Debt Documents and the TEC Prepetition Liens (each as defined in the DIP Orders in substantially the forms annexed as Exhibits B and C to the DIP Term Sheet).<br><br>Upon the entry of the Final Order and subject to the closing of the DIP Facility, in consideration of (i) each Secured Party's agreements under the DIP Term Sheet, including, as applicable, such Secured Party's several agreement to the making of post-petition loans, advances and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the DIP Term Sheet, the DIP Documents and the Interim Order, and (ii) the TEC Prepetition Lenders' respective agreements to make loans, advances, providing credit and other financial accommodations to the Debtors pursuant to the provisions of the TEC Prepetition Debt Documents and for the TEC Prepetition Liens to be primed by the DIP Liens, each Debtor, on behalf of and for itself (collectively, the "Releasors"), shall forever release, discharge and acquit the DIP Agent, the DIP Lenders, the TEC Prepetition Lenders and their respective Related Persons, predecessors-in-interest, successors and assigns (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have against Releasees as of the date of the DIP Term Sheet, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, in respect of events that occurred on or prior to the date of the DIP Term Sheet; provided that such release shall not, as to any Releasee, apply with respect to any claim, demand, liability, responsibility, dispute, remedy, cause of action, indebtedness or obligation that is determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the willful misconduct or gross negligence of such Releasee; provided, further, in no event shall any Releasee have any liability to any Releasor or any other person or entity for any |

|  | special damages, losses or expenses.  Notwithstanding anything to the contrary herein, the Debtors' releases do not extend to (a) any DIP Lender's obligation to make any DIP Loan subject to the terms and conditions of the DIP Term Sheet and of the DIP Orders, (b) the DIP Agent's or any DIP Lender's obligations to comply in all respects with the terms and conditions of the DIP Term Sheet and the DIP Orders that are required to be performed by such party (subject to any applicable limitations on such compliance set forth in the DIP Term Sheet or DIP Orders) or (c) compliance in all respects by Third Eye Capital Corporation and its successors and assigns with that certain Asset Purchase Agreement, dated as of March 17, 2015 (as amended or modified in accordance with its terms, the "TEC APA"), between the Borrower and Third Eye Capital Corporation (subject to any applicable limitations on such compliance set forth therein and subject to the entry of any applicable orders by the Court).<br><br>(*See* DIP Term Sheet, pp. 26–27; Interim Order, ¶ 25) |
|---|---|
| **Expenses and Indemnification** | None of the DIP Agent, the DIP Lenders or their respective Related Persons will have any liability for, and each of them will be indemnified and held harmless by the Debtors against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the DIP Term Sheet or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of the relevant indemnified person. Any payments required by the Debtors shall be satisfied in the manner described in the last sentence of the Section entitled "Expenses" set forth above.<br><br>(See DIP Term Sheet, p. 30; Interim Order, ¶ 24) |
| **Successors and Assigns** | The provisions of the DIP Term Sheet shall be binding upon and inure to the benefit of the parties thereto and their respective successors and assigns permitted thereby, except that (i) no Debtor may assign or otherwise transfer any of its rights or obligations under the DIP Term Sheet without the prior written consent of the DIP Agent and each DIP Lender and (ii) no DIP Lender may assign or otherwise transfer any of its rights or obligations thereunder without the consent of the DIP Agent (not to be unreasonably withheld or delayed).  Any permitted assignee of a DIP Lender shall, upon the effectiveness of such assignment, agree to by bound by the provisions of the DIP Documents applicable to it as a DIP Lender and to perform in accordance with their terms all of the obligations which by the terms of the DIP Documents are required to be performed by it as a DIP Lender.<br><br>(*See* DIP Term Sheet, p. 27; Interim Order, ¶ 35) |
| **Credit Bidding** | The DIP Agent and the TEC Prepetition Lenders shall each have the unqualified right to credit bid up to the full amount of the applicable outstanding DIP Obligations and the TEC Prepetition Indebtedness (as applicable), in each case including any accrued interest, in any sale of the DIP Collateral (or any part thereof) or the TEC Prepetition Collateral (or any part thereof), as applicable, without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.<br><br>(*See* Interim Order, ¶ 42) |
| **Events of Default** | The occurrence of any one or more of the following events (each such event and the expiry of the cure period, if any, provided in connection therewith, being herein referred to as an "Event of Default") shall constitute a default under the DIP Term Sheet:<br><br>1.     The failure by the Debtors to perform or comply with any term, condition, covenant, or obligation (including a payment obligation) contained in the DIP Term Sheet, the DIP Documents, the Interim Order or Final Order, on its part to be performed or complied with where any |

such failure to perform or comply shall not be remedied within three (3) business days after notice of default.

2.  The cessation of the DIP Facility to be in full force and effect or the DIP Facility being declared by the Court to be null and void or the validity or enforceability the DIP Facility or any DIP Documents (including but not limited to the Guaranty) being contested by the Debtors or the Debtors denying in writing that it has any further liability or obligation under the DIP Facility or the DIP Agent, for the benefit of the Secured Parties, ceasing to have the benefit of the liens granted by the Interim Order or Final Order.

3.  Except as permitted in the Interim Order or Final Order, the entry of any order of the Court granting to any third party a superpriority claim or lien pari passu with or senior to that granted to and/or for the benefit of the DIP Agent and the DIP Lenders under the DIP Term Sheet.

4.  The Debtors shall make any payment of principal or interest or otherwise on account of any indebtedness or payables other than the DIP Obligations under the DIP Facility or other than in accordance with the Budget approved by the DIP Agent.

5.  If, as of any Reporting Date, the Debtors cash disbursements, on a line item basis and a cumulative basis, from the period from the Petition Date through the end of any calendar month exceeds the Permitted Variances.

6.  The entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or any of the Debtors filing a motion or not opposing a motion seeking such relief.

7.  The entry of an order dismissing any of the Chapter 11 Cases, or any of the Debtors filing a motion or not opposing a motion seeking such relief, unless consented to by the DIP Agent.

8.  The entry of any order in any of the Chapter 11 Cases or any successor cases, which order constitutes the stay, modification, appeal, or reversal of the Interim Order or Final Order or which otherwise affects the effectiveness of the Interim Order or Final Order.

9.  The entry of an order in any of the Chapter 11 Cases appointing any examiner having expanded powers or a trustee to operate all or any part of any of the Debtors' business.

10. The entry of an order in any of the Chapter 11 Cases granting relief from the automatic stay so as to allow a third party or third parties to proceed against any property of the Debtors (including, without limitation, any DIP Collateral or any TEC Prepetition Collateral).

11. Any judgment or order as to post-petition liability or debt for the payment of money in excess of $500,000 shall be rendered against one or more of the Debtors individually or in the aggregate, and the enforcement thereof shall not have been stayed.

12. Any non-monetary, judgment, or order with respect to a post-petition event shall be rendered against the Debtors which does or could

reasonably be expected to result in a Material Adverse Change, and there shall be a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

13.  The Interim Order or Final Order being amended or modified without the consent of the DIP Agent.

14.  Any representation or warranty made by any Debtor in the DIP Term Sheet or in any other DIP Document shall prove to be untrue in any material respect on the date as of which made or deemed made.

15.  A Change of Control shall occur.  As used herein "Change of Control" shall mean (i) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934), other than Harry H. Graves or Lynne R. Graves, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "Option Right")), directly or indirectly, of 20% or more of the equity interests of the Borrower on a fully-diluted basis (and taking into account all such equity interests that such "person" or "group" has the right to acquire pursuant to any option right), (ii) the Borrower fails to own 100% of the equity interests of each Guarantor, and (iii) the consummation of any sale, lease, or transfer of all or substantially all of Borrower's or any Guarantor's assets to any person or group (as such term is used in Section 13(d)(3) of the Exchange Act) (unless the DIP Obligations are repaid in full and the DIP Commitments of the DIP Lenders under the DIP Facility are terminated substantially concurrently with the consummation of such transaction).

16.  The Debtors shall fail to achieve any milestone relating to the Sale Process within the applicable timing referred to in Exhibit D to the DIP Term Sheet.

17.  The Debtors challenge the application of any payments authorized by the Interim Order or the Final Order pursuant to section 506(b) of the Bankruptcy Code.

18.  The Debtors seek authority to grant liens on the DIP Collateral, or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are senior to, or pari passu with, the DIP Liens, the DIP Superpriority Claims (as defined in the Interim Order), or any other liens or claims granted to the DIP Agent, for itself and the benefit of the Secured Parties, unless the DIP Obligations are first repaid in full in cash and the DIP Facility is terminated.

19.  The Debtors seek authority to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than from the DIP Agent, or as may be otherwise expressly permitted under the DIP Documents, unless the Debtors use the proceeds of such post-petition loans or other financial accommodations to pay in full in cash all DIP Obligations.

| | |
|---|---|
| | To the extent any event described in item 1 or 14 above occurs as a result of any Debtor not taking an action due to the Budget not providing for the reasonably estimated costs and expenses of taking such action (any such event, a "Specified Event"), then the Borrower shall promptly notify the DIP Agent, who may (but shall not be obligated to), in its sole discretion, advance funds to be applied by the Debtors to take such actions as are designated by the DIP Agent (and any such advances shall constitute DIP Obligations). Notwithstanding anything to the contrary herein, to the extent the Debtors are in compliance with the Budget, subject to Permitted Variances, no Specified Event shall constitute an Event of Default.<br><br>(*See* DIP Term Sheet, pp. 20–23; Interim Order, ¶ 18) |
| **Remedies** | If any Event of Default occurs and is continuing, the DIP Agent may and, at the direction of the Majority Lenders, the DIP Agent shall take any or all of the following actions:<br><br>1.  declare the DIP Commitments of the DIP Lenders to make DIP Loans to be terminated, whereupon such DIP Commitments shall be terminated;<br><br>2.  declare the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under the DIP Facility, the DIP Term Sheet, the Interim Order or the Final Order to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors;<br><br>3.  declare interest on the DIP Obligations to accrue at the default rate set forth in the DIP Term Sheet, whereupon the interest on the DIP Obligations shall automatically accrue at the default rate;<br><br>4.  subject to the Default Notice Period, (i) enter upon any premises on or in which any of the DIP Collateral may be located and take possession of the DIP Collateral or complete processing, manufacturing and repair of all or any portion of the DIP Collateral, (ii) collect, foreclose, receive, appropriate, setoff and realize upon any and all DIP Collateral, (iii) remove any DIP Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose, (iv) exercise its unqualified right to credit bid up to the full amount of the outstanding DIP Obligations (including any accrued interest) in any sale of the DIP Collateral (or any part thereof), which credit bid may incorporate a credit bid of the TEC Prepetition Indebtedness (including any accrued interest), without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise and (v) take whatever other commercially reasonable action the DIP Agent or the Majority Lenders may deem necessary or desirable for the protection of the interests of the Secured Parties; and/or<br><br>5.  exercise all rights and remedies available to it (whether as a secured creditor or otherwise) under the DIP Facility, the DIP Term Sheet, the DIP Documents, the Interim Order, the Final Order or applicable law (including in respect of the DIP Collateral).<br><br>All rights, remedies and powers granted to any Secured Party under the DIP Documents or the Interim Order or Final Order, as applicable, are cumulative, not exclusive and |

| | |
|---|---|
| | enforceable, in such Secured Party's discretion, alternatively, successively, or concurrently. |
| | Each DIP Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Debtor or any other obligor under any of the DIP Documents or the Interim Order or Final Order, as applicable (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to the Guaranty or any DIP Collateral or any other property of any such Debtor, without the prior written consent of the DIP Agent.  The provisions of this paragraph are for the sole benefit of the DIP Lenders and the DIP Agent and shall not afford any right to, or constitute a defense available to, any Debtor. |
| | If an Event of Default shall have occurred, the DIP Agent shall have the power to waive any Event of Default under the DIP Term Sheet and all the DIP Lenders shall be bound by any such waiver upon such terms and conditions as the DIP Agent shall prescribe. |
| | (*See* DIP Term Sheet, pp. 23–25; Interim Order, ¶ 30) |
| **Section 506(c) Waiver** | Upon entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration which have been or may be incurred in the Cases or any Successor Case at any time shall be charged against or recovered from the DIP Collateral, the TEC Prepetition Collateral, against the DIP Agent, any DIP Lender or any TEC Prepetition Lender, or any of their respective claims, pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise. |
| | (*See* Interim Order, ¶ 21) |
| **Liens on Avoidance Actions** | The DIP Collateral shall not include Avoidance Actions (as defined below), but shall, upon entry of a Final Order, include the proceeds of Avoidance Actions.  "Avoidance Actions" shall mean actions for preferences, fraudulent conveyances, and other avoidance power claims under Sections 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code. |
| | (*See* DIP Term Sheet, pp. 11–12; Interim Order, ¶ 12) |

## BASIS FOR RELIEF REQUESTED

### *The Debtors' Urgent Need for Post-Petition Financing*

20.      As further described in the Vick Declaration, the Debtors require use of the Cash Collateral and proceeds from the DIP Financing to fund the costs of working capital obligations, operating expenses, and expenses relating to administration of the Chapter 11 Cases (including professional fees) in order to preserve and maintain the value of the Debtors' estates.  Given the encumbrances upon substantially all of the Debtors' assets and the lack of any additional borrowing base under the TEC Prepetition Agreements, the Debtors urgently need credit and additional capital to mitigate any negative effect of these Chapter 11 Cases and to maintain their

operations.  Absent new credit, the value of the Debtors' business will be severely and negatively impacted.

21.     Without immediate access to the DIP Financing, the Debtors expect to suffer an acute cash shortage that would immediately and irreparably harm their estates and creditors. Furthermore, the Debtors lack sufficient funds to meet expenses necessary for the continued operation of their business before the Final Hearing on this Motion can be held, and, therefore, it is essential that the Debtors obtain the proposed interim financing from the DIP Lenders.  In sum, the Debtors' ability to remain viable and preserve the value of their estates for the benefit of their creditors depends upon the interim and final relief requested in the Motion.  The Debtors' forecasted liquidity needs are set forth in detail in the Budget, a copy of which is attached as **Exhibit D** hereto.

## APPLICABLE AUTHORITY

22.     As described above, it is essential to the success of these cases that the Debtors immediately obtain access to sufficient post-petition financing, without which the Debtors will be unable to maintain their operations or fund these Chapter 11 Cases.  The Debtors' continuing viability, ability to maximize the value of their estates for the benefit of their creditors, and their ability to pursue the sale of their assets depends heavily upon the expeditious approval of the DIP Financing and the related actions requested herein.

23.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security.  If a debtor in possession cannot obtain post-petition credit on an unsecured basis, pursuant to section 364(c)

of the Bankruptcy Code,[11] a court may authorize a debtor in possession to obtain credit or incur debt, the repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.  Pursuant to section 364(d) of the Bankruptcy Code,[12] a court may authorize a debtor in possession to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is already subject to a lien.

24.    As a condition to entering into the DIP Financing and obtaining the Debtors' needed liquidity, the Debtors must obtain authorization, pursuant to sections 364(c) and (d) of the Bankruptcy Code, to grant (i) the DIP Agent automatically perfected security interests in and liens upon all of the DIP Collateral and (ii) the DIP Financing allowed superpriority administrative expense claim status in each of these Chapter 11 Cases and any successor cases.

**_Approval Under Section 364(c) of the Bankruptcy Code_**

25.    The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors in possession

---

[11]    Section 364(c) of the Bankruptcy Code provides as follows:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503 (b) or 507 (b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

[12]    Section 364(d) of the Bankruptcy Code provides as follows:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

are "unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense."  *See In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "although a debtor is not required to seek credit from every possible source, a debtor must show that it has made a reasonable effort to seek other sources of credit available under section 364(a) & (b)"); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

### *The Debtors Were Unable to Obtain Necessary Post-Petition Financing on an Unsecured Basis Under 11 U.S.C. § 364(a) or (b)*

26.     As set forth in the Vick Declaration and herein, and as the evidence at the hearings on this Motion will show, the Debtors could not have obtained a working capital facility of the type and size required in these cases on an unsecured basis.

27.     To show that the credit required could not be obtained on an unsecured basis, a debtor need only demonstrate "by good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code.  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.* at 1088; *see also Ames*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders).  Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it

would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

28.     Other than the proposed DIP Financing, there are no viable financing alternatives available to the Debtors under the circumstances.  Indeed, the Debtors are convinced that other than the proposed DIP Financing they would be entirely unable to obtain financing to address their urgent liquidity needs given, among other things, the nature and state of the Debtors' business operations, the immediacy of the Debtors' financing needs, and the liens of the TEC Prepetition Lenders on the TEC Prepetition Collateral.  Furthermore, as virtually all of the Debtors' assets are encumbered by liens and security interests granted to the TEC Prepetition Lenders, even if alternative debtor in possession financing was available on more favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the TEC Prepetition Lenders, the results of which could not be predicted with certainty.  Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, immediately jeopardizing their Chapter 11 Cases at the outset.  Furthermore, the Debtors do not have the financial resources to fund such a contested and protracted priming contest with the TEC Prepetition Lenders.  Based on the foregoing, the Debtors believe that they would not have been able to obtain debtor in possession financing on more favorable terms from other sources.

### ***Approval of Priming Liens***

29.     If the debtor in possession is unable to obtain credit under section 364(c) of the Bankruptcy Code, it may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien."  11 U.S.C. § 364(d).

Section 364(d) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by priming liens, provides that the court, after notice and hearing, may authorize the debtor in possession to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

> (A) the trustee is unable to obtain such credit otherwise; and

> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

30.     As discussed above, the Debtors have concluded that financing comparable to that provided by the DIP Lenders under the DIP Financing is currently unobtainable, if at all, without priming the TEC Prepetition Lenders' prepetition liens.  *See In re Utah 7000, L.L.C.*, 2008 WL 2654919, at *2 (Bankr. D. Utah July 3, 2008) (finding debtor unable to obtain financing without priming of prepetition liens); *In re Mosello*, 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996) (same); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630–31 (Bankr. S.D.N.Y. 1992) (same); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (same).

31.     Thus, given the circumstances, the Debtors are unable to obtain alternative post-petition financing through credit allowable on an unsecured basis and without granting priming liens.  The Debtors, in the exercise of their business judgment, have therefore determined that the financing provided by the DIP Financing is the most favorable under the circumstances and provides them the liquidity needed to maintain the value of their business.

***The DIP Financing Loans are Necessary to Preserve the Assets of the Debtors' Estates***

32.     It cannot reasonably be disputed that the Debtors have an immediate need for access to a working capital facility.  Indeed, as a consequence of the factors described herein and in the Vick Declaration, the Debtors have insufficient cash to maintain their operations and pay

the costs associated with the Chapter 11 Cases. To complete an orderly sale process and maximize the value of their assets for the benefit of their creditors and estates, the Debtors have an immediate need for the financing set forth in the Interim Order. The absence of the DIP Financing and the use of Cash Collateral would cause serious and irreparable harm to the Debtors and their estates and would render the orderly sale of the Debtors' business and assets impossible.

33.    Given the encumbrances upon substantially all of the Debtors' assets and the lack of any additional borrowing base under the TEC Prepetition Agreements, the Debtors urgently need credit and additional capital to mitigate any negative effect of these Chapter 11 Cases and to maintain their operations. Absent the availability of new credit, the going-concern value of the Debtors' business will be severely and negatively impacted. Therefore, the Debtors' need for access to the DIP Financing is immediate.

### Application of the Business Judgment Standard

34.    After appropriate and extensive investigations and analysis, and robust, good faith, and arm's length negotiations between the Debtors and the DIP Agent and DIP Lenders, the Debtors' management  and board of directors concluded that the proposed DIP Financing and the use of Cash Collateral is the best alternative available in the circumstances of these Chapter 11 Cases. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility, and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on behalf of TWA . . . [and were] reasonable under the circumstances and [were] in the best interest of TWA and its creditors"); *In re TM Carlton House Partners, LTD*, 91 B.R. 349, 357 (Bankr. E.D. Pa. 1988) (holding that due

to the debtor's distinct awareness of its own financial needs, the court would not second-guess its business judgment to put aside cash to effectuate a refinancing of its debts); *cf. Grp. of Institutional Investors v. Chi., Milwaukee, St. Paul & Pac. R.R.*, 318 U.S. 523, 550 (1943) (holding that the decision to reject or assume a lease is left to the business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus. Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code").  In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

35.     The DIP Financing proposed by the Debtors reflects the most favorable terms on which the DIP Lenders were willing to offer financing.  The Debtors believe that the proceeds from the DIP Facility will allow them to continue their operations in the ordinary course, fund restructuring costs, and otherwise meet their liquidity needs during the course of the Chapter 11 Cases.  The Debtors believe that the terms of the DIP Financing are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. Accordingly, the Debtors should be granted authority to enter into the DIP Financing and obtain funds from the DIP Lenders on the secured, administrative "superpriority" basis described above, pursuant to sections 364(c) and (d) of the Bankruptcy Code.

## REQUEST FOR USE OF CASH COLLATERAL

36.     The Debtors will require the ability to use cash and proceeds to maintain their operations and preserve the value of their estates.  These essential items, however, constitute part of the TEC Prepetition Lenders' collateral and, therefore, may not be used to support the Debtors' ongoing business activities absent compliance with section 363(c)(2) of the Bankruptcy Code.

37.     Section 363(c)(2) of the Bankruptcy Code provides:

> (2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>
> > (A) each entity that has an interest in such cash collateral consents; or
> >
> > (B) the court, after notice and a hearing, authorized such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

38.     In the instant cases, the TEC Prepetition Lenders have consented to the Debtors' use of Cash Collateral.  Because such use is essential to the preservation of the Debtors' estates and the TEC Prepetition Lenders have consented, the Court should approve the Debtors' use of Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

39.     As set forth on the Budget, the Debtors intend to use a portion of the DIP Financing to compensate Dr. Steven C. Vick, the Debtors' CEO, and Mr. Dwight N. Lockwood, a Senior Advisor to the Debtors, for their **post-petition** services rendered to the Debtors.  Dr.

Vick and Mr. Lockwood are the Debtors' only employees,[13] and the Debtors believe that payments for their post-petition work should be considered ordinary course transactions.

40.     Out of an abundance of caution, however, the Debtors request that the Court approve their post-petition payments to Dr. Vick and Mr. Lockwood (subject to the Budget) due to the Debtors' history of irregular payment of employee-related expenses.  As Dr. Vick and Mr. Lockwood are the Debtors' only employees, their continued and uninterrupted service is essential to the Debtors' ongoing operations.  Moreover, Dr. Vick and Mr. Lockwood are well situated to assist the Debtors' with these cases and are essential to the Debtors' proposed sale process.  Dr. Vick earned a PhD in inorganic chemistry from the Massachusetts Institute of Technology, has extensive work experience in engineering, technology development, and gasification facility operations, and has served as the Debtors' CEO since June 2010.  Mr. Lockwood likewise has considerable relevant educational and work experience, having earned an MSME, with a minor in chemical engineering, from Oregon State University, and held a number of positions with Standard Oil of Ohio (now part of British Petroleum Plc) and other gasification companies.  He is currently a Senior Advisor to the Debtors.  Compensating Dr. Vick and Mr. Lockwood for their post-petition service is undoubtedly an exercise of the Debtors' sound business judgment and should be approved to the extent necessary.

## APPROVAL OF ADEQUATE PROTECTION

41.     The Debtors propose to provide the TEC Prepetition Lenders and the Other Adequate Protection Parties with adequate protection in accordance with sections 361, 363, and 364 of the Bankruptcy Code.  To that end, the Debtors and the TEC Prepetition Lenders have

---

[13]     The Debtors have retained an interim chief financial officer and will seek approval of his retention by separate motion.  The Debtors also employ a director of finance and a vice president, but they are currently not receiving any salary or wages.

negotiated, and the Debtors request the Court approve, as of the Petition Date, certain adequate protection for the TEC Prepetition Lenders and the Other Adequate Protection Parties. The precise terms of this adequate protection are discussed more fully above and in the proposed Interim Order, the Proposed Final Order, and the DIP Term Sheet. The Debtors believe that the proposed adequate protection is fair and reasonable.

42.    Accordingly, based on the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide certain adequate protection in accordance with the terms set forth in the Interim Order, the Final Order, and the DIP Term Sheet.

## THE DEBTORS SHOULD BE PERMITTED TO MAKE INTERIM BORROWINGS UNDER THE DIP FINANCING

43.    This Court is empowered to conduct a preliminary, expedited hearing on the Motion and authorize the Interim Order. Specifically, Bankruptcy Rule 4001(c) governs the procedures for securing authorization to obtain debtor in possession financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c).

44.    Pending the Final Hearing, the Debtors require $408,145 under the DIP Facility for, *inter alia*, working capital needs as set forth in the Budget. It is essential that the Debtors immediately stabilize their operations to preserve the value of the Debtors' estates for the benefit of all of the Debtors' creditors and equity holders.

45.     Absent immediate financing, the Debtors will be unable to maintain their operations pending the Final Hearing.  Consequently, if interim relief is not granted, the Debtors, their estates, and their creditors will suffer immediate and irreparable harm.

46.     Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 14-day period following the filing of a motion requesting authorization to obtain post-petition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(c)(2).  The Debtors' acute need for post-petition liquidity provides ample evidence to support the conclusion that the Debtors will avoid immediate and irreparable harm only if the Court authorizes the relief provided for in the proposed Interim Order.

47.     Accordingly, the Debtors request that, pending the Final Hearing, the Court schedule the Interim Hearing on the Petition Date or as soon thereafter as is practical to consider the Debtors' request for authorization to obtain interim financing under the DIP Financing up to a maximum in the aggregate principal amount of $408,145 to sustain operations and comply with terms and conditions of the DIP Financing.

**GOOD FAITH**

48.     Section 364(e) of the Bankruptcy Code, which protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal, was designed to "encourage lenders to extend credit to debtors by eliminating the risk that any lien securing the loan will be modified on appeal."  *Keltic Fin. Partners, LP v. Foreside Mgmt. Co. (In re Foreside Mgmt. Co.)*, 402 B.R. 446, 451 (B.A.P. 1st Cir. 2009) (citing *Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.)*, 963 F.2d 1490, 1493 (11th Cir. 1992)); s*ee also White Rose Food v. Gen. Trading Co. (In re Clinton St. Food Corp.)*, 170 B.R. 216, 220

(S.D.N.Y. 1994) (section 364(e) "overcome[s] parties' reluctance to lend to a bankrupt firm");

*Fleet Nat'l Bank v. Doorcrafters (In re N. Atl. Millwork Corp.)*, 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of Section 364(e) is to allow good-faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankruptcy entities.").

49.     The Debtors believe that the terms and conditions of the DIP Financing are fair and reasonable and are the best possible terms on which the Debtors could obtain post-petition financing.  Further, the terms and conditions of the DIP Financing were negotiated in good faith and at arm's length with all parties represented by experienced counsel.  Accordingly, the DIP Agent, the DIP Lenders, the TEC Prepetition Lenders, and the Adequate Protection Parties should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Financing are later modified, vacated, stayed, or terminated by subsequent order of this or any other court, the DIP Agent, the DIP Lenders, the TEC Prepetition Lenders, and the Adequate Protection Parties will be fully protected with respect to any amounts previously disbursed.

<u>**REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY**</u>

50.     The proposed Interim Order contemplates a modification of the automatic stay established by section 362 of the Bankruptcy Code, to the extent necessary to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to (i) permit the Debtors to grant the adequate protection set forth therein; (ii) permit the Debtors to perform such acts as the DIP Agent may request in its sole discretion to assure the perfection and priority of the liens granted therein; and (iii) permit the Debtors to incur all liabilities and obligations to the DIP Lenders under the DIP Financing.

51.     Stay modification provisions of this type are customary features of post-petition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the proposed Interim Order.

## REQUEST TO WAIVE BANKRUPTCY RULES 6003(b), 6004(a), AND 6004(h)

52.     To successfully implement the foregoing, the Debtors respectfully request that the Court waive the notice requirements provided for by Bankruptcy Rule 6004(a), the 21-day stay provided for by Bankruptcy Rule 6003(b), and the 14-day stay provided for by Bankruptcy Rule 6004(h).  The Debtors believe, for the reasons set forth above, that ample justification exists for the Court to waive Bankruptcy Rules 6003(b), 6004(a), and 6004(h).

## REQUEST FOR FINAL HEARING

53.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is no later than 25 days from the Petition Date.

## NOTICE

54.     Notice of the interim hearing on this Motion has been given to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the entities listed on the Consolidated List of Creditors Holding the Twenty Largest Unsecured Claims; (iii) the Securities and Exchange Commission; (iv) counsel to the DIP Agent; and (v) counsel to the TEC Prepetition Lenders.  As this Motion is seeking first day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  The Debtors respectfully submit that no further notice of the interim hearing on this Motion is required.

## NO PRIOR REQUEST

55.     No prior request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order substantially in the form of the Interim Order annexed hereto as **Exhibit A**; (ii) schedule the Final Hearing, (iii) after the Final Hearing, enter a Final Order substantially in the form annexed hereto as **Exhibit B**; and (iv) grant such other and further relief as is just and proper.

Dated:    March 17, 2015                                    Respectfully submitted,
          Wilmington, Delaware

                                                           MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                                                           */s/ Andrew R. Remming*
                                                           Robert J. Dehney (No. 3578)
                                                           Andrew R. Remming (No. 5120)
                                                           Matthew R. Koch (No. 6048)
                                                           1201 N. Market St., 16th Flr.
                                                           PO Box 1347
                                                           Wilmington, DE  19899-1347
                                                           Telephone:    302-658-9200
                                                           Facsimile:    302-658-3989
                                                           rdehney@mnat.com
                                                           aremming@mnat.com
                                                           mkoch@mnat.com

                                                           *Proposed Counsel for Debtors*
                                                           *and Debtors in Possession*

8950329