**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------- x
    : Chapter 11
In re    :
    : Case No. 15-10599 (MFW)
USA SYNTHETIC FUEL    : (Jointly Administered)
CORPORATION, *et al.*[1]    :
    :
    Debtors.    :
    x
-------------------------------------------------------

**DECLARATION OF JEFFREY D. HENDERSON IN SUPPORT OF DEBTORS'
MOTION FOR AN ORDER AUTHORIZING AND APPROVING (A) THE SALE OF
CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS; (B) THE ASSET PURCHASE AGREEMENT
AND ANCILLARY AGREEMENTS; (C) THE ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
AND (D) RELATED RELIEF**

I, Jeffrey D. Henderson, being duly sworn, deposes and hereby declare as follows:

1.  I am over the age of eighteen and have personal knowledge of the facts in this matter, and, if called upon to testify, I could and would do so.

2.  I am a Senior Vice President at Asgaard Capital, a financial advisory and investment banking firm with offices at 1934 Old Gallows Road, Suite 350, Vienna, Virginia 22182. Except as otherwise noted, I have personal knowledge or have relied upon the knowledge of others employed by Asgaard Capital with respect to the matters set forth herein.

**Asgaard Capital's Qualifications**

3.  Asgaard Capital is a financial advisory and investment banking firm with a dedicated financial restructuring practice specializing in providing restructuring and advisory

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): USA Synthetic Fuel Corporation, a Delaware corporation (5258); Lima Energy Company (5661); and Cleantech Corporation (6023). The Debtors' address is 312 Walnut Street, Suite 1600, Cincinnati, Ohio 45202.

services.  Asgaard Capital provides a full range of advisory services to clients involved in mergers and acquisitions, restructurings, and other complex situations requiring sophisticated financial expertise.  Asgaard Capital professionals' previous representations include acting as financial advisors to the chapter 11 debtors in the cases of *In re Global Computer Enters., Inc.* (Bankr. E.D. Va., Case No. 14-13290), *In re Jillians Entertainment Holdings, Inc.* (Bankr. W.D. Ky., Case No. 04-33192), *In re Robotic Vision Sys. Inc.* (Bankr. D.N.H., Case No. 04-14151), *In re Am. Paper Grp. Inc.* (Bankr. N.D. Ohio, Case No. 02-45101), and *In re Nucentrix Broadband Networks, Inc.* (Bankr. N.D. Tex., Case No. 03-39123) with regard to 363 asset sales; acting as financial advisor and investment banker to the debtors in the successful chapter 11 reorganizations of *In re Acadia Invs. L.C.* (Bankr. E.D. Va., Case No. 11-12591) and *In re Hancock Fabrics, Inc.* (Bankr. D. Del., Case No. 07-10353), and acting as financial advisors to the Official Committee of Unsecured Creditors in *In re Appleseed's Intermediate Holdings LLC* (Bankr. D. Del., Case No. 11-10160), and *In re Velti, Inc.* (Bankr. D. Del., Case No. 13-12878), as well as the Official Committee of Equity Holders in *In re Riverstone Networks SPC, Inc.* (Bankr. D. Del., Case No. 06-10133).

4.    Asgaard Capital is also familiar with the Debtors and their businesses, having provided financial advisory and investment banking services to the Debtors for the past four months.

### The Debtors' Engagement of Asgaard Capital

5.    Pre-petition, Asgaard Capital was engaged by the Debtors pursuant to an engagement letter dated January 14, 2015 (the "Engagement Letter") to act as investment banker to the Debtors regarding a sale of all or substantially all of the Debtors' assets.  The Debtors and Asgaard Capital also entered into an Amendment to the Engagement Letter dated February 24,

2015 (the "Amendment," the Engagement Letter together with the Amendment being hereinafter referred to as the "Engagement Letter, as Amended").  From January 14, 2015 through the Petition Date, Asgaard Capital engaged in extensive due diligence and worked with the board of directors and management of the Debtors to educate itself regarding the Debtors' businesses, financials, and complex technology.  Also during this same time period, Asgaard Capital created marketing materials necessary to effectuate a sale of the Debtors' assets, including a "teaser" summary and confidential information memorandum for use with prospective and interested investors, and compiled a list of 280 potential acquirers specially tailored to the Debtors' businesses and assets (including 45 firms previously contacted by the Debtors in a July 2014 financing process).

6. On March 27, 2015, the Debtors filed the *Application For Order Authorizing The Retention Of Asgaard Capital LLC As Investment Banker To The Debtors, Nunc Pro Tunc To The Petition Date* [Docket No. 42] (the "Retention Application"), pursuant to which the Debtors sought court approval to retain Asgaard Capital to, among other things:

(a) Communicate with Dr. Steven C. Vick (President and Chief Executive Officer of the Debtors) and such other parties as the Debtors may suggest, to familiarize Asgaard Capital, to the extent appropriate and feasible, with the business, operations, financial condition, and prospects of the Debtors and, more particularly, the Debtors' Ultra Clean Btu Converter project in Lima, Ohio; and

(b) Work with the Debtors and their counsel to:

(i) develop a list of potential strategic and financial investors or purchasers;

(ii) help with identifying and negotiating DIP financing or use of cash collateral;

(iii) assist the Debtors and their counsel in stalking horse bid negotiations with Third Eye Capital (with its successors and assigns, the "Senior Lender");

(iv) work with the Debtors' counsel to develop and implement bid procedures to be used in the sale and auction process;

(v) drawing upon previously prepared marketing materials and the Debtors' information, prepare either an expanded teaser or short offering memorandum and related teaser for distribution and presentation to prospective investors or purchasers;

(vi) organize an online diligence room and make suggestions as to items to be included, to the extent such items are readily available or can be produced easily by the Debtors;

(vii) solicit interest among prospective investors or purchasers;

(viii) assist the Debtors in evaluating proposals received from prospective investors or purchasers;

(ix) if qualified bids are received, conduct the bankruptcy auction process;

(x) provide advice and, ultimately, testimony at the sale hearing, regarding the comparable benefits and drawbacks of different proposals and why a winning bid was selected;

(xi) assist in consummating any Transaction;

(xii) advise and/or participate in telephonic meetings of the Debtors' Board of Directors, Official Committee of Unsecured Creditors, and other official constituencies to discuss the sale process;

(xiii) help format and review the Debtors' Statement of Financial Affairs, other bankruptcy schedules and Monthly Operating Reports (however, it will be the Debtors' sole responsibility to generate the underlying accounting and financial data and other information required to produce such items at their own separate expense); and

(xiv) assist the Debtors and their counsel in the preparation and confirmation of a restructuring plan (a "Plan"), which may be a plan under chapter 11 the Bankruptcy Code; however, Asgaard Capital will not be required to provide any hard asset appraisal/liquidation or other valuation services related to the Debtors' remaining assets not sold or otherwise transferred to the Senior Lender, all of which will be provided by other specialist firms if required.

7. The Court entered the *Order Authorizing The Retention Of Asgaard Capital LLC As Investment Banker To The Debtors, Nunc Pro Tunc To The Petition Date* [Docket No. 81] on April 15, 2015.

**The Sale Motion and Marketing Process**

8. On March 17, 2015, the Debtors filed the *Debtors' Motion For An Order (I) Approving Procedures In Connection With The Sale Of Certain Of The Debtors' Assets Free And Clear Of Liens, Claims, Encumbrances, And Interests, (II) Authorizing The Debtors To Enter Into An Asset Purchase Agreement In Connection Therewith, (III) Authorizing The Payment Of Stalking Horse Protections, (IV) Setting Bid Deadline, Auction (If Needed) And Sale Approval Hearing Dates, (V) Establishing Notice Procedures And Approving Forms Of Notice, And (VI) Approving Procedures Related To Assumption And Assignment Of Executory Contracts And Unexpired Leases* [Docket No. 6] (the "Sale Motion") [2], pursuant to which the Debtors sought approval of, among other things, procedures for the solicitation of offers for the Debtors' assets higher and better than that contained in the Stalking Horse Agreement (the "Bidding Procedures") and an auction process (an "Auction").

9. The Stalking Horse Agreement ultimately provides for the sale of the Bid Assets to the Stalking Horse Bidder for a Purchase Price of: (a) $15 million less any amounts required to be withheld under applicable Law (including Section 897 or 1445 of the Internal Revenue Code of 1986), plus (b) the assumption of Assumed Liabilities, including payment of all Cure Amounts in accordance with the terms of the Sale Order.[3] Buyer shall surrender and release a portion of the DIP Loan, a portion of the Note Obligations, a portion of the Break Up Fee and a portion of the Expense Reimbursement and credit the Sellers with the satisfaction of the same, in the amount of $15 million (the "Credit Bid Amount") in order to satisfy payment of the Purchase Price to be paid at Closing.

---

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Sale Motion.

[3] This summary is qualified in its entirety by the provisions of the Stalking Horse Agreement. In the event of any inconsistency between the terms of the Stalking Horse Agreement and the terms herein, the terms of the Stalking Horse Agreement shall govern and control.

10. The Court entered an order approving the Bidding Procedures set forth in the Sale Motion on April 16, 2015 [Docket No. 91] (the "Sale Order").

11. Beginning March 20, 2015, Asgaard Capital contacted 280 parties, 45 of which had been previously been contacted by the Debtors in a July 2014 financing process. Each one of these prospective buyers received a "teaser" package via email as well as at least one follow-up phone call and/or e-mail. Of these 280 parties, a total of 10 received a confidentiality agreement, 3 of which agreed to execute a confidentiality agreement and received the confidential information memorandum. During this same time period, Asgaard Capital responded to numerous inquiries and provided information to several additional parties, including Ernest Jacquet, a former board member of USASF and USASF's current director of finance, to whom Asgaard Capital sent a proposed confidentiality agreement. Mr. Jacquet never executed the proposed confidentiality agreement, thus Asgaard Capital did not send the confidential information memorandum to Mr. Jacquet. In addition, the Debtors learned that James Treptow, a former board member of USASF, had expressed an interest in the Debtors' assets and, therefore, Asgaard Capital sent Mr. Treptow a proposed confidentiality agreement. Mr. Treptow never executed the proposed confidentiality agreement, thus Asgaard Capital did not send the confidential information memorandum to Mr. Treptow.

12. During the sale process, Asgaard Capital was in communication with the Debtors' management and other advisors on a daily basis to review and evaluate the marketing and sale process and make decisions on behalf of the Debtors with respect thereto.

13. Ultimately, the Debtors received no competing bids for the Bid Assets.

14. Based on my experience, I believe that the sale process – as conducted by Asgaard Capital and overseen by the Debtors' management – was fair and reasonably designed to solicit the highest and best offers available under the present circumstances. I further believe that the sale

process has had the intended effect of maximizing the current value of the Bid Assets for the benefit of all of the Debtors' stakeholders. Under the circumstances, I do not believe that any further sale or marketing process would generate additional interest in the Bid Assets and I, therefore, believe that the sale terms proposed in the Stalking Horse Agreement represent the highest and best possible return to the estates on account of the Bid Assets.

15. I further believe that a sale of the Bid Assets in accordance with the terms of the Stalking Horse Agreement must occur in order to maximize the value of the Debtors' estates.

16. All facts set forth in the Declaration are based on my personal knowledge, upon information supplied to me by the Debtors, the Debtors' professionals, or upon my opinion based on my experience and knowledge with respect to the Debtors' operations, financial condition, and related business issues.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

Dated: May 29, 2015.

_____
Jeffrey D. Henderson
Senior Vice President
Asgaard Capital LLC